MYERS, ADMINISTRATRIX, *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 2. Argued December 5, 1923; reargued April 13, 14, 1925.— Decided October 25, 1926.

1. A postmaster who was removed from office petitioned the President and the Senate committee on Post Offices for a hearing on any charges filed; protested to the Post Office Department; and

three months before his four year term expired, having pursued no other occupation and derived no compensation for other service in the interval, began suit in the Court of Claims for salary since removal. No notice of the removal, nor any nomination of a successor had been sent in the meantime to the Senate whereby his case could have been brought before that body; and the commencement of suit was within a month after the ending of its last session preceding the expiration of the four years. *Held* that the plaintiff was not guilty of laches. P. 107.

2. Section 6 of the Act of July 12, 1876, providing that " Postmasters of the first, second and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate and shall hold their offices for four years unless sooner removed or suspended according to law," is unconstitutional in its attempt to make the President's power of removal dependent upon consent of the Senate. Pp. 107, 176.

3. The President is empowered by the Constitution to remove any executive officer appointed by him by and with the advice and consent of the Senate, and this power is not subject in its exercise to the assent of the Senate nor can it be made so by an act of Congress. Pp. 119, 125.

4. The provision of Art. II, § 1, of the Constitution that . " the Executive power shall be vested in a President," is a grant of the power and not merely a naming of a department of the government. Pp. 151, 163.

5. The provisions of Art. II, § 2, which blend action by the legislative branch, or by part of it, in the work of the Executive, are limitations upon this general grant of the Executive power which are to be strictly construed and not to be extended by implication. P. 164.

6. It is a canon of interpretation that real effect should be given to all the words of the Constitution. P. 151.

7. Removal of executive officials from office is an executive function; the power to remove, like the power to appoint, is part of " the Executive power,"—a conclusion which is confirmed by the obligation " to take care that the laws be faithfully executed." Pp. 161, 164.

8. The power of removal is an incident of the power to appoint; but such incident does not extend the Senate's power of checking appointments, to removals. Pp. 119, 121, 126, 161.

9. The excepting clause in § 2 of Art. II, providing, " but Congress may by law vest the appointment of such inferior officers

as they may think proper in the President alone, in the courts of law or in the heads of departments," does not enable Congress to regulate the removal of inferior officers appointed by the President by and with the advice and consent of the Senate. Pp. 158–161.

10. A contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of the Constitution were actively participating in public affairs, acquiesced in for many years, fixes the meaning of the provisions so construed.   P. 175.

11. Upon an historical examination of the subject, the Court finds that the action of the First Congress, in 1789, touching the Bill to establish a Department of Foreign Affairs, was a clean-cut and deliberate construction of the Constitution as vesting in the President alone the power to remove officers, inferior as well as superior, appointed by him with the consent of the Senate; that this construction was acquiesced in by all branches of the Government for 73 years; and that subsequent attempts of Congress, through the Tenure of Office Act of March 2, 1867, and other acts of that period, to reverse the construction of 1789 by subjecting the President's power to remove executive officers appointed by him and confirmed by the Senate, to the control of the Senate, or lodge such power elsewhere in the Government, were not acquiesced in, but their validity was denied by the Executive whenever any real issue over it arose.   Pp. 111, 164–176.

12. The weight of congressional legislation as supporting a particular construction of the Constitution by acquiescence, depends not only upon the nature of the question, but also upon the attitude of the executive and judicial branches of the government and the number of instances in the execution of the law in which opportunity for objection in the courts or elsewhere has been afforded.   P. 170.

13. The provisions of the Act of May 15, 1820, for removal of the officers therein named " at pleasure," were not based on the assumption that without them the President would not have that power, but were inserted in acquiescence to the legislative decision of 1789.   P. 146.

14. Approval by the President of acts of Congress containing provisions purporting to restrict the President's constitutional power of removing officers, *held* not proof of Executive acquiescence in such curtailment, where the approval was explicable by the value of the legislation in other respects—as where the restriction was in a rider imposed on an appropriation act.   P. 170.

15. *Marbury* v. *Madison,* 1 Cranch 137, considered, in connection with *Parsons* v. *United States,* 167 U. S. 324, and *held* not authoritative on the question of removal power here involved. Pp. 139–144, 158.

---

The questions, (1) Whether a judge appointed by the President with the consent of the Senate under an act of Congress, not under authority of Art. III of the Constitution, can.be removed by the President alone without the consent of the Senate; (2), whether the legislative decision of 1789 covers such a case; and (3), whether Congress may provide for his removal in some other way, present considerations different from those which apply in the removal of executive officers, and are not herein decided. Pp. 154–158.

This Court has recognized (*United States* v. *Perkins,* 116 U. S. 483) that Congress may prescribe incidental regulations controlling and restricting the heads of departments in the exercise of the power of removal; but it has never held, and could not reasonably hold, that the excepting clause enables Congress to draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power. To do this would be to go beyond the words and implications of that clause and to infringe the constitutional principle of the separation of governmental powers. P. 161.

Assuming the power of Congress to regulate removals as incidental to the exercise of its constitutional power to vest appointments of inferior officers in the heads of departments, certainly so long as Congress does not exercise that power, the power of removal must remain where the Constitution places it,—with the President, as part of the executive power, in accordance with the legislative decision of 1789. P. 161.

Whether the action of Congress in removing the necessity for the advice and consent of the Senate, and putting the power of appointment in the President alone, would make his power of removal in such case any more subject to Congressional legislation than before, is a question not heretofore decided by this Court and not presented or decided in this case. P. 161.

Congress is only given power to provide for appointments and removals of inferior officers after it has vested, and on condition that it does vest, their appointment in other authority than the President with the Senate's consent. P. 164.

58 Ct. Cls. 199, affirmed.

APPEAL from a judgment of the Court of Claims reject-
ing a claim for salary. Appellant's intestate, Frank S.
Myers, was reappointed by the President, by and with
the advice and consent of the Senate, as a postmaster of
the first class. The Act of July, 1876, § 6, c. 179, 19 Stat.
80, provides that such postmasters shall hold office for
four years, unless sooner removed or suspended according
to law, and provides that they may be removed by the
President "by and with the advice and consent of the
Senate." Myers was removed, before the expiration of
his term, by an order of the Postmaster General, sanc-
tioned by the President. The removal was not referred
to the Senate, either directly or through nomination of a
successor, during the four year period. Judgment of the
Court below that Myers could not claim salary for the
part of that period following the removal, was based on
the view that there had been laches in asserting the claim.
The appeal was argued and submitted by counsel for
the appellant, on December 5, 1924. On January 5, 1925,
the Court restored the case for reargument. It invited
the Honorable George Wharton Pepper, United States
Senator from Pennsylvania, to participate as *amicus
curiae*. The reargument occurred on April 13, 14, 1925.

In view of the great importance of the matter, the
Reporter has deemed it advisable to print, in part, the
oral arguments, in addition to summaries of the briefs.

Oral [1] argument of *Mr. Will R. King*, for appellant.

---

[1] NOTE.—This and the other oral arguments are perforce con-
densed in these reproductions, retaining, however, so far as practi-
cable, the phraseology, as well as the substance. Senate Document
No. 174 (69th Cong., 2d sess.), issued December 13, 1926 (Govt.
Printing Office) contains not only the oral arguments as taken down
by a stenographer (with no doubt some amendments of form), but
also the record in the case, the briefs used on the reargument, and
the opinions. The oral arguments of Senator Pepper and Solicitor
General Beck were also printed (G. P. O.), in May, 1925, as a docu-
ment of the Department of Justice.

In the 136 years that have passed since the Constitution was adopted, there has come before this Court for the first time, so far as I am able to determine, a case in which the Government, through the Department of Justice, questions the constitutionality of its own act. As to that, I have no criticism to offer; I think it is but proper. We find the Solicitor General appearing as a representative of the Executive Department of the Government. And we have Senator Pepper, as *amicus curiae*, who, as I take it from his brief, represents another branch, the Legislative branch, of the Government. I appear as counsel for the appellant, who brought this suit in the first instance. It is gratifying to feel that all interests are properly represented.

Frank S. Myers, now deceased, and for whom the administratrix is substituted as a party, was postmaster at Portland, Oregon, for a number of years, four years the full term, and was then reappointed in 1917. About three years and a half after he entered upon the duties of his office, he was summarily removed by the Postmaster General, and afterwards, as stated by some telegram from the Postmaster General, it was concurred in by the President. It was treated as a removal by the President in the first instance. After receiving word of his removal, without any charges having been preferred against him, he protested; and he continued that protest throughout the entire period. The record will disclose that there was no lack of diligence on his part in objecting to his removal.

The suit was finally brought for the recovery of his salary in the Court of Claims. The Court of Claims has rendered a statement of findings, to which we take no exception; it is a very fair statement. And this Court will find stated in the appellant's brief, the statement of facts, quoted substantially as stated by the Court of Claims. Fortunately, there is no disagreement upon the question of facts, nor was there before the Court of

Claims. The Court of Claims, after fully considering the matter, decided they were with us on the facts, but against us on one question only, and that was the question of laches. That is to say, they attempted to bring this case within two or three decisions of this Court; and I will not take up the time of the Court to discuss those in detail, further than to call attention to the fact that there is a distinction between this case and all of the cases that have been cited. In fact, the lower court's own statement of its findings of facts would necessitate, if that were the only question involved, a judgment in favor of the appellant. The statements of facts are set out in the complaint, to the effect that this plaintiff was removed from office; he protested against the removal; he accepted no other employment; he continued to contest it up until the last moment expired for his successor to be appointed, and the name of his successor was not sent to the Senate. The Senate adjourned without a successor having been appointed; and then six or seven weeks afterward, he brought this suit.

The effect of the decision in this case is to hold that he is guilty of laches for not bringing the suit within the time required, the Court citing cases which we deem inapplicable.

If the conclusion of the Court of Claims is well founded, it would have been necessary for the appellant to have brought a suit immediately, or within a reasonable time, after each pay-day; he would have had to bring a suit every month. He brought his suit before the time expired in which the President could have sent to the Senate the name of his successor; several months before. Then, after the Senate had adjourned, and the time had expired in which the name could have been sent to the Senate, six or seven weeks . . . or less than eight weeks . . . he filed a supplemental complaint claiming his salary up to that time . . . in fact, he brought the

suit within seven weeks, when all is considered, of the expiration of the term.

The Government gives the man the right of action for wrongful dismissal; but if the application made by the Court of Claims is sound, he has a right without a remedy.

The only question before the Court, as I take it, under the admitted facts, is as to the constitutionality of the act which inhibits the President from removing an official, within this particular class designated by the statute, without the consent of the Senate. That the statute contains in effect a prohibition of the removal by the President of a postmaster of the first class without the consent of the Senate, I take it there is no dispute. The statute prohibits removal without it having been submitted to the Senate. I do not mean that it was necessary to send over a notice that he expected to remove this postmaster; and I will concede that sending the name of the appointee to succeed Mr. Myers would have been sufficient. But that was not done.

The Constitution of the United States specifies that the President may nominate for certain offices. Then it follows that with the provision that for all inferior officers appointment may be provided for by Congress, and may be delegated either to the President alone, to the heads of departments, or to the courts. The powers of the President of the United States are enumerated powers. Prior to the Constitutional Convention, all these powers were among the States. But when the Convention met, they decided upon having a head Executive. They delegated to him certain powers. Those powers are expressed in the Constitution. And there it is provided that the appointment of inferior officers may be delegated by Congress to the President alone, to the courts of law, or the heads of departments. It has been decided by this Court—I think unequivocally—that when it is delegated to the departments, Congress has the

power to provide that the removals can only be made by and with the consent of the Senate. *United States* v. *Perkins,* 116 U. S. 483.

The Court of Claims had held in that case that where Congress delegated the power to the head of a department, Congress had implied power to place restriction as to removal by the head of that department, and to require that it must receive the consent of the Senate. And the only difference between that case and this is that in that case the power was not delegated to the President. It was delegated to the head of an Executive Department. There is nothing in counsel's brief to indicate why there should be a distinction—so far as I can reason it out—between a delegation of power to the head of an Executive Department and the delegation of power to the President.

In the first instance, the whole delegation is vested in Congress, as it was before we had a Constitution; and the Constitution enumerates and specifies the particular offices to which the President might appoint, and makes the exception that the inferior officers shall be under the control of Congress.

With these few remarks, I believe I have stated the issues in this case, and will now leave the rest of the discussion in the opening to Senator Pepper, reserving the rest of my time for the closing.

Extract from brief of *Messrs. Will R. King* and *Martin L. Pipes,* for the appellant.

The defense of laches is untenable. *Norris* v. *United States,* 257 U. S. 77; *Nicholas* v. *United States,* 257 U. S. 71; *Arant* v. *Lane,* 249 U. S. 367; *id.,* 55 Ct. Cls. 327.

Forbidding removal of postmasters of the first class without the consent of the Senate is constitutional. Discussing the Act of June 8, 1872, c. 335, 17 Stat. 284; the Tenure of Office Act, April 5, 1869, 14 Stat. 430; 17 Stat. 284; *Parsons* v. *United States,* 167 U. S. 324; *Shurtleff* v. *United States,* 189 U. S. 314.

There is nothing in the Constitution relating to the President's power of removal. Under Art. II, § 2, cl. 2, Congress could vest power of both appointment and removal of postmasters in the Postmaster General. It would seem that, if it has the power to withhold from the President the power of appointment of a postmaster, it would also have the power, in the creation of the office, to limit the effect of an appointment made by the authority of an act of Congress, and therefore to limit the power of removal.

The power of appointment of postmasters, is not derived from the Constitution *directly,* but from a law of Congress, passed in pursuance of a power granted Congress by the Constitution. And since the power of the President in such case is derived from Congress, it would clearly seem to follow that the Congress can attach such conditions to the appointment as it sees fit. As to officers other than inferior officers mentioned in the section, of course the power of appointment, by and with the consent of the Senate, is a power vested in the President by the Constitution. Discussing *Porter* v. *Coble,* 246 Fed. 244.

Since the President's power of appointment of inferior officers is not absolute, but qualified and contingent upon the action of Congress, it follows that the power of removal, incident to the power of appointment, is also qualified and contingent upon the action of Congress; also that when Congress acts, and the contingency takes place, it is the act of Congress, in pursuance of the powers conferred by the Constitution, that vests both the power of appointment and the power of removal; and whether the act of Congress vests the power in the head of a department or in the President, *the power exists only by virtue of the act of Congress, and not directly by force of any constitutional provision.*

How can it be said that Congress " may vest " a power as to inferior officers if it has already been vested by the

Constitution? The plain meaning is that Congress is given plenary power to establish offices not created by the Constitution and to prescribe all the incidents and elements of the offices, including the authority to vest the power of appointment and of removal where it may deem proper, with the only limitation (if it be a limitation) that the appointing power must be in a court of law, a head of a department, or the President.

Since the power to remove is not mentioned in the Constitution, it follows that the President's power to remove an inferior officer is derived only from the recognized rule that the power to remove is incident to the power to appoint. That the President's power to remove does not exist in the President by virtue of the presidential office, is apparent from the fact that this power has always existed and been recognized in the heads of departments, where Congress has often placed it. It is so now in the case of fourth-class postmasters. The question is set at rest by *Eberlein* v. *United States,* 257 U. S. 82. See also *United States* v. *Perkins,* 116 U. S. 483.

. Congress has by the Budget Law recently sustained its constitutional power to vest the power of appointment in the President and yet to reserve to Congress the power of removal,—this after a debate on the very question. The offices of Comptroller General and Assistant Comptroller General were created, who are to be appointed by the President, but removed for causes specified by joint resolution of Congress or by impeachment " and in no other manner." This act was signed by the President, June 11, 1921. If that law be constitutional, then the law here involved is constitutional.

Appointments exclusively within the jurisdiction of the Executive are specifically designated in Art. II. *Expressio unius est exclusio alterius.* It will be observed that the officers placed within the exclusive jurisdiction

of the President are to be nominated; the other refers to appointment. To nominate is to suggest and must first come from the Chief Executive, while to appoint requires the joint action of the two departments.

See Story, Constitution, 2d ed., §§ 1534, 1535, 1539–40; *United States* v. *Germaine,* 99 U. S. 510; *United States* v. *Perkins,* 116 U. S. 483.

The debates in Congress on the subject in 1789, and the few years following, together with such adjudications as appear on the subject, determined but one question (if anything), and that, as stated in *Ex parte Hennen,* 13 Pet. 259; *McElroth* v. *United States,* 102 U. S. 426; *United States* v. *Perkins, supra,* and other cases of similar import, was the power of the Executive to remove an official without the consent of the Senate *in the absence of any provision in the Constitution or statutes on the subject.* Whatever may be said of the congressional action in 1789, it must be conceded that for more than a half century, wherever and whenever the subject has been before Congress, the latter has, by its enactments, declared in favor of that interpretation of the Constitution, making valid any and all restrictions that it has seen proper to place upon the removal by the President, whether by the direct or implied consent of the Senate, or by compliance with forms of prescribed procedure under the civil service, or other laws.

Congress has the right to exercise all powers essential to the making of the provision of the Constitution respecting postoffices and post roads effective. *In re Rapier,* 143 U. S. 110.

Prerogatives of the President consist only of that which is clearly delegated, or incident to those enumerated, to the Executive. The silence of the Constitution upon the subject, in view of the historical conditions from which the Constitution emanated, and the evils which it sought to remedy, could more properly be said

to imply that in all circumstances Congress, and only that branch of the Government, should have control of the subject. Taft, Our Chief Magistrate and His Powers, p. 144.

The office of Comptroller General serves as an excellent example of the wisdom of the framers of the Federal Constitution in leaving the creation of the so-called inferior officers, together with the authority for their appointment and for their removal, by such one of the authorities as may be there designated, to the wisdom of Congress, as conditions might develop.

It would seem to be clear from a mere recital of the duties performed by the accounting officers since the days of the Continental Congress, that such duties are not executive, but judicial in their nature, and no more deprive the President of his duty to take care that all laws are enforced than do the District Courts of the United States which are likewise created by statute. This was clearly recognized by Madison (Debates in Congress, Annals, VI, 636), in the debate on the bill which became the Act of September 2, 1789, establishing the accounting offices. *Id.,* p. 638. The accounting officers were placed in the Treasury Department, over the protests of James Madison and others, where they continued to remain until the Budget and Accounting Act of June 10, 1921, made them independent of all of the executive departments. While they were administratively within the Treasury Department, it has been recognized throughout the history of the United States, that, until within the last three or four years, their discretion was not subject to the control of either their immediate superior, or the President.

The office of the Commissioner of Patents affords illustration of another important *inferior office,* of a class that the Constitution did not intend should come exclusively under the Executive respecting his power of removal. *Butterworth* v. *Hoe,* 112 U. S. 67.

The President has no power to interfere with accounting officers in the performance of their duties. 1 Ops. Atty. Gen. 629; *id.*, 471; *id.*, 705, 706; 2 Ops. Atty. Gen. 509. The absolute independence of the accounting officers from control in their decisions by executive officials was recognized by Postmaster Kendall (whose authority was then as the Postmaster General's now), in his annual report of December 4, 1835. Ex. Doc. No. 2, 1st sess., 24th Cong., 399, 400. The Senate Committee summed the matter up in a report dated January 27, 1835. Sen. Doc. No. 422, 1st sess., 23d Cong.

Throughout the history of this Government, the President, Secretaries of the Treasury, and heads of Departments, with few exceptions, have disclaimed any authority over the accounting officers of the United States. See *United States* v. *Lynch,* 137 U. S. 280.

President Taft clearly recognized, in his message of June 27, 1912, transmitting the recommendations of the Commission of Economy and Efficiency, that there must be checks on the usurpation of power by the executive departments. House Doc. No. 854, 62d Cong., 2d sess.

Oral argument of *Senator Pepper,* as *amicus curiae.*

There are two questions before the Court which I shall discuss as clearly and briefly as I can.

With respect to the matter of laches, I submit that if an officer of the United States, claiming to have been illegally removed, who has protested continuously during the whole of the session to which his removal might have been reported; who has kept himself free from other employment and received no compensation from any other source; for whose successor no provision was made either by the President alone, or by the President with

the advice and consent of the Senate; who then brings his suit within six or seven weeks after the perfection of the cause of action—if he is to be denied a right of recovery on the ground of laches, the Government is handing to him with one hand the privilege of suing for the salary on the theory of unjustifiable removal, and with the other hand withdrawing the possibility of recovery, because the course of conduct which in that event would be prescribed for him is one which it would have occurred to few people to pursue.

I come now to the question on the merits.

The Solicitor General all but concedes that the language of the act under discussion evidences the intent of Congress that the Senate's consent shall be essential to removal as well as to appointment. The situation which confronts the Court then is this:

The Congress, in the exercise of an undoubted legislative power to create the office in question, creates it; prescribes the duties of the office; fixes the salary; specifies the term; and declares that the Senate shall have something to say with respect to removal, if removal is attempted. And the question is whether the Executive, having exercised his Constitutional right to appoint, with the advice and consent of the Senate, to the office which Congress has thus created, may ignore that part of the statute which specifies the conditions under which there may be a removal. The Congress in creating the office has declared that the responsibility of removal shall be the joint responsibility of the Executive and the Senate. May the Executive act under the statute, in so far as it creates the office, and may he ignore that portion of the statute which prescribes the conditions and circumstances under which a removal may take place?

I wish to emphasize as earnestly as I may that the issue in this case is not an issue between the President and the Senate. Except in newspaper headlines, there is no

such controversy. This is an issue between executive power and legislative power; and the question is where the Constitution has vested the power to prescribe terms of removal—whether in the Congress, as I contend, or in the President, as I think the Solicitor General must contend.

Here we have a constitutional " no man's land." It lies between the recognized lines of executive prerogative and of legislative power. The question is, who may rightfully occupy it? And the decision of this Court in this case will be of enormous significance in helping to clear up the question as to who may enter in and possess that area which up to date has been debatable.

The Act of 1876 is in no sense a bit of isolated or eccentric legislation. With the aid of one of the most efficient of Government agencies, the legislative counsel for the Senate, I have collated, as exhaustively as has been possible within the limits of the time for preparation, the statutes now upon the books, which in some degree undertake to place limitations upon the Presidential power or right of removal, if such a power or right exists.

Laying aside the case of officers whose tenure is prescribed by the Constitution, the Justices of this Court, and the federal judges generally, and turning to other officers for whose term or tenure the Constitution makes no provision, I suggest that the Court must choose between three theories. One is the theory that the power of removal is an executive power; that it is inseparably incident to the power of appointment; and that, since the Constitution places the limitation of Senatorial consent only upon the power of appointment, the inference is that the power of removal is left untrammeled and free. That, I take it, is the position which the Government must take here. It is the position which the Solicitor General took at the previous argument. It is a proposition the consequences of which, I think, he shrinks

from recognizing now; but in the last analysis it must be upon that proposition that the appellee must base its case.

Then there is the second proposition: that if the power of removal is a reciprocal of the power of appointment, then, since the Constitution has insisted that there shall be joint responsibility with the Senate in the case of appointment, the inference is that there is an intention that there shall be joint responsibility in the case of removal. There is very respectable authority in the books for that view; but for myself I confess that it seems to me to be unsound.

The third proposition is that which I venture to press upon your Honors: that the act of removing an officer is itself an executive act, but that prescribing the conditions under which that act may be done is the exercise of a legislative power, inseparably incident to the legislative power to create the office, to prescribe the duties of the office, to fix the salary, and to specify the term.

I am contending that it is only the act of removal that is executive in its character; and that prescribing the terms under which the removal may take place is a legislative act; a thing to be performed by Congress in the exercise of powers expressly granted, and under the power to pass all laws " necessary to carry the foregoing powers into effect," etc.

What is " *the* executive power " that is vested in the President? Not the vague executive prerogative which was resident in kings at the date of the adoption of our Constitution. It is the executive power which this instrument grants to him.

It is said, however, that this whole question has been settled by practice and by constitutional history in this country. I enter a flat denial. I think there has been a great misconception of what the testimony of history is in this matter. I call attention to the fact that when

you are discussing the origins of the Constitution, and debates in the Constitutional Convention, so far from finding material from which any inference can be drawn of the sort that the Solicitor General seeks to draw, the data are at least equivocal or even the basis of a contrary inference.

In the Constitutional Convention, Madison and others were in favor of vesting the power of appointment in the President alone, without the concurrence of the Senate. Pinckney and others were in favor of vesting the power of appointment in the Senate alone. Oliver Ellsworth was of opinion that the initiative of appointments should be with the Senate, and that the President should have only the power to negative. The report of Rutledge's committee, which was the conciliatory committee intended to reconcile the different views, brought in on the 6th of August, was to the effect that the making of treaties and the making of important appointments should be by the Senate.

Then came the compromise; and the compromise was that the Executive should make appointments, by and with the advice and consent of the Senate.

When you turn to contemporaneous exposition, absolutely the only utterance on the subject of removal that I can find in the interval between the action of the Constitutional Convention and ultimate ratification of the instrument by the States, is the utterance in No. 77 of The Federalist, usually attributed to Hamilton, which is to the effect that the assent of the Senate to removals will be necessary, as it is necessary to the appointments. I have cited in my brief a very interesting Illinois case (*Field* v. *The People,* 3 Ill. 79,) in which the court, after an examination of the authorities, gives reasons for believing that it was only upon a representation that the President would not have the power of removal that the Constitution could have been rati-

fied by the States; that if it had been supposed that the President had the power of removal, as an executive prerogative which the legislature could not curb, the Constitution never would have become effective as the fundamental law of the land.

When you come to the debates in the First Congress, of 1789, there is found no basis for the statement that those debates settled this question in favor of the presidential right of removal. I appeal to the record, because when this great tribunal declares the law we all bow to it; but history remains history, in spite of judicial utterances upon the subject.

When you turn to what actually took place in the Senate and in the House, you find that the issue which was before that Congress was an act to create a Department of Foreign Affairs, and to provide for the office of a Secretary of Foreign Affairs, to be appointed by the President, by and with the advice and consent of the Senate, and to be removed by the President.

A great controversy was aroused in the Senate and the House over the presence of the phrase " to be removed by the President." In the House an amendment prevailed, which was afterward accepted by the Senate, which side-stepped the question, after prolonged debate, by providing that if and when the Secretary of Foreign Affairs should be removed by the President of the United States, temporarily such-and-such things should happen to the records and books of the Department. That was upon a division following a debate, where, if you compare the way in which people voted with the way in which they spoke in the course of the debate, you find that no inference at all can be drawn from their vote as to whether they were voting that the President had the power of removal and needed not that it be conferred, or that he had it not and that Congress must confer it upon him; or that the President had not the power and that the Congress could not confer it upon him.

The most interesting analysis that I know of on the effect of debates and votes in a Congress is that contained in the judgment of Senator Edmunds, in the impeachment proceedings of President Johnson; where he analyzed the votes in the Senate and the House in that First Congress and came to the conclusion that you can not even guess as to what was the opinion of those who voted respecting the question at issue.

It will be remembered that in the First Congress there was a tie vote in the Senate. Only ten States were represented in the Senate at that time, there being twenty Senators. There was a tie vote, and John Adams, who was in the chair, cast the deciding vote and broke the tie, which carried the decision in favor of the measure as the House had amended it.

Now, I suggest that you can not draw any inference at all from those debates or from that vote, excepting that many of those who participated were believers in the power of the legislature; that many of those who participated were believers in the prerogative of the President; and that a clean-cut decision was obscured by a compromise.

When you come to the subsequent legislative history of this question, you will find the same difficulty in drawing historical inferences. The great confidence in President Washington contributed largely to such acquiescence as there was in those days in the theory of presidential power. Story testifies to it, as do many others of our great jurists. Jefferson made a great many removals; but he had both Houses of Congress with him, and no issue arose. The succeeding Presidents, Madison, Monroe, and John Quincy Adams, raised no issue with the Congress; although the Benton report made in 1820 showed apprehensions on the part of some statesmen that trouble was ahead if the existence of an executive prerogative was recognized.

Then came Jackson's administration and his removal of his Secretary of the Treasury because he would not obey the President in his direction to remove the Government deposits from the United States Bank. And as a result of that removal there took place a memorable debate in the Senate. The Senate was hostile to the Administration. The debate is notable for the remarkable arguments of Webster, Clay, and Calhoun. Those men have been quoted, and I admit in one or two instances referred to by former Justices of this Court in opinions, as having been advocates of the Executive prerogative of removal. Not so. Webster, after having made an argument to that effect, said that on reflection he had come to the conclusion that those who in 1789 claimed that this was a legislative power had the best of the argument, and that he would acquiesce merely for the time being in the passage of a law requiring the President to furnish Congress with his reasons for removals.

Clay took precisely the ground which I am taking here, that the act of removal is an executive act, but that the power to determine the conditions under which removal may be made is a great legislative power and is resident in the Congress.

Calhoun, in a great argument, went even further, and held that it was a power which was resident in the legislature alone and doubted whether it could be in any sense committed to the Executive.

I have supposed that under our system of government Congress can not confer executive power upon the President; that if it is a question of executive power you look to the Constitution. But I have supposed that the acts done by the Executive in the discharge of his duty faithfully to execute the laws, are such acts as those laws prescribe, and that where the Congress which makes the law declares that it is of the substance of the law that only such-and-such things shall be done in the execution of

it, that declaration is binding upon the Executive—not because it is clipping his power, but because it is a valid exercise of the power of Congress to declare how the incumbency of the office may be terminated. Let me illustrate:

*Marbury* v. *Madison* we think of always for the notable decision that this Court may declare an act of Congress unconstitutional. May I remind your Honors that, not by way of *obiter dictum*, but involved in the substance of the decision, was a decision by the great Chief Justice and the Court that an officer who had been appointed for a term was irremovable during that term by the President, except through the process of impeachment? That was a case in which Marbury and others had been named as justices of the peace of the District of Columbia by the President. Commissions had been signed by the President, had been sealed by the Secretary of State, and were in the office of the Secretary of State. An act of Congress conferred on this Court—or purported to—original jurisdiction to issue a mandamus; and in this case a petition was filed for a mandamus to the Secretary of State to compel him to deliver the commissions.

This Court decided, first, that when the commission had been signed and sealed and was in the office it was the property of the office-holder and must be delivered; second, that the duty to deliver it was not a political duty involving discretion, but was a ministerial duty which could be enforced by mandamus; that mandamus was the appropriate remedy at common law, but that this Court could not issue the mandamus because the attempt to enlarge its original jurisdiction was unconstitutional.

Some people have tried to get rid of that decision by a wave of the hand; by saying, "Oh, well, everything in it was *dictum* except the decision that there was no jurisdiction."

But the decision that there was no jurisdiction was reached only by declaring the act of Congress unconstitutional; and this Court never would have declared the act of Congress unconstitutional if they could have disposed of the case on the ground that this was an appointment which was revocable by the Executive, and that if they were to issue the writ to compel the delivery of the commission, the next day the President could recall it. Marshall so thought; and he said with admirable clearness that as long as the commission is unsigned or unsealed and in the hands of the President it is revocable, and therefore the officeholder has no rights and there can be no mandamus; but that the instant the duty to deliver it becomes ministerial, at that moment the duty must be performed, and it is a mere question of who is to compel the performance, because the appointee has tenure for his term. It is an interesting fact, may it please Your Honors, that in 1803 you have that significant utterance of Marshall's, too rarely commented upon in subsequent cases.

The Solicitor General in striving to find a middle ground between the alternative that there is a prerogative power of removal in the President and the proposition for which I contend, that the power to prescribe conditions of removal is legislative and inheres in Congress—the Solicitor General in attempting to find a middle ground and to save some laws that are on the statute books seems to me to concede my case.

A concession, for example, that Congress may declare a legislative policy respecting how an office is to be administered and for what causes the incumbent is to be removed is an end of the argument that the President must have a free hand if he is effectively to enforce the laws. It will not do to say that the President must have a free hand in the matter of determining when and how he shall remove and at the same time to say that Congress

may whittle away his freedom by prescribing the causes for which he may remove and the circumstances under which he may do it. To concede any power in the premises to Congress seems to me to be wholly inconsistent with the theory of a prerogative resident in the Executive, derived from the Constitution, in virtue of which he controls the officers of the United States. And with respect to them, I beg leave to say that the officers, incumbents of offices established by law, are officers of the United States; they are officers of the Government; they are officers of the people. They are not servants of the President.

I wish to call attention to that portion of section 2 of Article II of the Constitution which, after dealing with the manner of appointment of ambassadors, other public ministers, consuls, justices of this Court, and all other officers whose offices may be established by law, proceeds thus:

"But the Congress may by law vest [in the case of such inferior officers as may be from time to time established, the appointment either] in the President alone, in the courts of law, or in the heads of Departments."

I take it that "inferior officers" is a broad term and covers all officers not specified in the Constitution, and not heads of Departments. Certainly a postmaster is an inferior officer.

And I take it that if the Congress, under the Constitution, might have lifted the appointing power in this case out of the President altogether and vested it in the Postmaster General, then Congress has clearly the right, in vesting it in the President, to prescribe the terms upon which that vesting shall take place and how the power of removal shall be exercised. In the *Perkins* case, 116 U. S. 483, this Court decided that the power to vest the appointment in the head of a Department carried with it the power to prescribe conditions, including those affect-

ing removal.   And it would be a distorted application of the prerogative theory of Executive power to say that Congress may vest the appointment of an officer elsewhere than in the President and retain control over the removal, but, having chosen to. vest it in the President, may not annex conditions which concern the circumstances of removal.

Think of the psychology of this matter.   In the long run, is it safer to vest this tremendous prerogative of terrorizing officers into conduct of the sort acceptable to the Executive through fear of removal, in the Executive; or can the power most safely be lodged, in accordance with age-old precedents, with the legislature?   Of course, the legislature may abuse it, just as they abused it in the Tenure of Office Act.   That was most unwise legislation passed confessedly to embarrass the President.   But it was not unconstitutional.

It is said, however, that " It will be a cruel injustice if you hold the President accountable for enforcing the laws, but leave it in the power of the legislature to embarrass him in this way."   But you are not going to hold the President accountable for failure to enforce an impossible law.   The responsibility of creating a workable law is the responsibility of Congress; and attaching to the office conditions of removal which make it unworkable is a responsibility for which Congress must face the people.

Forensic argument and prophecy can build a great structure of calamity to result from denying to the President power to discipline people by terrorizing them through threat of removal.   But you can equally well imagine acts of executive tyranny if you do concede the power.   It is a question respecting the place most safely to lodge this great power.

The story, in English constitutional history, of the phrase " advice and consent " is coincident with the

whole story of the rise and development 'of English parliamentary government. I find the phrase first used back in the eighth' century, in 759, when a Northumbrian king does such-and-such things with the "advice and consent" of his wise men. It comes down through Magna Charta. It comes down through all the ages. And when in 1787 it became necessary, as between those who were championing a strong Executive and those who were championing the legislature, to find a middle ground, it was provided, in the language of old English law, that such-and-such things should be done by the President "with the advice and consent of the Senate."

I accordingly close by urging Your Honors to set this controversy at rest once and for all by determining that the power to control removals is neither in the President nor in the Senate, but that, in accordance with the age-long traditions of English constitutional history, it resides in the Congress of the United States, where the Constitution has placed it.

### Extract from brief of *Senator Pepper.*[1]

The Constitution puts the Justices of the Supreme Court and all of the Federal Judges in a class by themselves. They hold office during good behavior, and are removable only by impeachment. As to all other officers, whether named in the Constitution or not, there is absolute silence on the subject of removal. With respect to them the Court is confronted by three possible theories of removal. (These are stated in the oral argument, *ante,* p. 67.)

It is said that the Executive can not effectively execute the laws unless he has an unrestricted power of removal.

---

[1] Senator Pepper also filed a supplemental brief, prepared by Mr. Frederic P. Lee, Legislative Counsel of the Senate, giving a classified citation of existing statutes restricting the power of the President to appoint or remove officers. (See Sen. Doc. 174, 69th Cong., 2d sess.)

To argue thus is to beg the question. The laws which he is to execute are the laws made by Congress. The Constitution makes no vague grant of an executive prerogative, in the exercise of which the President may disregard legislative enactments. The executive power vested in him is only that which the Constitution grants to him. 9 Op. At. Gen. 516.

Whether or not a certain office shall be created is a legislative question. The duties of the official, the salary which he is to receive, and the term during which he is to serve, are likewise matters for legislative determination. Provision for filling the office is in its nature legislative, and so is provision for vacating it. The fact that the Constitution makes a specific provision in connection with the filling of the office works no change in the nature of the provision for vacating it. The actual removal is an executive act; but if it is legal it must be done in execution of a law—and the making of that law is an act of Congress. If the Constitution were silent in regard to appointment as it is silent in regard to removal, legislative action would be decisive in both cases. From the mere fact, however, that it is deemed wise to give to the Executive a limited power of appointment, no inference ought to be drawn that he is intended to have an unlimited power of removal.

The language of the second section of Article II of the Constitution is nicely chosen. The President is given the *power,* with the advice and consent of the Senate, to make treaties. Elsewhere he is similarly given the power to fill up vacancies during the recess of the Congress. But the executive right to make nominations and appointments to office when the Congress is in session is not described as a *power* at all. " He shall nominate, and by and with the advice and consent of the Senate, shall appoint." That which is laid upon him is an executive *duty.* His business is to effectuate the legislation of Con-

gress. From the existence of the duty no inference should be drawn of the grant of the power.

The power of control through fear is a dangerous power to lodge in the hands of any one person. It is far less likely to be abused when it is exercisable only by the vote of a large body of men than if it represents merely the determination of a single will. The case of the Comptroller General is a case in point.

At the present time the well-deserved public confidence in the President is equalled by the unpopularity of Congress. It must never be forgotten, however, that English-speaking people have found it wise to place their trust in the legislature, subject only to constitutional restraints. McElroy, Life of Grover Cleveland, Vol. I, pp. 166–168.

I find nothing in the record of the debates in the Constitutional Convention of 1787 from which it can be inferred that there was anything like a consensus of opinion respecting the exercise of the power of removal. It is clear that none of the members of the Constitutional Convention who took part in the debates desired the President to wield the powers which at that time were exercisable by the King of England. In the second place, it must be borne in mind that in the Constitutional Convention, Madison and others urged that the President alone, and without the consent of the Senate, should make appointments to office. See V, Elliott's Debates, p. 329. Others, like Roger Sherman and Pinckney, thought that the power of appointment should be in the Senate alone. *Ib.* pp. 328, 350. Oliver Ellsworth had suggested that nominations be made by the legislative branch, and that the Executive should have power to negative the nominations. In the report of Rutledge's Committee, made August 6th, it was provided that the Senate should have the power to make treaties and appoint ambassadors and Judges of the Supreme Court, and that the legislative branch should appoint a treasurer by

ballot.   Finally, a compromise was reached under which it took the joint action of the Executive and the Senate to appoint as provided in Sec. 2, Art. II of the Constitution.   No inference can be drawn, from a compromise reached under these circumstances, that it was the intention of the framers that the President alone should have the power of removal.   If that inference were permissible, a similar inference might be drawn that the removal should be by the Senate alone.   In the third place, it seems clear that it was not the intention of the framers of the Constitution that officers of the United States should be the officers or servants of the President.   The mingling of the powers of the President and the Senate was strongly opposed in the Convention.   See IV, Elliott's Debates, p. 401.   Finally, it cannot successfully be contended that the power of removal was commonly vested in governors of States by then existing state constitutions.   I, Congressional Debates, Pt. I, p. 490.

Nor can it be successfully contended that during the period when the issue of ratification was before the States the existence of any such power was conceded by the friends of the new instrument.   I find no exposition of the intent of the framers of the Constitution during the period of ratification except that in No. 77 of the Federalist, attributed to Alexander Hamilton, which was to the effect that " the consent of the Senate would be necessary to displace as well as appoint."   See *Field* v. *The People*, 2 Scam. 165.

When the first Congress met only ten States were represented in the Senate, which was composed of twenty members.   Of these precisely one-half had been members of the Constitutional Convention.   They were Oliver Ellsworth, William S. Johnson, Robert Morris, William Patterson, George Read, John Langdon, Caleb Strong, William Few, Richard Basset, and Pierce Butler.   Of the fifty-four members of the House of Rep-

resentatives who voted, eight had been members of the Constitutional Convention, namely, Baldwin, Carroll, Clymer, Fitzsimmons, Gerry, Gilman, Madison, and Sherman.

The first Congress had before it a bill to establish a Department of Foreign Affairs, at the head of which should be an officer to be called the Secretary of the Department of Foreign Affairs, "who shall be appointed by the President by and with the advice and consent of the Senate, and to be removable by the President." So far as the proceedings in the Senate are concerned, there is no complete record of the debate. We know that the vote on the passage of the bill was a tie, and that the deciding vote was cast by the Vice-President, John Adams. Our information respecting the views of individual Senators can be drawn only from the fragmentary notes of Mr. Adams. See Edmunds, Impeachment of Andrew Johnson, Vol. III, p. 84. Of the ten Senators who had sat in the Convention, six by voice or vote upheld the President's power and four opposed it. See Works of John Adams, Vol. III, pp. 407–412.

It is even more difficult to draw any certain inference from the proceedings in the House. In that body, when the bill was in committee of the whole, a resolution was offered to strike out so much of the bill as vested the power of removal in the President. On this question the yeas were twenty and the nays thirty-four. This vote, if considered without reference to the debates or to the subsequent parliamentary history of the measure, would tend to support the inference that a decisive majority was in favor of giving to the President the unrestricted right to remove a cabinet officer. It would of course throw no light whatever upon the question whether the President would have had any such right to removal if the Congress had not conferred it upon him. But the vote must be analyzed both in the light of the debates and in the light

23468°—27——6

of the subsequent fate of the bill; for when the bill came from the committee of the whole into the House an amendment was proposed to another portion of the bill making a certain disposition of the records of the office, "whenever the said principal officer shall be removed from office by the President of the United States, or in any other case of vacancy." It was thereupon declared that if this amendment prevailed it would be followed by a motion to strike out the substantive grant to the President of the power of removal as it had appeared in the bill when introduced. The amendment did prevail by a vote of yeas thirty-one and nays nineteen. The bill was finally passed in the House by a vote of yeas twenty-nine and nays twenty-two. When reference is made to the expressed views of the members of the House, as found in the debates, the analysis made by Senator Edmunds will be found in point. Impeachment of Andrew Johnson, vol. III, pp. 84–85.

The difficulty of drawing any certain inference from the votes and debates above summarized is a little relieved by the fact that on August 7, 1789, there was passed an act for the government of the Northwest Territory, which provided that the President should nominate and by and with the advice and consent of the Senate appoint officers where offices had been appointed by the Congress, and that the President should have the power of removal where Congress could remove. This recognition of a power of removal in Congress is inconsistent with the contention that the power of removal is exclusively an executive prerogative. Nor can any argument in favor of an executive power of removal be drawn from the course of subsequent legislation. In the Act of February 13, 1795, 1 Stat. 415, the proviso would appear to be a legislative attempt to construe the constitutional provision giving to the President the power to fill up vacancies and reserving to the Congress control over the appoint-

ment in case of vacancies. Congress may or may not have had in mind vacancies caused by removals.

In 1801 Jefferson removed many officers by executive acts, but the Senate and the House were overwhelmingly of his political faith. So that no question arose. The Presidents who succeeded him, Madison, Monroe, and John Quincy Adams, forced no issues with the Congress upon the subject of removals. It is to be noted, however, that on May 15, 1820, an act was passed providing that district attorneys, collectors of the customs, naval officers, etc., should be appointed for four years, but removable from office at pleasure. At whose pleasure is not stated. Presumably, the President's pleasure is meant. This act shows that the President and the Congress were of opinion that the Congress may by law fix the duration of the occupancy of an office by assigning him a term. From the power to specify a term it is easy to deduce a power in Congress to provide for the manner in which the incumbent of the office may be removed.

In 1826 a select committee of the Senate, of which Benton was chairman, and having among its members Van Buren and Hayne, submitted a report and certain bills, one of which was a bill to prevent the President from dismissing military and naval officers at his pleasure. The bill was not passed at that time, but a similar measure became law at a later date, to wit, on July 13, 1866.

In Washington's time there was enormous popular confidence in the President. In Jefferson's time there was political harmony between him and the Congress. In the days of his three successors no issues were forced. But when Andrew Jackson took office the question of the extent of executive power occupied a large share of the attention of Congress. His removal of Duane was followed by condemnatory resolutions of the Senate with a bill to repeal the first and second sections of the Act of May 15, 1820, and to limit the terms of service of certain

civil servants. The object of this measure was to limit executive patronage. It passed the Senate. Webster, Clay, and Calhoun expressed their views at length. Extracts from what these great men said in debate will show that it is altogether inaccurate to quote them as champions of the executive power of removal. Webster, Cong. Deb. No. 11, pt. I, pp. 458–470; Clay, *id.*, pp. 513–524; Calhoun, *id.*, pp. 553–563.

Webster was clearly of opinion that those who in 1789 argued in favor of the presidential power of removal had the worst of the argument, and that it should then have been decided that the power of removal was exercisable only by the President and the Senate. He regarded legislative practice as having mistakenly recognized the power to regulate the matter of removals as executive, but for the time being would be satisfied with a requirement that the President when removing should state his reasons to the Senate.

Clay held the view which in the instant case I am pressing upon the Court, namely, that since the legislative authority creates the office, defines its duties, and prescribes its duration, the same authority may determine the conditions of dismissal.

Calhoun was of opinion that the power to regulate removals was exercisable by Congress alone. What is here said with regard to the position of Webster is said with confidence, although I am not unmindful of the fact that in *Parsons* v. *United States*, 167 U. S. 324 (1896), the Court attributed to Mr. Webster a view which I venture to suggest was inferred from an isolated statement in the debate divorced from the context in which it was used.

In 1867 Congress passed the Tenure of Office Act over President Johnson's veto; and when, in disregard of the act, he undertook to dismiss Mr. Stanton, he was impeached by the House and tried by the Senate. The vote

for conviction stood yeas thirty-five, nays nineteen. He was therefore acquitted, the requisite two-thirds not having voted to convict. See views expressed in their opinions by Senators Sherman and Edmunds. III Impeachment of President Johnson, pp. 3, 5, 6; *Id.,* pp. 83, 84.

By the Act of April 5, 1869, which amended the Tenure of Office Act by ridding it of its most obnoxious features, the President might make removals but was required "within thirty days after the commencement of each session . . . to nominate persons to fill all vacancies." As a practical proposition, this placed it in the power of the Senate alone to obstruct removals (although Congress had imposed upon the Senate no responsibility respecting them) by withholding consent to the appointment of the successor unless actually satisfied with the reasons for the preceding removal. Against this limitation President Grant filed his protest, President Hayes urged repeal; and President Garfield denounced the senatorial usurpation.

During the recess of Congress, President Cleveland removed 643 officers, and within thirty days after the assembling of Congress sent to the Senate his nominations of persons to be appointed as successors to the removed officials. One of the removed officials was a federal attorney. The act under which he had been appointed did not undertake to vest the power of removal elsewhere than in the President. The case was therefore unlike the instant case. Before acting upon the nomination of his successor, the Senate Committee on the Judiciary requested the Attorney General to submit information and papers relating not only to the qualifications of the nominee but to the removal of his predecessor. The Attorney General, by direction of the President, refused to comply with the request. A heated controversy ensued. After vehement debate a resolution was passed—32 to 25—censuring the Attor-

ney General and, by implication, the President. The incident ended, however, somewhat in opera bouffe fashion by the discovery that the term of the removed official had expired before the Senate had passed its resolution of inquiry. There was therefore nothing to do but to confirm the appointment of the successor.

It was as a sequel to this conflict that what was left of the Tenure of Office Act was repealed, the repealing measure being signed by the President on March 3, 1887. As already pointed out, however, this repeal had no effect upon the Act of July 12, 1876, which is the act with which we are concerned in the instant case. While the joint operation of the Acts of 1869 and of 1887 leaves the President free to remove other members of his cabinet, the Postmaster General and postmasters of the first, second, and third class are removable only by and with the advice and consent of the Senate.

The act of removal is an executive act but the power to frame the law of which the act of removal is an execution is a legislative power and is vested in the Congress. If the Congress creates an office, prescribes its duties, the qualifications of the incumbent, and the salary paid to him, but makes no provision on the subject of removal, the inference is that the removal is intended to be at the President's discretion. If the Congress similarly creates the office and specifies in affirmative words grounds upon which the President may remove, it is nevertheless to be inferred that he may still remove at discretion because only negative words can displace this inference. If the creating act gives a term to the appointee, it might still be inferred, in the absence of other provisions, that the President may remove at discretion; but this proposition is inconsistent with the view expressed by Chief Justice Marshall in *Marbury* v. *Madison,* 1 Cr. 137. If the creating act specifies causes of removal and superadds a provision that there shall be removal for no other causes,

the inference is of an intention to limit executive removals to that extent.  Probably the same inference should be drawn where the statute provides that the incumbent is to hold " during good behavior."  If the statute creating the office provides that the President may remove only after affirmative action by another body, e. g., by a court-martial, the possibility of executive removal is to this extent limited.  If the creating act (as in the instant case) provides that removal shall be the joint responsibility of the President and the Senate, the President may not remove without the consent of the Senate.  If the creating act provides that removal can take place only after action by both Houses of Congress, this also is a constitutional use of legislative power.

The decisions of this Court are not in conflict with any of the positions above summarized.  *Marbury* v. *Madison,* 1 Cr. 137; *Matter of Hennen,* 13 Pet. 230; *United States* v. *Guthrie,* 17 How. 284; *United States* v. *Perkins,* 116 U. S. 483; *Parsons* v. *United States,* 167 U. S. 324; *Shurtleff* v. *United States,* 189 U. S. 311; *Wallace* v. *United States,* 257 U. S. 541.

The cases above cited are believed to be the only decisions of this Court in which the question at issue has been touched upon.  It is undeniable that the historical summaries contained in the several opinions tend to conclusions favorable to the contention now made on behalf of the appellant.  For the reasons heretofore given, and with the greatest possible deference, it is suggested that these summaries may well be supplemented by a further consideration of the whole subject in a case which happily comes before the Court for decision at a time far removed from the transaction which gave rise to it and when the Court is unembarrassed by any pending conflict of opinion between the legislature and the Executive.

As to the argument *ab inconveniente,* two observations may be made: first, that constitutional liberty is more

vital than governmental efficiency; and, second, that the inconveniences which can result from the legislative regulation of removals are imaginary rather than real.

Oral argument of *Solicitor General James M. Beck,* for the United States.

The Government recognizes that it can not sustain this judgment on the ground of *laches.* Unless, therefore, the Act of July 12, 1876, be unconstitutional, the judgment must be reversed.

I therefore address myself to this great constitutional question—a question which has repeatedly been submitted to this Court, but which the Court up to the present hour has found it unnecessary to decide; a question of great delicacy, because it affects the relative powers of two great departments of the Government.

If I understand the distinguished Senator's contention, it is this: that the President's power of removal is not a constitutional power; that he derives nothing from the Constitution, under which the " executive Power " was vested in the President of the United States; nothing by reason of the solemn obligation imposed upon him by that Constitution to " take care that the laws be faithfully executed "; nothing by the oath which the Constitution exacts from him that he will support, maintain, defend, and preserve the Constitution of the United States; that his only power in this vital matter of administration of removing officers is derived from the inaction of Congress, which has plenary power over the subject of removals from office. It seems to me an amazing proposition.

Senator Pepper would sustain the law on the ground that Congress was not obliged to create the position of postmaster of Portland, Oregon; and therefore could create it upon such terms as it pleased, and if so, those conditions are beyond judicial review. In other words, Con-

gress can provide—as it has provided in the statute under consideration—that the postmaster at Portland, Oregon, should serve during the pleasure of the Senate. If this be true, then the Executive power of removal, hitherto supposed to be granted by the Constitution to the President, is no longer in the President, but when Congress creates the office it may reserve Executive powers to the Senate.

If appellant's argument be a sound one, Congress, in creating the offices of the Government, can do so under conditions which would transfer governmental power from the Executive to the Legislature. If so, where does the power to alter the Constitution's distribution of powers end? Thus there could be created two executive departments, one the executive department of the Constitution, which would be shorn of its powers and its halls like the poet's "banquet hall deserted," which the President would tread alone with "all but him departed," and the other, a congressional executive department, which would function independently of the President and be responsible only to Congress and removable only by Congress.

But if Congress has this power, then it has equally the power to delegate to any part of itself the executive power or function of removal. In the statute now under consideration, Congress has not itself assumed the power to control the removal of this postmaster. It has delegated it, primarily, to the President of the United States, but, ultimately, to the Senate. Under this theory, it could delegate the ultimate decision as to removals to the President, the Vice-President, as presiding officer of the Senate, and the Speaker of the House. Thus would be revived the triumvirate of Rome, for there would be three great officers of the State, sharing that which is vital in the practical administration of the Government, the removal of unworthy or inefficient officials from the public service.

The Constitutional Convention rejected a triumvirate when they refused to have an Executive of three individuals.

It is not necessary in this case to determine the full question as to this power of removal. This Court can say that this particular Act is unconstitutional, without denying to the Congress the power to create legislative standards of public service, which have a legitimate relation to the nature and scope of the office, and the qualifications of the incumbent.

I do not concede that a law, which thus subjects the power of removal to congressional conditions, is constitutional; but it is not necessary to decide that in this case. For this law differs, *toto caelo*, from a law which prescribes a standard of service. It declares no public policy with respect to any attribute of an office. There is no legislative standard of efficiency; it is a mere redistribution of power—a giving to one branch of Congress some of the power which belongs to the President.

The President's right of removal is not an implication of the Constitution, but a fair interpretation of its language; an interpretation that has had the sanction and confirmation of unbroken usage.

The great defect that called the Constitution into being was that under the Confederation all judicial, executive, and legislative powers were vested in the Congress of the Confederation. And it was because the Continental Congress exercised executive power that there came the tragedy of the Revolution, and especially the dark and terrible days of Valley Forge, when Washington's little army starved in a land of plenty, because of a headless Government that had no Executive, but which, under the guise of a legislative tribunal, attempted to exercise both legislative and executive powers. The result was that, when the Constitution was formed, quite apart from the teachings of Montesquieu as to the distribution of power

as a safeguard of liberty, the one thing that they were anxious to create was a strong, independent Executive, who, carrying out the laws of Congress, would yet have sufficient inherent strength to preserve his department against the creation of a parliamentary despotism.

In the debates of the Constitutional Convention, it must be admitted that there is very little to be found on this subject. They did discuss the question of removal, so far as the office of President is concerned, because he could not remove himself; and so far as the judiciary is concerned, they intended to give the judges a life tenure and necessarily made some provision for removal for extraordinary reasons. They did assert—and this is the answer to Senator Pepper's charge of executive absolutism—a power in the legislature, to be traced to the old Anglo-Saxon reliance upon the legislature as the ultimate safeguard of liberty, that if the President, in the exercise of his executive functions, wilfully failed in his duty—if he tolerated dishonest, inefficient, or disloyal men in the Executive Department—he or any other officer of the State could be impeached by the House of Representatives, tried by the Senate, and removed from office. But with that exception, there was no suggestion in the debates with respect to the power of removal.

At that time, in the science of government, according to the custom of the nation from which we drew our institutions in great part, and according to the custom of every country, so far as I know, the power to appoint and the power to remove had always been regarded as executive functions.

[In answer to interrogations from the Bench:] No one questions that the Congress, if it vests in the Postmaster General the appointment of a postmaster, can restrain the Postmaster General from removing his subordinate. Congress has control over those upon whom it confers

the mere *statutory* power of appointment. But it has no such power as against the President; because the President's power is not statutory; it is constitutional. In my judgment, the President can remove any one in the Executive Department of the Government. The employees of the judicial branch of the 'Government and the special and direct employees of the Congress, like the Sergeant at Arms, are not officers of the executive branch of the Government, and therefore are not within the grant of executive power to the President. That is one theory. The other theory is the one I first suggested, that the executive power is even · more comprehensive. But it is not necessary for me to press the argument that far.

As Mr. Madison showed in the first great debate on this subject, the power to remove is not a mere incident and is not solely attributable to the power to appoint. It has a much broader basis.

To assume that the only source of the power to remove is the power to appoint is to put the pyramid on its apex; whereas you put the pyramid on its base when you say that the power to remove is part of that which, in sweeping and comprehensive and yet apt phrase, is de-/ nominated the " executive power," coupled with the explanation that the executive power is to " take care that the laws be faithfully executed," a mandate of tremendous significance and import.

The Constitution, in addition to this division of the Government into three great branches, draws this significant distinction between the grant of legislative power and the grant of executive power: In the grant of legislative power, it said (and it never uses a word idly): "All legislative powers *herein granted* shall be vested in a Congress." And when you come to look at the " powers herein granted," you will search in vain for any suggestion of a power to remove by the Congress.

The most one can say is that, under the general power, the omnibus clause of the legislative grant, namely, the power to make laws " for carrying into execution the foregoing powers," there is the implied power to create offices, and according to the theory advanced by opposing counsel, the resultant power to step over the dead line into the Executive Department and assume the right of removal.

When you come to the executive branch of the Government, it is significant that the framers omitted the words " herein granted." Why? They could specify the nature of and classify the legislative powers with reasonable precision. But the executive power was something different. And therefore they simply said " the executive power," not " the executive powers." It was not only in the singular number; but it was intended to describe something that was very familiar to them, and about which they did not believe men could disagree; and therefore they said, remembering the innumerable ills of the old Confederation, " the executive power."

It was not granted to an Executive Department. That is, again, a very significant thing. They might have limited it. But they said: " The executive power shall be vested in a President of the United States "—distinguishing him from all other servants of the Executive Department, and making him the repository of this vast, undefined grant of power called " the executive power." Then they went on to say what that power was—not in any way attempting to classify or enumerate it; but they simply gave its objective, and that was " to take care that the laws be faithfully executed."

It was common sense in the days of the Fathers, when our country was a little one; it is common sense today, when we are the greatest nation in the world; when we have, as I say, 800,000 employees of the State—that the President can not take care that the laws are faithfully executed, unless he has the power of removal, and the

summary power of removal, without any interference or curb upon him. And that has been shown again and again in our history.

But the Constitution did not stop there. There is a clause to which very little significance has been attached in the discussion on this question, but which I submit has great significance. It says that the President shall " commission" officers. There was special significance in the minds of the framers when, in this broad grant of " executive power," they said that the President should commission. Thus there are four steps—nomination; confirmation; appointment; commission. Nomination implies in its very essence the power of removal. It is the power to select at all times and at all places the best man for a position. In the matter of an existing office, the power to nominate includes the power, if necessary, to remove an existing incumbent, to make way for a better man.

Then comes the one qualification of the Constitution: That as to all offices which the Congress may think sufficiently important, no one can be appointed except with the advice and consent of the Senate. It is significant that, while the power of appointment is subject to the confirmation of the Senate, nowhere is there a suggestion in the Constitution that in the conceded power of removal, as an executive power, any such limitation has been put upon it. The power of appointment required local information. At all events, it was a matter in which the framers might well say that the ambassadors of the States desired to be consulted. But when a man has been taken from his locality and has become a part of the federal machinery; when he has been for one or more years under the supervision of the President, who knows best whether that man is faithfully or unfaithfully discharging his duties? How can the Senate know?

From those grants of power; from the nature of the Government; from the division into three different de-

partments; from the sweeping grant of executive power; from the power to nominate; from the duty of taking care that the laws be faithfully executed; from the power to commission, importing a continuation of that confidence which the President, in the very text of the commission, reposes in the appointee—from all those things, I assert that it is a just interpretation of the Constitution, and not a mere implication, that the power to remove is a part of the executive power granted to the President.

This question was discussed very ably about 136 years ago. Mr. Webster, who, in his antipathy to President Jackson, did take advanced ground in that direction— but not going to the great lengths of Senator Pepper— still recognized the tremendous force of the judgment that was reached in the First Congress of the United States. What was the result of that debate? The House of Representatives sustained Mr. Madison. The Senate equally divided; but Vice President Adams in the chair voted for the law in the form that would sustain the President's prerogative. And George Washington, the first President of the United States, the presiding officer of the Constitutional Convention, added his concurrence to the view thus expressed, and would have acted upon it if he had had any occasion to exercise the power of removal.

The first Congress of the United States, which one might almost call an adjourned session of the Constitutional Convention, so determined it. And from that day until it was challenged in Jackson's time, a period of nearly half a century, there never was a question as to the power of the President, nor any attempt by Congress to regulate or curb it. That great controversy was determined in Jackson's favor. And then the question never arose again until, the " tenure of office " acts in President Johnson's administration, and these acts resulted— if I may use a pragmatical argument—in one of the most discreditable chapters in the history of this country. And

now, more than a half century later, as a part of the "irrepressible conflict" between the Congress and the Executive, Congress again raises the question in its most offensive form in the Comptroller General act.

If you take my middle ground, that Congress may guide and direct the discretion of the President by such statutory qualifications as are properly inherent in the nature of an office, but without disturbing the power of removal as the Constitution vested it, Congress can not destroy the independence of the Executive. But if you take Senator Pepper's view and that of his colleague, the power of Congress to put the President in a strait-jacket is unlimited.

This is a grave question. The men who framed the Constitution honestly believed that we could never succeed through a legislative despotism. I am quite willing to concede also that they believed that our nation could not endure an executive despotism. I am not contending for an executive absolutism; but I am protesting against a legislative absolutism.

The CHIEF JUSTICE. Mr. Beck, would it interrupt you for me to ask you to state specifically what your idea is in regard to the middle ground to which you referred? What kind of a method did you mean?

Mr. BECK. Well, I instanced one case, Mr. Chief Justice. I will try to give two or three illustrations: Take, for example, the kind of law I first cited, a law that says that an office is created and that the President shall appoint somebody to the office, and that he shall be removable for inefficiency and dishonesty. That largely leaves the President's prerogative untouched.

The CHIEF JUSTICE. Do you mean that he still would retain the power of absolute removal without having any such cause as that mentioned in the statute?

Mr. BECK. Exactly. And he would apply the legislative standard that had been given to him, *viz*, whether the incumbent was inefficient or dishonest.

Suppose the Congress creates an office and says that it shall only be filled by a man learned in the law; and suppose it further provides that, if a man ceases to be a member of the bar, he shall be removed. I am not prepared to say that such a law can not be reconciled with the Constitution. What I do say is that, when the condition imposed upon the creation of the office has no reasonable relation to the office; when it is not a legislative standard to be applied by the President, and is not the declaration of qualifications, but is the creation of an appointing power other than. the President, then Congress has crossed the dead line, for it has usurped the prerogative of the President.

The power to suspend, within the interpretation of the Constitution, is only part of the power to remove. No one contends now that impeachment is the only way. There has never been since the first Congress a contention that, unless Congress affirmatively requires the consent of the Senate to a removal, the Senate concurrence is necessary. You need not determine in this case whether Congress may not reasonably regulate and control or guide the discretion of the President as to the act of removal, so long as it does not impair his essential power of removal. I do not want to question any part of the great prerogative of the President by conceding, or by inviting this Court to say, that there is any power of control which would prevent the President, in a case properly within his discretion, from exercising the power of removal in the teeth of an act of Congress.

The *amicus curiæ* argues that the genius of our race requires that the last hope of the people shall be reposed in the legislative branch of the Government. I reply that such last hope is reposed in neither the legislative branch, nor the executive. It is reposed in the Constitution of the United States, which has seen fit to divide the powers in such a way that neither of these three great departments can monopolize the powers of government.

The Constitution preserved such equilibrium; it takes away from the President the temptation to remove any important official without cause, because the moment he appoints a successor the Senate must be consulted. Moreover, Congress has its power over the purse strings. It has the power of impeachment. It can abolish the office altogether. It can fully legislate as to the nature of offices, which it creates, but it can not create an office upon conditions which change the fundamental nature of our Government.

If it is within the power of Congress to create offices in such a way and by such methods as to redistribute the ·-powers of -government, then the Constitution will, sooner or later, become, by Congressional usurpation, a house of cards.

Our form of government is a magnificent edifice, erected by a hundred and thirty-six years of patient sacrifice and labor. It has its " cloudcapped towers; " its " gorgeous palaces; " its " solemn temples "—and this great Court is such a temple. But if the Court should sustain appellant's contention, this noble edifice of constitutional liberty might one day become an " insubstantial pageant faded," and posterity might then say that it was not the work of supremely great men, but of muddled dreamers, for it would be of " such stuff as dreams are made of."

Extract from the brief of *Solicitor General Beck* and *Mr. Robert P. Reeder,* Special Assistant to the Attorney General, for the United States.

The statute can be held unconstitutional without assuming the absolute power of the President to remove any executive officer. It may, in creating the office, limit the duration of the term thereof.

In the present case, no legislative standard is prescribed and no general policy laid down, except that the President may not exercise his executive function of re-

moval except with the consent of the Senate. This necessarily associates the Senate with the President in the exercise of a purely executive function. Such a law does not regulate the power of removal.

There may be a middle ground between absolute power in the President to remove and absolute power in Congress to control removal. The power of removal may be subject to such general laws as do not destroy the exercise by the President of his power of removal, but allow its exercise subject to standards of public service. If this " middle ground" does not commend itself to the Court, then the broader question becomes whether the power of removal is a constitutional prerogative of the President and, as such, can not be regulated by Congress.

On this theory, Congress may undoubtedly control the power to regulate the removal, when exercised *by any other official,* to whom the power of appointment has been delegated (for they owe their power of appointment solely to Congress,) and unquestionably the Congress can grant to other officials—such as the heads of departments—the power of appointment upon any conditions as to the power of removal by them that it thinks proper. The power of the President, however, is not *statutory,* but *constitutional.* As it is indisputable that the removal of a civil servant is essentially an executive power, it must follow that, as executive power is vested in a President, the power of removal inheres in him as a part of his prerogative, except where such power is expressly limited by the Constitution. It cannot now be seriously contended that the removal by the President of civil officers, who are his subordinates, must await the slow process of impeachment.

From the beginning of the Government removal has been recognized as essentially an executive function. In no sense is it either judicial or legislative. The only question, therefore, is whether Congress by reason of its

legislative power can control the exercise by the President of his executive power of removal; and that power of removal does not depend upon any implication of the Constitution but upon the well-considered delegation of powers in the Constitution itself. A cursory examination of the constitutions of many modern States discloses that, with one or possibly two exceptions, no power of removal is expressly given and that it is invariably treated by necessary implication as a function of the executive. This Court has often recognized that the power to remove is a necessary incident to the power to appoint, and that it is an executive power.

There seems to be but one explanation for the failure of the Constitutional Convention to discuss the question of removal (except in respect of the President and the judges); they regarded it as axiomatic that the power to remove was an executive power and that it was included within the grant of " executive power " to the President and the special grant that he should " take care that the laws be faithfuly executed." Under the Articles of Confederation, the Congress had the power of removal, but the Virginia Plan contemplated the transfer of such " executive rights " to the national executive. The Virginia Plan was the Constitution in embryo. That constitution, as finally developed by the Committee on Style, commenced with three separate articles, which were intended to carry out the division of powers, then so generally recognized. The various powers respectively assigned to each of the trinity were classified with admirable precision in the three Articles; and the attempt to keep them separate and distinct, except in so far as the Constitution expressly interblended them, is clear. There is, however, a very significant difference between the first sections of Art. I and Art. II, respectively. Art. I, § 1, provides: "All legislative Powers *herein granted* shall be vested in a Congress of the United States." Art. II, § 2, provides: *"The*

executive Power shall be vested in a President." It does not use the words " herein granted," nor does it speak of a class of powers as the preceding section, but it speaks of the " executive power; " and the executive power, as understood at that time in the science of government, always included both the power to appoint and the power to remove.

No attempt was made to specify the various kinds of executive power, as was done in respect of the legislative. Remembering the impotence of the Confederation because of its lack of an executive, the Framers desired to give to the President the fullest " executive power," except where they limited it; but, without defining, they indicated the nature of that power by several sweeping phrases. Upon him was the great obligation to " take care that the laws be faithfully executed " and he " shall commission all the officers of the United States."

To grant a commission was a prerogative of the Executive,—in England the " Crown,"—as distinguished from the legislature. Every officer of the State in England at that time received his commission directly or indirectly from the King. The Framers departed from this model by the requirement that the Senate should consent to the appointments. But, having consented, the function of the Senate ends, and the commission of every high federal official comes to him not from Congress, which created the office, but from the President. The commission recites that the President " reposing special trust and confidence " does appoint—and " authorizes and empowers—to execute and fulfill the duties of the office." This is something more than a clerical detail; and, reading it in connection with the British theory that the executive and not the legislature was the fountain head of political preferment, it means that it is the President who commissions. Even after the Senate has consented to the

appointment, the President may still refuse to deliver the commission and invite the Senate to concur in another selection.

If Congress can require the concurrence of the Senate in the removal of officers of the Army and the Navy as against the President's power of removal, then the President's power as Commander in Chief is potentially as weak as was that of Washington when he commanded the American Army, between 1775–1781, and the officers and soldiers of the States came and went at the pleasure of those States.

In three respects only did the Constitution limit the executive power of the President: *viz.*, the declaration of war, the making of treaties, and in the making of appointments.

A clear distinction is made between nomination, appointment, and commission—three stages, in only one of which does the Senate participate. To nominate is to select the best man for a given position. Charged with the responsibility to the people for faithful execution of the laws, the President must have the power to select the human agencies through whom he discharges his duties, if he is to meet the responsibility. The only constitutional limitation upon the President's power of selection is that he cannot appoint the higher officers until he has first obtained the advice and consent of the Senate. This restriction, being an exception to a general grant, must be limited to the fair meaning of the words used. Nowhere is there a suggestion that the President's power to remove, which the Constitution takes for granted as a part of the executive power, must likewise be effected with the advice and consent of the Senate. To justify this exception, it is necessary to read words into the Constitution which are not there.

It can not be argued that the Framers of the Constitution did not take into account the possibility that removals

would be necessary. Where they intended a servant of the State to have a life tenure they said so. Only judicial officers were thus to serve. They knew that the President would necessarily discharge his duties through many civil servants. The very form of the Government was a great experiment. It all depended upon the wisdom of those who should conduct its operations. It is quite obvious that they must have recognized that the selection of civil servants would inevitably be attended by many errors in judgment. With all this in mind, it seems inconceivable that they could have intended that no officer should be removed except with the consent of the Congress—often not in session—or that their careful restriction of the senatorial power of confirmation to the appointment of public servants should apply also to the very different question of a removal of those servants. There was substantial reason why they should thus qualify the power of appointment, for intercommunication between the constituent States was very inconsiderable; and if the patronage of the Government was to be distributed, no President would have the local knowledge to select the men from various localities. But after appointment, the President became the best judge as to whether the retention of an official was in the interests of the public service.

There remains, however, the final clause, which, if it stood alone, would justify the implication of the President's power to remove; for Article II, § 3, provides that the President " shall take care that the laws be faithfully executed." If he fail in this duty, he may be impeached. Apart from impeachment, the people may refuse to give him another term of office. His reputation is vitally concerned in the ability to do those things which this grave responsibility requires. It would be a cruel injustice to the President to hold him responsible for the faithful execution of the laws, if he has no control

over the human agencies whom he must, of necessity, employ for this purpose.

While this Court did not find it necessary in *Parsons* v. *United States,* 167 U. S. 324, to base its decision upon the constitutional rights of the President, its review of the history of the subject shows that the overwhelming weight of authority is in favor of the President's power to remove from office, so that it seems clear that, if necessary, the Court would have then held that an act depriving the President of this power was unconstitutional. A contemporaneous legislative exposition of the Constitution acquiesced in for a long term of years fixes the construction to be given to its provisions. *Stuart* v. *Laird,* 1 Cr. 299; *Briscoe* v. *Bank of Ky.,* 11 Pet. 257; *Burrow-Giles Co.* v. *Sarony,* 111 U. S. 53; *Ames* v. *Kansas,* 111 U. S. 449; *Cooper Mfg. Co.* v. *Ferguson,* 113 U. S. 727; *United States* v. *Philbrick,* 120 U. S. 52; *United States* v. *Hill,* 120 U. S. 169; *Robertson* v. *Downing,* 127 U. S. 607; *Schell's Exrs.* v. *Fauche,* 138 U. S. 562; *Field* v. *Clark,* 143 U. S. 649; *Ex parte Grossman,* 267 U. S. 87. Blaine, Twenty Years of Congress, II, p. 270.

[The brief then reviews at length the arguments in the first Congress touching the President's power of removal, citing: Annals of Congress; Life and Works of John Adams, III, 407–412; Journal of William Maclay, 109–118; Letters, Madison to Patton, March 24, 1834; Madison to Edward Coles, October 15, 1834; Madison to Adams, October 13, 1835.]

The law which was then enacted received the approval of George Washington, the President who had presided over the deliberations of the Constitutional Convention, and the principles which it recognized were thereafter accepted without question for generations and until, in the fiery passions of the Civil War, the enemies of Andrew Johnson sought to cripple him. In its legislation

Congress recognized that the President's power to make removals arose from the Constitution itself and not from any federal legislation.

Presidents of the United States have repeatedly made removals from office without asking for the consent of the Senate. For example, Adams, when Vice President, in 1789 cast the deciding vote in recognition of the President's power, showing the opinion which he had formed during the debate in the Senate. In May, 1800, as President, he acted upon this opinion by summarily discharging Pickering from the position of Secretary of State after the Secretary had refused to resign. Life and Works of John Adams, IX, p. 55. Jackson, in 1833, dismissed Duane, as Secretary of the Treasury. Sumner, Andrew Jackson, p. 354. Later many Attorneys General advised their official chiefs of the power of the President to make removals from office. Legare, in 1842, 4 Op. At. Gen. 1; Clifford, in 1847, 4 Op. At. Gen. 609; Cushing, in 1851, 5 Op. At. Gen. 223; Devens, in 1878, 15 Op. At. Gen. 421. Jackson, on February 10, 1835, declined to comply with a resolution of the Senate requesting the charges which caused the removal of an official from office. Messages of the Presidents, III, p. 133. Johnson vetoed the Tenure of Office Act on March 2, 1867, upon the ground that it was unconstitutional. *Id.,* VI, p. 497. Grant, December 6, 1869, recommended total repeal of that Act. *Id.,* VII, p. 38. Cleveland, March 1, 1886, denied the right of the Senate to require his reasons for removing officials. *Id.,* VIII, p. 379. Wilson, in the last year of his administration, vetoed the bill for a national budget because in § 303 it provided that a Comptroller General and an Assistant Comptroller General should be appointed by the President with the advice and consent of the Senate, but that they should be removable only by concurrent resolution of both Houses of Congress for specified causes or by impeachment. Cong. Rec., June 4, 1920, pp.

8609, 8610. President Coolidge took a strong position upon the power of the President to remove an officer of the Government without the consent of the Senate and the impropriety of Senatorial interference in favor of or against his exercise of that power. Cong. Rec., vol. 65, pp. 2245, 2335, 2339.

*Mr. Will R. King,* for the appellant, closed the argument.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This case presents the question whether under the Constitution the President has the exclusive power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate.

Myers, appellant's intestate, was on July 21, 1917, appointed by the President, by and with the advice and consent of the Senate, to be a postmaster of the first class at Portland, Oregon, for a term of four years. On January 20, 1920, Myers' resignation was demanded. He refused the demand. On February 2, 1920, he was removed from office by order of the Postmaster General, acting by direction of the President. February 10th, Myers sent a petition to the President and another to the Senate Committee on Post Offices, asking to be heard, if any charges were filed. He protested to the Department against his removal, and continued to do so until the end of his term. He pursued no other occupation and drew compensation for no other service during the interval. On April 21, 1921, he brought this suit in the Court of Claims for his salary from the date of his removal, which, as claimed by supplemental petition filed after July 21, 1921, the end of his term, amounted to $8,838.71. In August, 1920, the President made a recess appointment of one Jones, who took office September 19, 1920.

The Court of Claims gave judgment against Myers, and this is an appeal from that judgment. The Court held that he had lost his right of action because of his delay in suing, citing *Arant* v. *Lane*, 249 U. S. 367; *Nicholas* v. *United States*, 257 U. S. 71, and *Norris* v. *United States*, 257 U. S. 77. These cases show that when a United States officer is dismissed, whether in disregard of the law or from mistake as to the facts of his case, he must promptly take effective action to assert his rights. But we do not find that Myers failed in this regard. He was constant in his efforts at reinstatement. A hearing before the Senate Committee could not be had till the notice of his removal was sent to the Senate or his successor was nominated. From the time of his removal until the end of his term, there were three sessions of the Senate without such notice or nomination. He put off bringing his suit until the expiration of the Sixty-sixth Congress, March 4, 1921. After that, and three months before his term expired, he filed his petition. Under these circumstances, we think his suit was not too late. Indeed the Solicitor General, while not formally confessing error in this respect, conceded at the bar that no laches had been shown.

By the 6th section of the Act of Congress of July 12, 1876, 19 Stat. 80, 81, c. 179, under which Myers was appointed with the advice and consent of the Senate as a first-class postmaster, it is provided that

" Postmasters of the first, second and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate and shall hold their offices for four years unless sooner removed or suspended according to law."

The Senate did not consent to the President's removal of Myers during his term. If this statute, in its requirement that his term should be four years unless sooner removed by the President by and with the consent of the

Senate, is valid, the appellant, Myers' administratrix, is entitled to recover his unpaid salary for his full term, and the judgment of the Court of Claims must be reversed. The Government maintains that the requirement is invalid, for the reason that under Article II of the Constitution the President's power of removal of executive officers appointed by him with the advice and consent of the Senate is full and complete without consent of the Senate. If this view is sound, the removal of Myers by the President without the Senate's consent was legal and the judgment of the Court of Claims against the appellant was correct and must be affirmed, though for a different reason from that given by that court. We are therefore confronted by the constitutional question and can not avoid it.

The relevant parts of Article II of the Constitution are as follows:

" Section 1. The executive Power shall be vested in a President of the United States of America.   .   .   .

" Section 2. The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any subject relating to the duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment.

" He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States whose Appointments are not herein otherwise provided for, and which shall be estab-

lished by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

" The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

" Section 3. He shall from time to time give to the Congress information of the State of the Union and recommend to their consideration such measures as he shall judge necessary and expedient; he may, on extraordinary occasions, convene both Houses or either of them, and in case of disagreement between them with respect to the time of adjournment, he may adjourn them to such time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

" Section 4. The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other High Crimes and Misdemeanors."

Section 1 of Article III, provides:

" The judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the Supreme and inferior Courts, shall hold their offices during good behavior. . . ."

The question where the power of removal of executive officers appointed by the President by and with the advice and consent of the Senate was vested, was presented early in the first session of the First Congress. There is no express provision respecting removals in the Constitution, except as Section 4 of Article II, above quoted, provides. for removal from office by impeachment. The subject

was not discussed in the Constitutional Convention. Under the Articles of Confederation, Congress was given the power of appointing certain executive officers of the Confederation, and during the Revolution and while the Articles were given effect, Congress exercised the power of removal.   May, 1776, 4 Journals of the Continental Congress, Library of Congress Ed., 361; August 1, 1777, 8 Journals, 596; January 7, 1779, 13 Journals, 32–33; June 1779, 14 Journals, 542, 712, 714; November 23, 1780, 18 Journals, 1085; December 1, 1780, 18 Journals, 1115.

Consideration of the executive power was initiated in the Constitutional Convention by the seventh resolution in the Virginia Plan, introduced by Edmund Randolph. 1 Farrand, Records of the Federal Convention, 21.   It gave to the Executive "all the executive powers of the Congress under the Confederation," which would seem therefore to have intended to include the power of removal which had been exercised by that body as incident to the power of appointment.   As modified by the Committee of the Whole this resolution declared for a national executive of one person, to be elected by the legislature, with power to carry into execution the national laws and to appoint to offices in cases not otherwise provided for.   It was referred to the Committee on Detail, 1 Farrand, 230, which recommended that the executive power should be vested in a single person, to be styled the President of the United States; that he should take care that the laws of the United States be duly and faithfully executed, and that he should commission all the officers of the United States and appoint officers in all cases not otherwise provided by the Constitution.   2 Farrand, 185.   The committee further recommended that the Senate be given power to make treaties, and to appoint ambassadors and judges of the Supreme Court.

After the great compromises of the Convention—the one giving the States equality of representation in the

Senate, and the other placing the election of the President, not in Congress as once voted, but in an electoral college, in which the influence of larger States in the selection would be more nearly in proportion to their population—the smaller States, led by Roger Sherman, fearing that under the second compromise the President would constantly be chosen from one of the larger States, secured a change by which the appointment of all officers, which theretofore had been left to the President without restriction, was made subject to the Senate's advice and consent, and the making of treaties and the appointments of ambassadors, public ministers, consuls and judges of the Supreme Court were transferred to the President, but made subject to the advice and consent of the Senate. This third compromise was effected in a special committee, in which Gouverneur Morris of Pennsylvania represented the larger States and Roger Sherman the smaller States. Although adopted finally without objection by any State in the last days of the Convention, members from the larger States, like Wilson and others, criticized this limitation of the President's power of appointment of executive officers and the resulting increase of the power of the Senate. 2 Farrand, 537, 538, 539.

In the House of Representatives of the First Congress, on Tuesday, May 18, 1789, Mr. Madison moved in the Committee of the Whole that there should be established three executive departments—one of Foreign Affairs, another of the Treasury, and a third of War—at the head of each of which there should be a Secretary, to be appointed by the President by and with the advice and consent of the Senate, and to be removable by the President. The committee agreed to the establishment of a Department of Foreign Affairs, but a discussion ensued as to making the Secretary removable by the President. 1 Annals of Congress, 370, 371. " The question was now taken and carried, by a considerable majority, in favor

of declaring the power of removal to be in the President."
1 Annals of Congress, 383.

On June 16, 1789, the House resolved itself into a
Committee of the Whole on a bill proposed by Mr. Madison for establishing an executive department to be denominated the Department of Foreign Affairs, in which
the first clause, after stating the title of the officer and
describing his duties, had these words: "to be removable
from office by the President of the United States." 1 Annals of Congress, 455. After a very full discussion the
question was put: shall the words "to be removable by
the President" be struck out? It was determined in the
negative—yeas 20, nays 34. 1 Annals of Congress, 576.

On June 22, in the renewal of the discussion, "Mr.
Benson moved to amend the bill, by altering the second
clause, so as to imply the power of removal to be in the
President alone. The clause enacted that there should
be a chief clerk, to be appointed by the Secretary of
Foreign Affairs, and employed as he thought proper, and
who, in case of vacancy, should have the charge and custody of all records, books, and papers appertaining to
the department. The amendment proposed that the
chief clerk, 'whenever the said principal officer shall be
removed from office by the President of the United
States, or in any other case of vacancy,' should during
such vacancy, have the charge and custody of all records,
books, and papers appertaining to the department." 1
Annals of Congress, 578.

"Mr. Benson stated that his objection to the clause
'to be removable by the President' arose from an idea
that the power of removal by the President hereafter
might appear to be exercised by virtue of a legislative
grant only, and consequently be subjected to legislative
instability, when he was well satisfied in his own mind
that it was fixed by a fair legislative construction of the
Constitution." 1 Annals of Congress, 579.

"Mr. Benson declared, if he succeeded in this amendment, he would move to strike out the words in the first clause, 'to be removable by the President' which appeared somewhat like a grant. Now, the mode he took would evade that point and establish a legislative construction of the Constitution. He also hoped his amendment would succeed in reconciling both sides of the House to the decision, and quieting the minds. of gentlemen." 1 Annals of Congress, 578.

Mr. Madison admitted the objection made by the gentleman near him (Mr. Benson) to the words in the bill. He said: "They certainly may be construed to imply a legislative grant of the power. He wished everything like ambiguity expunged, and the sense of the House explicitly declared, and therefore seconded the motion. Gentlemen have all along proceeded on the idea that the Constitution vests the power in the President; and what arguments were brought forward respecting the convenience or inconvenience of such disposition of the power, ·vere intended only to throw light upon what was meant by the compilers of the Constitution. Now, as the words proposed by the gentleman from New York expressed to his mind the meaning of the Constitution, he should be in favor of them, and would agree to strike out those agreed to in the committee." 1 Annals of Congress, 578, 579.

Mr. Benson's first arˌndment to alter the second clause by the insertion of the italicized words, made that clause.to read as follows:

"That there shall be in the State Department an inferior officer to be appointed by the said principal officer, and to be employed therein as he shall deem proper, to be called the Chief Clerk in the Department of Foreign Affairs, *and who, whenever the principal officer shall be removed from office by the President of the United States,* or in any other case of vacancy, shall, during such va-

23468°—27——8

cancy, have charge and custody of all records, books and papers appertaining to said department."

The first amendment was then approved by a vote of thirty to eighteen.  1 Annals of Congress, 580.  Mr. Benson then moved to strike out in the first clause the words " to be removable by the President," in pursuance of the purpose he had already declared, and this second motion of his was carried by a vote of thirty-one to nineteen. 1 Annals of Congress, 585.

The bill as amended was ordered to be engrossed, and read the third time the next day, June 24, 1789, and was then passed by a vote of twenty-nine to twenty-two, and the Clerk was directed to carry the bill to the Senate and desire their concurrence.  1 Annals of Congress, 591.

It is very clear from this history that the exact question which the House voted upon was whether it should recognize and declare the power of the President under the Constitution to remove the Secretary of Foreign Affairs without the advice and consent of the Senate. That was what the vote was taken for.  Some effort has been made to question whether the decision carries the result claimed for it, but there is not the slightest doubt, after an examination of the record, that the vote was, and was intended to be, a legislative declaration that the power to remove officers appointed by the President and the Senate vested in the President alone, and until the Johnson Impeachment trial in 1868, its meaning was not doubted even by those who questioned its soundness.

The discussion was a very full one.  Fourteen out of the twenty-nine who voted for the passage of the bill, and eleven of the twenty-two who voted against the bill took part in the discussion.  Of the members of the House, eight had been in the Constitutional Convention, and of these, six voted with the majority, and two, Roger Sherman and Eldridge Gerry, the latter of whom had refused to sign the Constitution, voted in the minority.  After

the bill as amended had passed the House, it was sent to the Senate, where it was discussed in secret session, without report. The critical vote there was upon the striking out of the clause recognizing and affirming the unrestricted power of the President to remove. The Senate divided by ten to ten, requiring the deciding vote of the Vice-President, John Adams, who voted against striking out, and in favor of the passage of the bill as it had left the House.* Ten of the Senators had been in the Constitutional Convention, and of them six voted that the power of removal was in the President alone. The bill having passed as it came from the House was signed by President Washington and became a law. Act of July 27, 1789, 1 Stat. 28, c. 4.

The bill was discussed in the House at length and with great ability. The report of it in the Annals of Congress is extended. James Madison was then a leader in the House, as he had been in the Convention. His arguments in support of the President's constitutional power of removal independently of Congressional provision, and without the consent of the Senate, were masterly, and he carried the House.

It is convenient in the course of our discussion of this case to review the reasons advanced by Mr. Madison and his associates for their conclusion, supplementing them, so far as may be, by additional considerations which lead this Court to concur therein.

First. Mr. Madison insisted that Article II by vesting the executive power in the President was intended to grant to him the power of appointment and removal of executive officers except as thereafter expressly provided in that Article. He pointed out that one of the chief

––––––––––––––––

* Maclay shows the vote ten to ten. Journal of William Maclay, 116. John Adams' Diary shows nine to nine. 3 C. F. Adams, Works of John Adams, 412. Ellsworth's name appears in Maclay's list as voting against striking out, but not in that of Adams—evidently an inadvertence.

purposes of the Convention was to separate the legislative from the executive functions.   He said:

" If there is a principle in our Constitution, indeed in any free Constitution, more sacred than another, it is that which separates the Legislative, Executive and Judicial powers.   If there is any point in which the separation of the Legislative and Executive powers ought to be maintained with great caution, it is that which relates to officers and offices."   1 Annals of Congress, 581.

Their union under the Confederation had not worked well, as the members of the convention knew.   Montesquieu's view that the maintenance of independence as between the legislative, the executive and the judicial branches was a security for the people had their full approval.   Madison in the Convention, 2 Farrand, Records of the Federal Convention, 56.   *Kendall* v. *United States,* 12 Peters 524, 610.   Accordingly, the Constitution was so framed as to vest in the Congress all legislative powers therein granted, to vest in the President the executive power, and to vest in one Supreme Court and such inferior courts as Congress might establish, the judicial power.   From this division on principle, the reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires.   Madison, 1 Annals of Congress, 497.   This rule of construction has been confirmed by this Court in *Meriwether* v. *Garrett,* 102 U. S. 472, 515; *Kilbourn* v. *Thompson,* 103 U. S. 168, 190; *Mugler* v. *Kansas,* 123 U. S. 623, 662.

The debates in the Constitutional Convention indicated an intention to create a strong Executive, and after a controversial discussion the executive power of the Government was vested in one person and many of his important functions were specified so as to avoid the

humiliating weakness of the Congress during the Revolution and under the Articles of Confederation.   1 Farrand, 66–97.

Mr. Madison and his associates in the discussion in the House dwelt at length upon the necessity there was for construing Article II to give the President the sole power of removal in his responsibility for the conduct of the executive branch, and enforced this by emphasizing his duty expressly declared in the third section of the Article to "take care that the laws be faithfully executed."   Madison, 1 Annals of Congress, 496, 497.

The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws.   He must execute them by the assistance of subordinates.   This view has since been repeatedly affirmed by this Court.   *Wilcox* v. *Jackson,* 13 Peters 498, 513; *United States* v. *Eliason,* 16 Peters 291, 302; *Williams* v. *United States,* 1 How. 290, 297; *Cunningham* v. *Neagle,* 135 U. S. 1, 63; *Russell Co.* v. *United States,* 261 U. S. 514, 523.   As he is charged specifically to take care that they be faithfully executed, the reasonable implication, even in the absence of express words, was that as part of his executive power he should select those who were to act for him under his direction in the execution of the laws.   The further implication must be, in the absence of any express limitation respecting removals, that as his selection of administrative officers is essential to the execution of the laws by him, so must be his power of removing those for whom he can not continue to be responsible.   Fisher Ames, 1 Annals of Congress, 474.   It was urged that the natural meaning of the term "executive power" granted the President included the appointment and removal of executive subordinates.   If such appointments and removals were not an exercise of the executive power, what were they?   They certainly

were not the exercise of legislative or judicial power in government as usually understood.

It is quite true that, in state and colonial governments at the time of the Constitutional Convention, power to make appointments and removals had sometimes been lodged in the legislatures or in the courts, but such a disposition of it was really vesting part of the executive power in another branch of the Government. In the British system, the Crown, which was the executive, had the power of appointment and removal of executive officers, and it was natural, therefore, for those who framed our Constitution to regard the words "executive power" as including both. *Ex Parte Grossman*, 267 U. S. 87, 110. Unlike the power of conquest of the British Crown, considered and rejected as a precedent for us in *Fleming* v. *Page*, 9 How. 603, 618, the association of removal with appointment of executive officers is not incompatible with our republican form of Government.

The requirement of the second section of Article II. that the Senate should advise and consent to the Presidential appointments, was to be strictly construed. The words of section 2, following the general grant of executive power under section 1, were either an enumeration and emphasis of specific functions of the Executive, not all inclusive, or were limitations upon the general grant of the executive power, and as such, being limitations, should not be enlarged beyond the words used. Madison, 1 Annals, 462, 463, 464. The executive power was given in general terms, strengthened by specific terms where emphasis was regarded as appropriate, and was limited by direct expressions where limitation was needed, and the fact that no express limit was placed on the power of removal by the Executive was convincing indication that none was intended. This is the same construction of Article II as that of Alexander Hamilton quoted *infra*.

Second. The view of Mr. Madison and his associates was that not only did the grant of executive power to the President in the first section of Article II carry with it the power of removal, but the express recognition of the power of appointment in the second section enforced this view on the well approved principle of constitutional and statutory construction that the power of removal of executive officers was incident to the power of appointment. It was agreed by the opponents of the bill, with only one or two exceptions, that as a constitutional principle the power of appointment carried with it the power of removal. Roger Sherman, 1 Annals of Congress, 491. This principle as a rule of constitutional and statutory construction, then generally conceded, has been recognized ever since. *Ex parte Hennen,* 13 Peters 230, 259; *Reagan* v. *United States,* 182 U. S. 419; *Shurtleff* v. *United States,* 189 U. S. 311, 315. The reason for the principle is that those in charge of and responsible for administering functions of government who select their executive subordinates need in meeting their responsibility to have the power to remove those whom they appoint.

Under section 2 of Article II, however, the power of appointment by the Executive is restricted in its exercise by the provision that the Senate, a part of the legislative branch of the Government, may check the action of the Executive by rejecting the officers he selects. Does this make the Senate part of the removing power? And this, after the whole discussion in the House is read attentively, is the real point which was considered and decided in the negative by the vote already given.

The history of the clause by which the Senate was given a check upon the President's power of appointment makes it clear that it was not prompted by any desire to limit removals. As already pointed out, the important purpose of those who brought about the restriction was to lodge in the Senate, where the small States had equal

representation with the larger States, power to prevent the President from making too many appointments from the larger States. Roger Sherman and Oliver Ellsworth, delegates from Connecticut, reported to its Governor: "The equal representation of the States in the Senate and the voice of that branch in the appointment to offices will secure the rights of the lesser as well as of the greater States." 3 Farrand, 99. The formidable opposition to the Senate's veto on the President's power of appointment indicated that, in construing its effect, it should not be extended beyond its express application to the matter of appointments. This was made apparent by the remarks of Abraham Baldwin, of Georgia, in the debate in the First Congress. He had been a member of the Constitutional Convention. In opposing the construction which would extend the Senate's power to check appointments to removals from office, he said:

"I am well authorized to say that the mingling of the powers of the President and Senate was strongly opposed in the Convention which had the honor to submit to the consideration of the United States and the different States the present system for the government of the Union. Some gentlemen opposed it to the last, and finally it was the principal ground on which they refused to give it their signature and assent. One gentleman called it a monstrous and unnatural connexion and did not hesitate to affirm it would bring on convulsions in the government. This objection was not confined to the walls of the Convention; it has been subject of newspaper declamation and perhaps justly so. Ought we not, therefore, to be careful not to extend this unchaste connexion any further?" 1 Annals of Congress, 557.

Madison said:

"Perhaps there was no argument urged with more success or more plausibly grounded against the Constitution under which we are now deliberating than that founded

on the mingling of the executive and legislative branches of the Government in one body. It has been objected that the Senate have too much of the executive power even, by having control over the President in the appointment to office. Now shall we extend this connexion between the legislative and executive departments which will strengthen the objection and diminish the responsibility we have in the head of the Executive?" 1 Annals of Congress, 380.

It was pointed out in this great debate that the power of removal, though equally essential to the executive power, is different in its nature from that of appointment. Madison, 1 Annals of Congress, 4 97, *et seq.;* Clymer, 1 Annals, 489; Sedgwick, 1 Annals, 522; Ames, 1 Annals, 541, 542; Hartley, 1 Annals, 481. A veto by the Senate—a part of the legislative branch of the Government—upon removals is a much greater limitation upon the executive branch and a much more serious blending of the legislative with the executive than a rejection of a proposed appointment. It is not to be implied. The rejection of a nominee of the President for a particular office does not greatly embarrass him in the conscientious discharge of his high duties in the selection of those who are to aid him, because the President usually has an ample field from which to select for office, according to his preference, competent and capable men. The Senate has full power to reject newly proposed appointees whenever the President shall remove the incumbents. Such a check enables the Senate to prevent the filling of offices with bad or incompetent men or with those against whom there is tenable objection.

The power to prevent the removal of an officer who has served under the President is different from the authority to consent to or reject his appointment. When a nomination is made, it may be presumed that the Senate is, or may become, as well advised as to the fitness of the nomi-

nee as the President, but in the nature of things the
defects in ability or intelligence or loyalty in the adminis-
tration of the laws of one who has served as an officer
under the President, are facts as to which the President,
or his trusted subordinates, must be better informed than
the Senate, and the power to remove him may, there-
fore, be regarded as confined, for very sound and practical
reasons, to the governmental authority which has admin-
istrative control. The power of removal is incident to the
power of appointment, not to the power of advising and
consenting to appointment, and when the grant of the
executive power is enforced by the express mandate to
take care that the laws be faithfully executed, it empha-
sizes the necessity for including within the executive
power as conferred the exclusive power of removal.

Oliver Ellsworth was a member of the Senate of the
First Congress, and was active in securing the imposition
of the Senate restriction upon appointments by the Presi-
dent. He was the author of the Judiciary Act in that
Congress, and subsequently Chief Justice of the United
States. His view as to the meaning of this article of the
Constitution, upon the point as to whether the advice of
the Senate was necessary to removal, like that of Madi-
son, formed and expressed almost in the very atmosphere
of the Convention, was entitled to great weight. What
he said in the discussion in the Senate was reported by
Senator William Patterson, 2 Bancroft, History of the
Constitution of the United States, 192, as follows:

" The three distinct powers, legislative, judicial and
executive should be placed in different hands. 'He shall
take care that the laws be faithfully executed' are sweep-
ing words. The officers should be attentive to the Presi-
dent to whom the Senate is not a council. To turn a
man out of office is an exercise neither of legislative nor
of judicial power; it is like a tree growing upon land that
has been granted. The advice of the Senate does not
make the appointment. The President appoints. There

are certain restrictions in certain cases, but the restriction is as to the appointment and not as to the removal."

In the discussion in the First Congress fear was expressed that such a constitutional rule of construction as was involved in the passage of the bill would expose the country to tyranny through the abuse of the exercise of the power of removal by the President. Underlying such fears was the fundamental misconception that the President's attitude in his exercise of power is one of opposition to the people, while the Congress is their only defender in the Government, and such a misconception may be noted in the discussions had before this Court. This view was properly contested by Mr. Madison in the discussion (1 Annals of Congress, 461), by Mr. Hartley (1 Annals, 481), by Mr. Lawrence (1 Annals, 485), and by Mr. Scott (1 Annals, 533). The President is a representative of the people just as the members of the Senate and of the House are, and it may be, at some times, on some subjects, that the President elected by all the people is rather more representative of them all than are the members of either body of the Legislature whose constituencies are local and not countrywide; and, as the President is elected for four years, with the mandate of the people to exercise his executive power under the Constitution, there would seem to be no reason for construing that instrument in such a way as to limit and hamper that power beyond the limitations of it, expressed or fairly implied.

Another argument advanced in the First Congress against implying the power of removal in the President alone from its necessity in the proper administration of the executive power, was that all embarrassment in this respect could be avoided by the President's power of suspension of officers, disloyal or incompetent, until the Senate could act. To this, Mr. Benson, said:

"Gentlemen ask, will not the power of suspending an officer be sufficient to prevent mal-conduct? Here is some

inconsistency in their arguments. They declare that Congress have no right to construe the Constitution in favor of the President, with respect to removal; yet they propose to give a construction in favor of the power of suspension being exercised by him. Surely gentlemen do not pretend that the President has the power of suspension granted expressly by the Constitution; if they do, they have been more successful in their researches into that instrument than I have been. If they are willing to allow a power of suspending, it must be because they construe some part of the Constitution in favor of such a grant. The construction in this case must be equally unwarrantable. But admitting it proper to grant this power, what then? When an officer is suspended, does the place become vacant? May the President proceed to fill it up? Or must the public business be likewise suspended? When we say an officer is suspended, it implies that the place is not vacant; but the parties may be heard, and, after the officer is freed from the objections that have been taken to his conduct, he may proceed to execute the duties attached to him. What would be the consequence of this? If the Senate, upon its meeting, were to acquit the officer, and replace him in his station, the President would then have a man forced on him whom he considered as unfaithful; and could not, consistent with his duty, and a proper regard to the general welfare, go so far as to entrust him with full communications relative to the business of his department. Without a confidence in the Executive department, its operations would be subject to perpetual discord, and the administration of the Government become impracticable." 1 Annals of Congress, 506.

Mr. Vining said:

"The Departments of Foreign Affairs and War are peculiarly within the powers of the President, and he must be responsible for them; but take away his controlling power, and upon what principle do you require his responsibility?

"The gentlemen say the President may suspend. They were asked if the Constitution gave him this power any more than the other? Do they contend the one to be a more inherent power than the other? If they do not, why shall it be objected to us that we are making a Legislative construction of the Constitution, when they are contending for the same thing?" 1 Annals of Congress, 512.

In the case before us, the same suggestion has been made for the same purpose, and we think it is well answered in the foregoing. The implication of removal by the President alone is no more a strained construction of the Constitution than that of suspension by him alone, and the broader power is much more needed and more strongly to be implied.

Third. Another argument urged against the constitutional power of the President alone to remove executive officers appointed by him with the consent of the Senate is that, in the absence of an express power of removal granted to the President, power to make provision for removal of all such officers is vested in the Congress by section 8 of Article I.

Mr. Madison, mistakenly thinking that an argument like this was advanced by Roger Sherman, took it up and answered it as follows:

"He seems to think (if I understand him rightly) that the power of displacing from office is subject to Legislative discretion; because, having a right to create, it may limit or modify as it thinks proper. I shall not say but at first view this doctrine may seem to have some plausibility. But when I consider that the Constitution clearly intended to maintain a marked distinction between the Legislative, Executive and Judicial powers of Government; and when I consider that if the Legislature has a power, such as is contended for, they may subject and transfer at discretion powers from one department of our Government to another; they may, on that principle,

exclude the President altogether from exercising any authority in the removal of officers; they may give [it] to the Senate alone, or the President and Senate combined; they may vest it in the whole Congress; or they may reserve it to be exercised by this house.   When I consider the consequences of this doctrine, and compare them with the true principles of the Constitution, I own that I can not subscribe to it.  . . ."   1 Annals of Congress, 495, 496.

Of the eleven members of the House who spoke from amongst the twenty-two opposing the bill, two insisted that there was no power of removing officers after they had been appointed, except by impeachment, and that the failure of the Constitution expressly to provide another method of removal involved this conclusion. Eight of them argued that the power of removal was in the President and the Senate—that the House had nothing to do with it; and most of these were very insistent upon this view in establishing their contention that it was improper for the House to express in legislation any opinion on the constitutional question whether the President could remove without the Senate's consent.

The constitutional construction that excludes Congress from legislative power to provide for the removal of superior officers finds support in the second section of Article II.   By it the appointment of all officers, whether superior or inferior, by the President is declared to be subject to the advice and consent of the Senate.   In the absence of any specific provision to the contrary, the power of appointment to executive office carries with it, as a necessary incident, the power of removal.   Whether the Senate must concur in the removal is aside from the point we now are considering.   That point is, that by the specific constitutional provision for appointment of executive officers with its necessary incident of removal, the power of appointment and removal is clearly provided for by

the Constitution, and the legislative power of Congress in respect to both is excluded save by the specific exception as to inferior offices in the clause that follows, *viz,* "but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." These words, it has been held by this Court, give to Congress the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them. *United States* v. *Perkins,* 116 U. S. 483, 485. Here, then, is an express provision, introduced in words of exception, for the exercise by Congress of legislative power in the matter of appointments and removals in the case of inferior executive officers. The phrase " But Congress may by law vest " is equivalent to " excepting that Congress may by law vest." By the plainest implication it excludes Congressional dealing with appointments or removals of executive officers not falling within the exception, and leaves unaffected the executive power of the President to appoint and remove them.

A reference of the whole power of removal to general legislation by Congress is quite out of keeping with the plan of government devised by the framers of the Constitution. It could never have been intended to leave to Congress unlimited discretion to vary fundamentally the operation of the great independent executive branch of government and thus most seriously to weaken it. It would be a delegation by the Convention to Congress of the function of defining the primary boundaries of another of the three great divisions of government. The inclusion of removals of executive officers in the executive power vested in the President by Article II, according to its usual definition, and the implication of his power of removal of such officers from the provision of section 2 expressly recognizing in him the power of their appoint-

ment, are a much more natural and appropriate source of
the removing power.

It is reasonable to suppose also that, had it been in-
tended to give to Congress power to regulate or control
removals in the manner suggested, it would have been in-
cluded among the specifically enumerated legislative
powers in Article I, or in the specified limitations on the
executive power in Article II. The difference between
the grant of legislative power under Article I to Congress,
which is limited to powers therein enumerated, and the
more general grant of the executive power to the Presi-
dent under Article II, is significant. The fact that the
executive power is given in general terms strengthened
by specific terms where emphasis is appropriate, and
limited by direct expressions where limitation is needed
and that no express limit is placed on the power of re-
moval by the executive, is a convincing indication that
none was intended.

It is argued that the denial of the legislative power to
regulate removals in some way involves the denial of
power to prescribe qualifications for office, or reasonable
classification for promotion, and yet that has been often
exercised. We see no conflict between the latter power
and that of appointment and removal, provided of course
that the qualifications do not so limit selection and so
trench upon executive choice as to be in effect legislative
designation. As Mr. Madison said in the First Congress:

" The powers relative to offices are partly Legislative
and partly Executive. The Legislature creates the office,
defines the powers, limits its duration and annexes a com-
pensation. This done, the Legislative power ceases.
They ought to have nothing to do with designating the
man to fill the office. That I conceive to be of an Execu-
tive nature. Although it be qualified in the Constitution,
I would not extend or strain that qualification beyond the
limits precisely fixed for it. We ought always to con-

sider the Constitution with an eye to the principles upon which it was founded. In this point of view, we shall readily conclude that if the Legislature determines the powers, the honors, and emoluments of an office, we should be insecure if they were to designate the officer also. The nature of things restrains and confines the Legislative and Executive authorities in this respect; and hence it is that the Constitution stipulates for the independence of each branch of the Government." 1 Annals of Congress, 581, 582.

The legislative power here referred to by Mr. Madison is the legislative power of Congress under the Constitution, not legislative power independently of it. Article II expressly and by implication withholds from Congress power to determine who shall appoint· and who shall remove except as to inferior offices. To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed, and their compensation—all except as otherwise provided by the Constitution.

An argument in favor of full Congressional power to make or withhold provision for removals of all appointed by the President is sought to be found in an asserted analogy between such a power in Congress and its power in the establishment of inferior federal courts. By Article III the judicial power of the United States is vested in one Supreme Court and in such inferior courts as the Congress may from time to time establish. By section 8 of Article I, also, Congress is given power to constitute tribunals inferior to the Supreme Court. By the second section the judicial power is extended to all cases in law and equity under this Constitution and to a substantial number of other classes of cases. Under the ac-

23468°—27——9

cepted construction the cases mentioned in this section are treated as a description and reservoir of the judicial power of the United States and a boundary of that federal power as between the United States and the States, and the field of jurisdiction within the limits of which Congress may vest particular jurisdiction in any one inferior federal court which it may constitute. It is clear that the mere establishment of a federal inferior court does not vest that court with all the judicial power of the United States as conferred in the second section of Article III, but only that conferred by Congress specifically on the particular court. It must be limited territorially and in the classes of cases to be heard; and the mere creation of the court does not confer jurisdiction except as it is conferred in the law of its creation or its amendments. It is said that, similarly, in the case of the executive power which is "vested in the President," the power of appointment and removal can not arise until Congress creates the office and its duties and powers, and must accordingly be exercised and limited only as Congress shall in the creation of the office prescribe.

We think there is little or no analogy between the two legislative functions of Congress in the cases suggested. The judicial power described in the second section of Article III is vested in the courts collectively, but is manifestly to be distributed to different courts and conferred or withheld as Congress shall in its discretion provide their respective jurisdictions, and is not all to be vested in one particular court. Any other construction would be impracticable. The duty of Congress, therefore, to make provision for the vesting of the whole federal judicial power in federal courts, were it held to exist, would be one of imperfect obligation and unenforceable. On the other hand, the moment an office and its powers and duties are created, the power of appointment and removal, as limited by the Constitution, vests in the Execu-

tive.  The functions of distributing jurisdiction to courts, and the exercise of it when distributed and vested, are not at all parallel to the creation of an office, and the mere right of appointment to, and of removal from, the office, which at once attaches to the Executive by virtue of the Constitution.

Fourth.  Mr. Madison and his associates pointed out with great force the unreasonable character of the view that the Convention intended, without express provision, to give to Congress or the Senate, in case of political or other differences, the means of thwarting the Executive in the exercise of his great powers and in the bearing of his great responsibility, by fastening upon him, as subordinate executive officers, men who by their inefficient service under him, by their lack of loyalty to the service, or by their different views of policy, might make his taking care that the laws be faithfully executed most difficult or impossible.

As Mr. Madison said in the debate in the First Congress:

"Vest this power in the Senate jointly with the President, and you abolish at once that great principle of unity and responsibility in the Executive department, which was intended for the security of liberty and the public good.  If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community."  1 Annals of Congress, 499.

Mr. Boudinot of New Jersey said upon the same point:

"The supreme Executive officer against his assistant; and the Senate are to sit as judges to determine whether sufficient cause of removal exists.  Does not this set the Senate over the head of the President?  But suppose they

shall decide in favor of the officer, what a situation is the President then in, surrounded by officers with whom, by his situation, he is compelled to act, but in whom he can have no confidence; reversing the privilege given him by the Constitution, to prevent his having officers imposed upon him who do not meet his approbation?" 1 Annals of Congress, 468.

Mr. Sedgwick of Massachusetts asked the question:

"Shall a man under these circumstances be saddled upon the President, who has been appointed for no other purpose but to aid the President in performing certain duties? Shall he be continued, I ask again, against the will of the President? If he is, where is the responsibility? Are you to look for it in the President, who has no control over the officer, no power to remove him if he acts unfeelingly or unfaithfully? Without you make him responsible, you weaken and destroy the strength and beauty of your system." 1 Annals of Congress, 522.

Made responsible under the Constitution for the effective enforcement of the law, the President needs as an indispensable aid to meet it the disciplinary influence upon those who act under him of a reserve power of removal. But it is contended that executive officers appointed by the President with the consent of the Senate are bound by the statutory law and are not his servants to do his will, and that his obligation to care for the faithful execution of the laws does not authorize him to treat them as such. The degree of guidance in the discharge of their duties that the President may exercise over executive officers varies with the character of their service as prescribed in the law under which they act. The highest and most important duties which his subordinates perform are those in which they act for him. In such cases they are exercising not their own but his discretion. This field is a very large one. It is sometimes described as political. *Kendall* v. *United States,* 12

Peters, 524 at p. 610.   Each head of a department is and
must be the President's *alter ego* in the matters of that
department where the President is required by law to
exercise authority.

The extent of the political responsibility thrust upon
the President is brought out by Mr. Justice Miller, speak-
ing for the Court in *Cunningham* v. *Neagle,* 135 U. S. 1
at p. 63:

" The Constitution, section 3, Article 2, declares that
the President ' shall take care that the laws be faithfully
executed,' and he is provided with the means of fulfilling
this obligation by his authority to commission all the
officers of the United States, and by and with the advice
and consent of the Senate to appoint the most important
of them and to fill vacancies.   He is declared to be com-
mander-in-chief of the army and navy of the United
States.   The duties which are thus imposed upon him he
is further enabled to perform by the recognition in the
Constitution, and the creation by Acts of Congress, of
executive departments, which have varied in number
from four or five to seven or eight, the heads of which
are familiarly called cabinet ministers.   These aid him
in the performance of the great duties of his office and
represent him in a thousand acts to which it can hardly
be supposed his personal attention is called, and thus he
is enabled to fulfill the duty of his great department,
expressed in the phrase that ' he shall take care that the
laws be faithfully executed.' "

He instances executive dealings with foreign govern-
ments, as in the case of Martin Koszta, and he might
have added the Jonathan Robbins case as argued by John
Marshall in Congress, 5 Wheat. Appendix 1. and approved
by this Court in *Fong Yue Ting* v. *United States,* 149
U. S. 698, 714.   He notes the President's duty as to the
protection of the mails, as to which the case of *In re
Debs,* 158 U. S. 564, 582–584 affords an illustration.   He

instances executive obligation in protection of the public domain, as in *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273, and *United States* v. *Hughes,* 11 How. 552. The possible extent of the field of the President's political executive power may be judged by the fact that the quasi-civil governments of Cuba, Porto Rico and the Philippines, in the silence of Congress, had to be carried on for several years solely under his direction as commander in chief.

In all such cases, the discretion to be exercised is that of the President in determining the national public interest and in directing the action to be taken by his executive subordinates to protect it. In this field his cabinet officers must do his will. He must place in each member of his official family, and his chief executive subordinates, implicit faith. The moment that he loses confidence in the intelligence, ability, judgment or loyalty of any one of them, he must have the power to remove him without delay. To require him to file charges and submit them to the consideration of the Senate might make impossible that unity and co-ordination in executive administration essential to effective action.

The duties of the heads of departments and bureaus in which the discretion of the President is exercised and which we have described, are the most important in the whole field of executive action of the Government. There is nothing in the Constitution which permits a distinction between the removal of the head of a department or a bureau, when he discharges a political duty of the President or exercises his discretion, and the removal of executive officers engaged in the discharge of their other normal duties. The imperative reasons requiring an unrestricted power to remove the most important of his subordinates in their most important duties must, therefore, control the interpretation of the Constitution as to all appointed by him.

But this is not to say that there are not strong reasons why the President should have a like power to remove his appointees charged with other duties than those above described. The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone. Laws are often passed with specific provision for the adoption of regulations by a department or bureau head to make the law workable and effective. The ability and judgment manifested by the official thus empowered, as well as his energy and stimulation of his subordinates, are subjects which the President must consider and supervise in his administrative control. Finding such officers to be negligent and inefficient, the President should have the power to remove them. Of course there may be duties so peculiarly and specifically committed to the discretion of a particular officer as to raise a question whether the President may overrule or revise the officer's interpretation of his statutory duty in a particular instance. Then there may be duties of a quasi-judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President can not in a particular case properly influence or control. But even in such a case he may consider the decision after its rendition as a reason for removing the officer, on the ground that the discretion regularly entrusted to that officer by statute has not been on the whole intelligently or wisely exercised. Otherwise he does not discharge his own constitutional duty of seeing that the laws be faithfully executed,

We have devoted much space to this discussion and decision of the question of the Presidential power of removal in the First Congress, not because a Congressional conclusion on a constitutional issue is conclusive, but, first, because of our agreement with the reasons upon which it was avowedly based; second, because this was the decision of the First Congress, on a question of primary importance in the organization of the Government, made within two years after the Constitutional Convention and within a much shorter time after its ratification; and, third, because that Congress numbered among its leaders those who had been members of the Convention. It must necessarily constitute a precedent upon which many future laws supplying the machinery of the new Government would be based, and, if erroneous, it would be likely to evoke dissent and departure in future Congresses. It would come at once before the executive branch of the Government for compliance, and might well be brought before the judicial branch for a test of its validity. As, we shall see, it was soon accepted as a final decision of the question by all branches of the Government.

It was of course to be expected that the decision would be received by lawyers and jurists with something of the same division of opinion as that manifested in Congress, and doubts were often expressed as to its correctness. But the acquiescence which was promptly accorded it after a few years was universally recognized.

A typical case of such acquiescence was that of Alexander Hamilton. In the discussion in the House of Representatives in 1789, Mr. White and others cited the opinion of Mr. Hamilton in respect of the necessity for the consent of the Senate to removals by the President, before they should be effective. (1 Annals, First Congress, 456.) It was expressed in No. 77 of the Federalist, as follows:

" It has been mentioned as one of the advantages to be expected from the co-operation of the Senate in the business of appointments, that it would contribute to the stability of the Administration. The consent of that body would be necessary to displace as well as to appoint. A change of the Chief Magistrate, therefore, would not occasion so violent or so general a revolution in the officers of the Government as might be expected if he were the sole disposer of offices."

Hamilton changed his view of this matter during his incumbency as Secretary of the Treasury in Washington's Cabinet, as is shown by his view of Washington's first proclamation of neutrality in the war between France and Great Britain. That proclamation was at first criticized as an abuse of executive authority. It has now come to be regarded as one of the greatest and most valuable acts of the first President's Administration, and has been often followed by succeeding Presidents. Hamilton's argument was that the Constitution, by vesting the executive power in the President, gave him the right, as the organ of intercourse between the Nation and foreign nations, to interpret national treaties and to declare neutrality. He deduced this from Article II of the Constitution on the executive power, and followed exactly the reasoning of Madison and his associates as to the executive power upon which the legislative decision of the First Congress as to Presidential removals depends, and he cites it as authority. He said:

"The second article of the Constitution of the United States, section first, establishes this general proposition, that 'the Executive Power shall be vested in a President of the United States of America.'

"The same article, in a succeeding section, proceeds to delineate particular cases of executive power. It declares, among other things, that the President shall be commander in chief of the army and navy of the United

States, and of the militia of the several states, when called into the actual service of the United States; that he shall have power, by and with the advice and consent of the Senate, to make treaties; that it shall be his duty to receive ambassadors and other public ministers, *and to take care that the laws be faithfully executed.*

"It would not consist with the rules of sound construction, to consider this enumeration of particular authorities as derogating from the more comprehensive grant in the general clause, further than as it may be coupled with express restrictions or limitations; as in regard to the co-operation of the Senate in the appointment of officers and the making of treaties; which are plainly qualifications of the general executive powers of appointing officers and making treaties. The difficulty of a complete enumeration of all the cases of executive authority, would naturally dictate the use of general terms, and would render it improbable that a specification of certain particulars was designed as a substitute for those terms, when antecedently used. The different mode of expression employed in the Constitution, in regard to the two powers, the legislative and the executive, serves to confirm this inference. In the article which gives the legislative powers of the government, the expressions are 'All legislative powers herein granted shall be vested in a congress of the United States.' In that which grants the executive power, the expressions are *'The executive power* shall be vested in a President of the United States.'

"The enumeration ought therefore to be considered, as intended merely to specify the principal articles implied in the definition of executive power; leaving the rest to flow from the general grant of that power, interpreted in conformity with other parts of the Constitution, and with the principles of free government.

"The general doctrine of our Constitution then is, that the executive power of the nation is vested in the Presi-

dent; subject only to the exceptions and qualifications, which are expressed in the instrument.

"Two of these have already been noticed; the participation of the Senate in the appointment of officers, and in the making of treaties. A third remains to be mentioned; the right of the legislature to 'declare war and grant letters of marque and reprisal.'

"With these exceptions, the executive power of the United States is completely lodged in the President. This mode of construing the Constitution has indeed been recognized by Congress in formal acts upon full consideration and debate; of which the power of removal from office is an important instance. It will follow that if a proclamation of neutrality is merely an executive act, as it is believed, has been shown, the step which has been taken by the President is liable to no just exception on the score of authority." 7 J. C. Hamilton's "Works of Hamilton," 80–81.

The words of a second great constitutional authority, quoted as in conflict with the Congressional decision, are those of Chief Justice Marshall. They were used by him in his opinion in *Marbury* v. *Madison*, 1 Cranch, 137 (1803). The judgment in that case is one of the great landmarks in the history of the construction of the Constitution of the United States, and is of supreme authority, first, in respect of the power and duty of the Supreme Court and other courts to consider and pass upon the validity of acts of Congress enacted in violation of the limitations of the Constitution, when properly brought before them in cases in which the rights of the litigating parties require such consideration and decision, and, second, in respect of the lack of power of Congress to vest in the Supreme Court original jurisdiction to grant the remedy of mandamus in cases in which by the Constitution it is given only appellate jurisdiction. But it is not to be regarded as such authority in respect of the

power of the President to remove officials appointed by the advice and consent of the Senate, for that question was not before the Court.

The case was heard upon a rule served upon James Madison, Secretary of State, to show cause why a writ of mandamus should not issue directing the defendant, Madison, to deliver to William Marbury his commission as a justice of the peace for the County of Washington in the District of Columbia. The rule was discharged by the Supreme Court for the reason that the Court had no jurisdiction in such a case to issue a writ for mandamus.

The Court had, therefore, nothing before it calling for a judgment upon the merits of the question of issuing the mandamus. Notwithstanding this, the opinion considered preliminarily, first, whether the relator had the right to the delivery of the commission, and, second, whether it was the duty of the Secretary of State to deliver it to him, and a duty which could be enforced in a court of competent jurisdiction at common law by a writ of mandamus. The facts disclosed by affidavits filed were, that President Adams had nominated Marbury to be a justice of the peace in the District of Columbia, under a law of Congress providing for such appointment, by and with the advice and consent of the Senate, for the term of five years, and that the Senate had consented to such an appointment; that the President had signed the commission as provided by the Constitution, and had transmitted it to the Secretary of State, who, as provided by statute, had impressed the seal of the United States thereon. The opinion of the Chief Justice on these questions was, that the commission was only evidence of the appointment; that, upon delivery of the signed commission by the President to the Secretary of State, the office was filled and the occupant was thereafter entitled to the evidence of his appointment in the form of the commission; that the duty of the Secretary in delivering the commission to the officer entitled

was merely ministerial and could be enforced by mandamus; that the function of the Secretary in this regard was entirely to be distinguished from his duty as a subordinate to the President in the discharge of the President's political duties which could not be controlled.

It would seem that this conclusion applied, under the reasoning of the opinion, whether the officer was removable by the President or not, if in fact the President had not removed him. But the opinion assumed that, in the case of a removable office, the writ would fail, on the presumption that there was in such a case discretion of the appointing power to withhold the commission. And so the Chief Justice proceeded to express an opinion on the question whether the appointee was removable by the President. He said: "As the law creating the office, gave the officer a right to hold it for five years, independent of the executive, the appointment was not revocable, but vested in the officer legal rights which are protected by the laws of his country."

There was no answer by Madison to the rule issued in the case. The case went by default. It did not appear, even by avowed opposition to the issue of the writ, that the President had intervened in the matter at all. It would seem to have been quite consistent with the case as shown that this was merely an arbitrary refusal by the Secretary to perform his ministerial function, and, therefore, that the expression of opinion that the officer was not removable by the President was unnecessary, even to the conclusion that a writ in a proper case could issue. However this may be, the whole statement was certainly *obiter dictum* with reference to the judgment actually reached. The question whether the officer was removable was not argued to the Court by any counsel contending for that view. Counsel for the relator, who made the only argument, contended that the officer was not removable by the President, because he held a judicial office and

under the Constitution could not be deprived of his office
for the five years of his term by Presidential action. The
opinion contains no wider discussion of the question than
that quoted above.

While everything that the great Chief Justice said,
whether *obiter dictum* or not, challenges the highest and
most respectful consideration, it is clear that the mere
statement of the conclusion made by him, without any
examination of the discussion which went on in the First
Congress, and without reference to the elaborate argu-
ments there advanced to maintain the decision of 1789,
can not be regarded as authority in considering the weight
to be attached to that decision—a decision, which as we
shall see, he subsequently recognized as a well-established
rule of constitutional construction.

In such a case we may well recur to the Chief Justice's
own language in *Cohens* v. *Virginia,* 6 Wheat. 264, 399, in
which, in declining to yield to the force of his previous
language in *Marbury* v. *Madison,* which was unnecessary
to the judgment in that case and was *obiter dictum,* he
said:

"It is a maxim, not to be disregarded, that general
expressions, in every opinion, are to be taken in connec-
tion with the case in which those expressions are used.
If they go beyond the case, they may be respected, but
ought not to control the judgment in a subsequent suit
when the very point is presented for decision. The
reason of this maxim is obvious. The question actually
before the court is investigated with care and considered
in its full extent. Other principles which may serve to
illustrate it, are considered in their relation to the case
decided, but their possible bearing on all other cases is
seldom completely investigated."

The weight of this dictum of the Chief Justice as to a
Presidential removal, in *Marbury* v. *Madison,* was con-
sidered by this Court in *Parsons* v. *United States,* 167

U. S. 324.   It was a suit by Parsons against the United
States for the payment of the balance due for his salary
and fees as United States District Attorney for Alabama.
He had been commissioned as such, under the statute,
for the term of four years from the date of the commis-
sion, subject to the conditions prescribed by law.   There
was no express power of removal provided.   Before the
end of the four years he was removed by the President.
He was denied recovery.

The language of the Court in *Marbury* v. *Madison,*
already referred to, was pressed upon this Court to show
that Parsons was entitled, against the Presidential action
of removal, to continue in office.   If it was authoritative
and stated the law as to an executive office, it ended the
case; but this Court did not recognize it as such, for the
reason that the Chief Justice's language relied on was not
germane to the point decided in *Marbury* v. *Madison.*
If his language was more than a dictum, and was a deci-
sion, then the *Parson's* case overrules it.

Another distinction, suggested by Mr. Justice Peckham
in *Parson's* case was that the remarks of the Chief Justice
were in reference to an office in the District of Columbia,
over which, by Art. I, sec. 8, subd. 17, Congress had
exclusive jurisdiction in all cases, and might not apply
to offices outside of the District in respect to which the
constant practice and the Congressional decision had been
the other way (p. 335).   How much weight should be
given to this distinction, which might accord to the spe-
cial exclusive jurisdiction conferred on Congress over the
District power to ignore the usual constitutional separa-
tion between the executive and legislative branches of the
Government, we need not consider.

If the Chief Justice, in *Marbury* v. *Madison,* intended
to express an opinion for the Court inconsistent with the
legislative decision of 1789, it is enough to observe that he
changed his mind; for otherwise it is inconceivable that

he should. have written and printed his full account of the discussion and decision in the First Congress and his acquiescence in it, to be found in his Life of Washington (Vol. V, pages 192–200).

He concluded his account as follows:

"After an ardent discussion which consumed several days, the committee divided; and the amendment [i. e. to strike out from the original bill the words ' to be removable by the President '] was negatived by a majority of thirty-four to twenty. The opinion thus expressed by the house of representatives did not explicitly convey their sense of the Constitution. Indeed the express grant of the power to the president, rather implied a right in the legislature to give or withhold it at their discretion. To obviate any misunderstanding of the principle on which the question had been decided, Mr. Benson [later] moved in the house, when the report of the committee of the whole was taken up, to amend the second clause in the bill so as clearly to imply the power of removal to be solely in the president. He gave notice that if he should succeed in this, he would move to strike out the words which had been the subject of debate. If those words continued, he said the power of removal by the president might hereafter appear to be exercised by virtue of a legislative grant only and consequently be subjected to legislative instability; when he was well satisfied in his own mind, that it was by fair construction, fixed in the constitution. The motion was seconded by Mr. Madison, and both amendments were adopted. As the bill passed into a law, it has ever been considered as a full expression of the sense of the legislature on this important part of the American constitution."

This language was first published in 1807, four years after the judgment in *Marbury* v. *Madison,* and the edition was revised by the Chief Justice in 1832. 3 Beveridge, Life of Marshall, 248, 252, 272, 273.

Congress, in a number of acts, followed and enforced the legislative decision of 1789 for seventy-four years. In the act of the First Congress, which adapted to the Constitution the ordinance of 1787 for the government of the Northwest Territory, which had provided for the appointment and removal of executive territorial officers by the Congress under the Articles of Confederation, it was said "in all cases where the United States in Congress assembled, might, by the said ordinance revoke any commission or remove from any office, the President is hereby declared to have the same powers of revocation and removal." 1 Stat. 53, c. 8. This was approved eleven days after the act establishing the Department of Foreign Affairs, and was evidently in form a declaration in accord with the legislative constitutional construction of the latter act. In the provision for the Treasury and War Departments, the same formula was used as occurred in the act creating the Department of Foreign Affairs; but it was omitted from other creative acts only because the decision was thought to be settled constitutional construction. *In re Hennen*, 13 Peters 230, 259.

Occasionally we find that Congress thought it wiser to make express what would have been understood. Thus, in the Judiciary Act of 1789, we find it provided in § 27, 1 Stat. 87, c. 20, " that a marshal shall be appointed in and for each district for the term of four years, but shall be removable at pleasure, whose duty it shall be to attend the District and Circuit Courts." That act became a law on September 24th, a month after the Congressional debate on removals. It was formulated by a Senate committee, of which Oliver Ellsworth was chairman, and which presumably was engaged in drafting it during the time of that debate. Section 35 of the same act provided for the appointment of an attorney for the United States to prosecute crimes and conduct civil actions on behalf of

the United States, but nothing was said as to his term
of office or as to his removal. The difference in the two
cases was evidently to avoid any inference from the
fixing of the term that a conflict with the legislative deci-
sion of 1789 was intended.

In the Act of May 15, 1820, 3 Stat. 582, c. 102, Con-
gress provided that thereafter all district attorneys, col-
lectors of customs, naval officers, surveyors of the cus-
toms, navy agents, receivers of public moneys for land,
registers of the land office, paymasters in the army, the
apothecary general, the assistant apothecaries general,
and the commissary general of purchases, to be appointed
under the laws of the United States, should be appointed
for the term of four years, but should be removable from
office at pleasure.

It is argued that these express provisions for removal
at pleasure indicate that, without them, no such power
would exist in the President. We can not accede to this
view. Indeed, the conclusion that they were adopted to
show conformity to the legislative decision of 1789 is au-
thoritatively settled by a specific decision of this Court.

In the *Parsons* case, 167 U. S. 324, already referred to,
the exact question which the Court had to decide was
whether under § 769 of the Revised Statutes, providing
that district attorneys should be appointed for a term of
four years and their commissions should cease and expire
at the expiration of four years from their respective
dates, the appellant, having been removed by the Presi-
dent from his office as district attorney before the end of
his term, could recover his salary for the remainder of
the term. If the President had no power of removal,
then he could recover. The Court held that under that
section the President did have the power of removal, be-
cause of the derivation of the section from the Act of
1820, above quoted. In § 769 the specific provision of
the Act of 1820 that the officers should be removable

from office at pleasure was omitted. This Court held that the section should be construed as having been passed in the light of the acquiescence of Congress in the decision of 1789, and therefore included the power of removal by the President, even though the clause for removal was omitted. This reasoning was essential to the conclusion reached and makes the construction by this Court of the Act of 1820 authoritative. The Court used, in respect of the Act of 1820, this language (167 U. S. 324, 339):

"The provision for a removal from office at pleasure was not necessary for the exercise of that power by the President, because of the fact that he was then regarded as being clothed with such power in any event. Considering the construction of the Constitution in this regard as given by the Congress of 1789, and having in mind the constant and uniform practice of the Government in harmony with such construction, we must construe this act as providing absolutely for the expiration of the term of office at the end of four years, and not as giving a term that shall last, at all events, for that time, and we think the provision that the officials were removable from office at pleasure was but a recognition of the construction thus almost universally adhered to and acquiesced in as to the power of the President to remove."

In the Act of July 17, 1862, 12 Stat. 596, c. 200, Congress actually requested the President to make removals in the following language:

"the President of the United States be, and hereby is, authorized and requested to dismiss and discharge from the military service, either in the army, navy, marine corps, or volunteer force, any officer for any cause which, in his judgment, either renders such officer unsuitable for, or whose dismission would promote, the public service."

Attorney General Devens (15 Op. A. G. 421) said of this act that, so far as it gave authority to the President,

it was simply declaratory of the long-established law; that the force of the act was to be found in the word " requested," by which it was intended to re-enforce strongly this power in the hands of the President at a great crisis of the state—a comment by the Attorney General which was expressly approved by this Court in *Blake* v. *United States*, 103 U. S. 227, 234.

The acquiescence in the legislative decision of 1789 for nearly three-quarters of a century by all branches of the Government has been affirmed by this Court in unmistakable terms. In *Parsons* v. *United States*, already cited, in which the matter of the power of removal was reviewed at length in connection with that legislative decision, this Court, speaking by Mr. Justice Peckham, said (page 330) :

" Many distinguished lawyers originally had very different opinions in regard to this power from the one arrived at by this Congress, but when the question was alluded to in after years they recognized that the decision of Congress in 1789 and the universal practice of the Government under it, had settled the question beyond any power of alteration."

We find this confirmed by Chancellor Kent's and Mr. Justice Story's comments. Chancellor Kent, in writing to Mr. Webster in January, 1830, concerning the decision of 1789, said:

" I heard the question debated in the summer of 1789, and Madison, Benson, Ames, Lawrence, etc. were in favor of the right of removal by the President, and such has been the opinion ever since and the practice. I thought they were right because I then thought this side uniformly right."

Then, expressing subsequent pause and doubt upon this construction as an original question because of Hamilton's original opinion in The Federalist, already referred to, he continued:

" On the other hand, it is too late to call the President's power in question after a declaratory act of Congress and

· an acquiescence of half a century. We should hurt the reputation of our government with the world, and we are accused already of the Republican tendency of reducing all executive power into the legislative, and making Congress a national convention. That the President grossly abuses the power of removal is manifest, but it is the evil genius of Democracy to be the sport of factions." 1 Private Correspondence of Daniel Webster, Fletcher Webster ed., 486; 1903 National ed., Little Brown Co.

In his Commentaries, referring to this question, the Chancellor said:

" This question has never been made the subject of judicial discussion; and the construction given to the Constitution in 1789 has continued to rest on this loose, incidental, declaratory opinion of Congress, and the sense and practice of government since that time. It may now be considered as firmly and definitely settled, and there is good sense and practical utility in the construction." 1 Kent Commentaries, Lecture 14, p. 310, Subject, Marshals.

Mr. Justice Story, after a very full discussion of the decision of 1789, in which he intimates that as an original question he would favor the view of the minority, says:

·     " That the final decision of this question so made was greatly influenced by the exalted character of the President then in office, was asserted at the time, and has always been believed. Yet the doctrine was opposed, as well as supported, by the highest talents and patriotism of the country. The public, however, acquiesced in this decision; and it constitutes, perhaps, the most extraordinary case in the history of the government of a power, conferred by implication on the executive by the assent of a bare majority of Congress, which has not been questioned on many other occasions. Even the most jealous advocates of state rights seem to have slumbered over this vast reach of authority; and have left it untouched, as the neutral ground of controversy, in which they de-

sired to reap no harvest, and from which they retired, without leaving any protestations of title or contest. Nor is this general acquiescence and silence without a satisfactory explanation." 2 Story, Constitution, § 1543.

He finds that, until a then very recent period, namely the Administration of President Jackson, the power of unrestricted removal had been exercised by all the Presidents, but that moderation and forbearance had been shown, that under President Jackson, however, an opposite course had been pursued extensively and brought again the executive power of removal to a severe scrutiny. The learned author then says:

" If there has been any aberration from the true constitutional exposition of the power of removal (which the reader must decide for himself), it will be difficult, and perhaps impracticable. after forty years' experience, to recall the practice to correct theory. But, at all events, it will be a consolation to those who love the Union, and honor a devotion to the patriotic discharge of duty, that in regard to ' inferior officers ' (which appellation probably includes ninety-nine out of a hundred of the lucrative offices in the government), the remedy for any permanent abuse is still within the power of Congress, by the simple expedient of requiring the consent of the Senate to removals in such cases." 2 Story Constitution, § 1544.

In an article by Mr. Fish contained in the American Historical Association Reports, 1899, p. 67, removals from office, not including Presidential removals in the Army and the Navy, in the administrations from Washington to Johnson, are stated to have been as follows: Washington 17; Adams 19; Jefferson 62; Madison 24; Jackson 180; Van Buren 43; Harrison and Tyler 389; Polk 228; Taylor 491; Fillmore 73; Pierce 771; Buchanan 253; Lincoln 1400; Johnson 726. These, we may infer, were all made in conformity to the legislative decision of 1789.

Mr. Webster is cited as opposed to the decision of the First Congress. His views were evoked by the contro-

versy between the Senate and President Jackson. The
alleged general use of patronage for political purposes by
the President, and his dismissal of Duane, Secretary of
the Treasury, without reference to the Senate, upon
Duane's refusal to remove government deposits from the
United States Bank, awakened bitter criticism in the Sen-
ate, and led to an extended discussion of the power of
removal by the President. In a speech, May 7, 1834, on
the President's protest, Mr. Webster asserted that the
power of removal, without the consent of the Senate, was
in the President alone, according to the established con-
struction of the Constitution, and that Duane's dismissal
could not be justly said to be a usurpation. 4 Webster,
Works, 103–105. A year later, in February, 1835, Mr.
Webster seems to have changed his views somewhat, and
in support of a bill requiring the President in making
his removals from office to send to the Senate his reasons
therefor, made an extended argument against the cor-
rectness of the decision of 1789. He closed his speech
thus: " But I think the decision of 1789 has been estab-
lished by practice, and recognized by subsequent laws, as
the settled construction of the Constitution, and that it
is our duty to act upon the case accordingly for the
present; without admitting that Congress may not, here-
after, if necessity shall require it, reverse the decision of
1789." 4 Webster, 179, 198. Mr. Webster denied that
the vesting of the executive power in the President was
a grant of power. It amounted, he said, to no more
than merely naming the department. Such a construc-
tion, although having the support of as great an ex-
pounder of the Constitution as Mr. Webster, is not in
accord with the usual canon of interpretation of that
instrument, which requires that real effect should be
given to all the words it uses. *Prout* v. *Starr*, 188 U. S.
537, 544; *Hurtado* v. *California*, 110 U. S. 516, 534; *Prigg*
v. *Pennsylvania*, 16 Pet. 539, 612; *Holmes* v. *Jennison*,

14 Pet. 540, 570–571; *Cohens* v. *Virginia*, 6 Wheat. 264, 398; *Marbury* v. *Madison, supra,* at p. 174. Nor can we concur in Mr. Webster's apparent view that when Congress, after full consideration and with the acquiescence and long practice of all the branches of the Government, has established the construction of the Constitution, it may by its mere subsequent legislation reverse such construction. It is not given power by itself thus to amend the Constitution. It is not unjust to note that Mr. Webster's final conclusion on this head was reached after pronounced political controversy with General Jackson, which he concedes may have affected his judgment and attitude on the subject.

Mr. Clay and Mr. Calhoun, acting upon a like impulse, also vigorously attacked the decision; but no legislation of any kind was adopted in that period to reverse the established constitutional construction, while its correctness was vigorously asserted and acted on by the Executive. On February 10, 1835, President Jackson declined to comply with the Senate resolution, regarding the charges which caused the removal of officials from office, saying:

"The President in cases of this nature possesses the exclusive power of removal from office, and, under the sanctions of his official oath and of his liability to impeachment, he is bound to exercise it whenever the public welfare shall require. If, on the other hand, from corrupt motives he abuses this power, he is exposed to the same responsibilities. On no principle known to our institutions can he be required to account for the manner in which he discharges this portion of his public duties, save only in the mode and under the forms prescribed by the Constitution." 3 Messages of the Presidents, 1352.

In *Ex parte Hennen,* 13 Peters 230, decided by this Court in 1839, the prevailing effect of the legislative decision of 1789 was fully recognized. The question there

was of the legality of the removal from office by a United States District Court of its clerk, appointed by it under § 7 of the Judiciary Act, 1 Stat. 76, c. 20. The case was ably argued and the effect of the legislative decision of the First Congress was much discussed. The Court said (pp. 258–259):

" The Constitution is silent with respect to the power of removal from office, where the tenure is not fixed. It provides that the judges, both of the supreme and inferior courts, shall hold their offices during good behavior. But no tenure is fixed for the office of clerks. . . . It can not, for a moment, be admitted that it was the intention of the Constitution that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made? In the absence of all constitutional provision or statutory regulation, it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment. This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained in the early history of this government. This related, however, to the power of the President to remove officers appointed with the concurrence of the Senate; and the great question was whether the removal was to be by the President alone, or with the concurrence of the Senate, both constituting the appointing power. No one denied the power of the President and Senate, jointly to remove, where the tenure of the office was not fixed by the Constitution, which was a full recognition of the principle that the power of removal was incident to the power of appointment. But it was very early adopted as the practical construction of the Constitution that this power was vested in the President alone. And such would appear to have been the legislative construction of the Constitution. For in the organization of the three great

departments of State, War and Treasury, in the year 1789, provision is made for the appointment of a subordinate officer by the head of the department, who should have the charge and custody of the records, books, and papers appertaining to the office, when the head of the department should be removed from the office by the President of the United States. (1 Story, 5, 31, 47.) When the Navy Department was established in the year 1798 (1 Story, 498), provision is made for the charge and custody of the books, records, and documents of the department, in case of vacancy in the office of secretary, by removal or otherwise. It is not here said, by removal by the President, as is done with respect to the heads of the other departments; and yet there can be no doubt that he holds his office by the same tenure as the other secretaries, and is removable by the President. The change of phraseology arose, probably, from its having become the settled and well understood construction of the Constitution that the power of removal was vested in the President alone, in such cases, although the appointment of the officer was by the President and Senate."

The legislative decision of 1789 and this Court's recognition of it were followed, in 1842, by Attorney General Legare, in the Administration of President Tyler (4 Op. A. G. 1); in 1847, by Attorney General Clifford, in the Administration of President Polk (4 Op. A. G. 603); by Attorney General Crittenden, in the Administration of President Fillmore (5 Op. A. G. 288, 290); by Attorney General Cushing, in the Administration of President Buchanan (6 Op. A. G. 4); all of whom delivered opinions of a similar tenor.

It has been sought to make an argument, refuting our conclusion as to the President's power of removal of executive officers, by reference to the statutes passed and practice prevailing from 1789 until recent years in respect of the removal of judges, whose tenure is not fixed by

Article III of the Constitution, and wno are not strictly
United States Judges under that article.  The argument
is that, as there is no express constitutional restriction as
to the removal of such judges, they come within the same
class as executive officers, and that statutes and practice
in respect of them may properly be used to refute the
authority of the legislative decision of 1789 and acqui-
escence therein.

The fact seems to be that judicial removals were not
considered in the discussion in the First Congress, and
that the First Congress, August 7, 1789, 1 Stat. 50–53,
c. 8, and succeeding Congresses until 1804, assimilated the
judges appointed for the territories to those appointed
under Article III, and provided life tenure for them,
while other officers of those territories were appointed for
a term of years unless sooner removed.  See as to such
legislation dissenting opinion of Mr. Justice McLean in
*United States* v. *Guthrie,* 17 How. 284, 308.   In *American
Insurance Company* v. *Canter,* 1 Peters 511 (1828), it
was held that the territorial courts were not constitutional
courts in which the judicial power conferred by the Con-
stitution on the general government could be deposited.
After some ten or fifteen years, the judges in some terri-
tories were appointed for a term of years, and the Gov-
ernor and other officers were appointed for a term of years
unless sooner removed.   In Missouri and Arkansas only
were the judges appointed for four years if not sooner
removed.

After 1804, removals were made by the President of
territorial judges appointed for terms of years, before the
ends of their terms.   They were sometimes suspended
and sometimes removed.   Between 1804 and 1867, there
were ten removals of such judges in Minnesota, Utah,
Washington, Oregon and Nebraska.   The executive de-
partment seemed then to consider that territorial judges
were subject to removal just as if they had been executive

officers, under the legislative decision of 1789. Such was
the opinion of Attorney General Crittenden on the ques-
tion of the removal of the Chief Justice of Minnesota
Territory (5 Op. A. G. 288) in 1851. Since 1867, terri-
torial judges have been removed by the President, seven
in Arizona, one in Hawaii, one in Indian Territory, two
in Idaho, three in New Mexico, two in Utah, one in
Wyoming.

The question of the President's power to remove such
a judge, as viewed by Mr. Crittenden, came before this
Court in *United States* v. *Guthrie,* 17 How. 284. The
relator Goodrich, who had been removed by the President
from his office as a territorial judge, sought by manda-
mus to compel the Secretary of the Treasury to draw his
warrant for the relator's salary for the remainder of his
term after removal, and contested the Attorney General's
opinion that the President's removal in such a case was
valid. This Court did not decide this issue, but held that
it had no power to issue a writ of mandamus in such a
case. Mr. Justice McLean delivered a dissenting opinion
(at page 308). He differed from the Court in its holding
that mandamus would not issue. He expressed a doubt
as to the correctness of the legislative decision of the First
Congress as to the power of removal by the President
alone of executive officers appointed by him with the con-
sent of the Senate, but admitted that the decision as to
them had been so acquiesced in, and the practice had so
conformed to it, that it could not be set aside. But he
insisted that the statutes and practice which had governed
the appointment and removal of territorial judges did
not come within the scope and effect of the legislative
decision of 1789. He pointed out that the argument upon
which the decision rested was based on the necessity for
Presidential removals in the discharge by the President
of his executive duties and his taking care that the laws be
faithfully executed, and that such an argument could not

apply to the judges over whose judicial duties he could not properly exercise any supervision or control after their appointment and confirmation.

In the case of *McAllister* v. *United States,* 141 U. S. 174, a judge of the District Court of Alaska, it was held, could be deprived of a right to salary as such by his suspension under Revised Statutes 1768. That section gave the President in his discretion authority to suspend any civil officer appointed by and with the advice and consent of the Senate, except judges of the courts of the United States, until the end of the next session of the Senate, and to designate some suitable person, subject to be removed in his discretion by the designation of another, to perform the duties of such suspended officer. It was held that the words " except judges of the courts of the United States " applied to judges appointed under Article III and did not apply to territorial judges, and that the President under § 1768 had power to suspend a territorial judge during a recess of the Senate, and no recovery could be had for salary during that suspended period. Mr. Justice Field, with Justices Gray and Brown, dissented on the ground that in England by the act of 13th William III, it had become established law that judges should hold their offices independent of executive removal, and that our Constitution expressly makes such limitation as to the only judges specifically mentioned in it and should be construed to carry such limitation as to other judges appointed under its provisions.

Referring in *Parsons* v. *United States,* 167 U. S. 324, at p. 337, to the *McAllister* case, this Court said:

" The case contains nothing in opposition to the contention as to the practical construction that had been given to the Constitution by Congress in 1789, and by the government generally since that time and up to the Act of 1867."

The questions, first, whether a judge appointed by the President with the consent of the Senate under an act of

Congress, not under authority of Article III of the Constitution, can be removed by the President alone without the consent of the Senate, second, whether the legislative decision of 1789 covers such a case, and third, whether Congress may provide for his removal in some other way, present considerations different from those which apply in the removal of executive officers, and therefore we do not decide them.

We come now to consider an argument advanced and strongly pressed on behalf of the complainant, that this case concerns only the removal of a postmaster; that a postmaster is an inferior officer; that such an office was not included within the legislative decision of 1789, which related only to superior officers to be appointed by the President by and with the advice and consent of the Senate. This, it is said, is the distinction which Chief Justice Marshall had in mind in *Marbury* v. *Madison,* in the language already discussed in respect of the President's power to remove a District of Columbia justice of the peace appointed and confirmed for a term of years. We find nothing in *Marbury* v. *Madison* to indicate any such distinction. It can not be certainly affirmed whether the conclusion there stated was based on a dissent from the legislative decision of 1789, or on the fact that the office was created under the special power of Congress exclusively to legislate for the District of Columbia, or on the fact that the office was a judicial one or on the circumstance that it was an inferior office. In view of the doubt as to what was really the basis of the remarks relied on, and their *obiter dictum* character, they can certainly not be used to give weight to the argument that the 1789 decision only related to superior officers.

The very heated discussions during General Jackson's Administration, except as to the removal of Secretary Duane, related to the distribution of offices which were, most of them, inferior offices, and it was the operation of

the legislative decision of 1789 upon the power of removal of incumbents of such offices that led the General to refuse to comply with the request of the Senate that he give his reasons for the removals therefrom. It was to such inferior officers that Chancellor Kent's letter to Mr. Webster, already quoted, was chiefly directed; and the language cited from his Commentaries on the decision of 1789 was used with reference to the removal of United States marshals. It was such inferior offices that Mr. Justice Story conceded to be covered by the legislative decision, in his Treatise on the Constitution, already cited, when he suggested a method by which the abuse of patronage in such offices might be avoided. It was with reference to removals from such inferior offices that the already cited opinions of the Attorneys General, in which the legislative decision of 1789 was referred to as controlling authority, were delivered. That of Attorney General Legare (4 Op. A. G. 1) affected the removal of a surgeon in the Navy. The opinion of Attorney General Clifford (4 Op. A. G. 603, 612) involved an officer of the same rank. The opinion of Attorney General Cushing (6 Op. A. G. 4) covered the office of military storekeeper. Finally, *Parson's* case, where it was the point in judgment, conclusively establishes for this Court that the legislative decision of 1789 applied to a United States attorney, an inferior officer.

It is further pressed on us that, even though the legislative decision of 1789 included inferior officers, yet under the legislative power given Congress with respect to such officers, it might directly legislate as to the method of their removal without changing their method of appointment by the President with the consent of the Senate. We do not think the language of the Constitution justifies such a contention.

Section 2 of Article II, after providing that the President shall nominate and with the consent of the Senate

appoint ambassadors, other public ministers, consuls, judges of the Supreme Court and all other officers of the United States whose appointments are not herein otherwise provided for, and which shall be established by law, contains the proviso "but the Congress may by law vest the appointment of such inferior officers as they think proper in the President alone, in the courts of law or in the heads of departments." In *United States* v. *Perkins,* 116 U. S. 483, a cadet engineer, a graduate of the Naval Academy, brought suit to recover his salary for the period after his removal by the Secretary of the Navy. It was decided that his right was established by Revised Statutes 1229, providing that no officer in the military or naval service should in time of peace be dismissed from service, except in pursuance of a sentence of court-martial. The section was claimed to be an infringement upon the constitutional prerogative of the Executive. The Court of Claims refused to yield to this argument and said:

" Whether or not Congress can restrict the power of removal incident to the power of appointment to those officers who are appointed by the President by and with the advice and consent of the Senate under the authority of the Constitution, Article 2, Section 2, does not arise in this case, and need not be considered. We have no doubt that when Congress by law vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed. The head of a department has no constitutional prerogative of appointment to offices independently of the legislation of Congress, and by such legislation he must be governed, not only in making appointments but in all that is incident thereto."

This language of the Court of Claims was approved by this Court and the judgment was affirmed.

The power to remove inferior executive officers, like that to remove superior executive officers, is an incident of the power to appoint them, and is in its nature an executive power. The authority of Congress given by the excepting clause to vest the appointment of such inferior officers in the heads of departments carries with it authority incidentally to invest the heads of departments with power to remove. It has been the practice of Congress to do so and this Court has recognized that power. The Court also has recognized in the *Perkins* case that Congress, in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal. But the Court never has held, nor reasonably could hold, although it is argued to the contrary on behalf of the appellant, that the excepting clause enables Congress to draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power. To do this would be to go beyond the words and implications of that clause and to infringe the constitutional principle of the separation of governmental powers.

Assuming then the power of Congress to regulate removals as incidental to the exercise of its constitutional power to vest appointments of inferior officers in the heads of departments, certainly so long as Congress does not exercise that power, the power of removal must remain where the Constitution places it, with the President, as part of the executive power, in accordance with the legislative decision of 1789 which we have been considering.

Whether the action of Congress in removing the necessity for the advice and consent of the Senate, and putting the power of appointment in the President alone, would

make his power of removal in such case any more subject to Congressional legislation than before is a question this Court did not decide in the *Perkins* case.    Under the reasoning upon which the legislative decision of 1789 was put, it might be difficult to avoid a negative answer, but it is not before us and we do not decide it.

The *Perkins* case is limited to the vesting by Congress of the appointment of an inferior officer in the head of a department.    The condition upon which the power of Congress to provide for the removal of inferior officers rests is that it shall vest the appointment in some one other than the President with the consent of the Senate. Congress may not obtain the power and provide for the removal of such officer except on that condition.    If it does not choose to entrust the appointment of such inferior officers to less authority than the President with the consent of the Senate, it has no power of providing for their removal.    That is the reason why the suggestion of Mr. Justice Story, relied upon in this discussion, can not be supported, if it is to have the construction which is contended for.    He says that, in regard to inferior officers under the legislative decision of 1789, " the remedy for any permanent abuse (i. e. of executive patronage) is still within the power of Congress by the simple expedient of requiring the consent of the Senate to removals in such cases."    It is true that the remedy for the evil of political executive removals of inferior offices is with Congress by a simple expedient, but it includes a change of the power of appointment from the President with the consent of the Senate.    Congress must determine first that the office is inferior, and second that it is willing that the office shall be filled by appointment by some other authority than the President with the consent of the Senate.    That the latter may be an important consideration is manifest, and is the subject of comment by this Court in its opinion in the case of *Shurtleff* v. *United States*, 189 U. S. 311, 315, where this Court said:

" To take away this power of removal in relation to an inferior office created by statute, although that statute provided for an appointment thereto by the President and confirmation by the Senate, would require very clear and explicit language. It should not be held to be taken away by mere inference or implication. Congress has regarded the office as of sufficient importance to make it proper to fill it by appointment to be made by the President and confirmed by the Senate. It has thereby classed it as appropriately coming under the direct supervision of the President and to be administered by officers appointed by him (and confirmed by the Senate) with reference to his constitutional responsibility to see that the laws are faithfully executed. Art. 2, sec. 3."

It is said that, for forty years or more, postmasters were all by law appointed by the Postmaster General. This was because Congress under the excepting clause so provided. But thereafter Congress required certain classes of them to be, as they now are, appointed by the President with the consent of the Senate. This is an indication that Congress deemed appointment by the President with the consent of the Senate essential to the public welfare, and, until it is willing to vest their appointment in the head of the Department, they will be subject to removal by the President alone, and any legislation to the contrary must fall as in conflict with the Constitution.

Summing up, then, the facts as to acquiescence by all branches of the Government in the legislative decision of 1789, as to executive officers, whether superior or inferior, we find that from 1789 until 1863, a period of 74 years, there was no act of Congress, no executive act, and no decision of this Court at variance with the declaration of the First Congress, but there was, as we have seen, clear, affirmative recognition of it by each branch of the Government.

Our conclusion on the merits, sustained by the arguments before stated, is that Article II grants to the Presi-

dent the executive power of the Government, i. e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers—a conclusion confirmed by his obligation to take care that the laws be faithfully executed; that Article II excludes the exercise of legislative power by Congress to provide for appointments and removals, except only as granted therein to Congress in the matter of inferior offices; that Congress is only given power to provide for appointments and removals of inferior officers after it has vested, and on condition that it does vest, their appointment in other authority than the President with the Senate's consent; that the provisions of the second section of Article II, which blend action by the legislative branch, or by part of it, in the work of the executive, are limitations to be strictly construed and not to be extended by implication; that the President's power of removal is further established as an incident to his specifically enumerated function of appointment by and with the advice of the Senate, but that such incident does not by implication extend to removals the Senate's power of checking appointments; and finally that to hold otherwise would make it impossible for the President, in case of political or other differences with the Senate or Congress, to take care that the laws be faithfully executed.

We come now to a period in the history of the Government when both Houses of Congress attempted to reverse this constitutional construction and to subject the power of removing executive officers appointed by the President and confirmed by the Senate to the control of the Senate—indeed, finally, to the assumed power in Congress to place the removal of such officers anywhere in the Government.

This reversal grew out of the serious political difference between the two Houses of Congress and President John-

son. There was a two-thirds majority of the Republican party in control of each House of Congress, which resented what it feared would be Mr. Johnson's obstructive course in the enforcement of the reconstruction measures, in respect of the States whose people had lately been at war against the National Government. This led the two Houses to enact legislation to curtail the then acknowledged powers of the President. It is true that, during the latter part of Mr. Lincoln's term, two important, voluminous acts were passed, each containing a section which seemed inconsistent with the legislative decision of 1789, (Act of February 25, 1863, 12 Stat. 665, c. 58, § 1, Act of March 3, 1865, 13 Stat. 489, c. 79, § 12); but they were adopted without discussion of the inconsistency and were not tested by executive or judicial inquiry. The real challenge to the decision of 1789 was begun by the Act of July 13, 1866, 14 Stat. 92, c. 176, forbidding dismissals of Army and Navy officers in time of peace without a sentence by court-martial, which this Court, in *Blake* v. *United States,* 103 U. S. 227, at p. 235, attributed to the growing differences between President Johnson and Congress.

Another measure having the same origin and purpose was a rider on an army appropriation act of March 2, 1867, 14 Stat. 487, c. 170, § 2, which fixed the headquarters of the General of the Army of the United States at Washington, directed that all orders relating to military operations by the President or Secretary of War should be issued through the General of the Army, who should not be removed, suspended, or relieved from command, or assigned to duty elsewhere, except at his own request, without the previous approval of the Senate; and that any orders or instructions relating to military operations issued contrary to this should be void; and that any officer of the Army who should issue, knowingly transmit, or obey any orders issued contrary to the provisions of

this section, should be liable to imprisonment for years. By the Act of March 27, 1868, 15 Stat. 44, c. 34, § 2, the next Congress repealed a statutory provision as to appeals in *habeas corpus* cases, with the design, as was avowed by Mr. Schenck, chairman of the House Committee on Ways and Means, of preventing this Court from passing on the validity of reconstruction legislation. 81 Congressional Globe, pages 1881, 1883; *Ex parte McArdle,* 7 Wall. 506.

But the chief legislation in support of the reconstruction policy of Congress was the Tenure of Office Act, of March 2, 1867, 14 Stat. 430, c. 154, providing that all officers appointed by and with the consent of the Senate should hold their offices until their successors should have in like manner been appointed and qualified, and that certain heads of departments, including the Secretary of War, should hold their offices during the term of the President by whom appointed and one month thereafter subject to removal by consent of the Senate. The Tenure of Office Act was vetoed, but it was passed over the veto. The House of Representatives preferred articles of impeachment against President Johnson for refusal to comply with, and for conspiracy to defeat, the legislation above referred to, but he was acquitted for lack of a two-thirds vote for conviction in the Senate.

In *Parsons* v. *United States, supra,* the Court thus refers to the passage of the Tenure of Office Act (p. 340):

" The President, as is well known, vetoed the tenure of office act, because he said it was unconstitutional in that it assumed to take away the power of removal constitutionally vested in the President of the United States—a power which had been uniformly exercised by the Executive Department of the Government from its foundation. Upon the return of the bill to Congress it was passed over the President's veto by both houses and became a law. The continued and uninterrupted practice of the

Government from 1789 was thus broken in upon and changed by the passage of this act, so that, if constitutional. thereafter all executive officers whose appointments had been made with the advice and consent of the Senate could not be removed by the President without the concurrence of the Senate in such order of removal.

" Mr. Blaine, who was in Congress at the time, in afterwards speaking of this bill, said: ' It was an extreme proposition—a new departure from the long-established usage of the Federal Government—and for that reason, if for no other, personally degrading to the incumbent of the Presidential chair. It could only have grown out of abnormal excitement created by dissensions between the two great departments of the Government. . . . The measure was resorted to as one of self-defense against the alleged aggressions and unrestrained power of the executive department.' Twenty Years of Congress, vol. 2, 273, 274."

The extreme provisions of all this legislation were a full justification for the considerations so strongly advanced by Mr. Madison and his associates in the First Congress for insisting that the power of removal of executive officers by the President alone was essential in the division of powers between the executive and the legislative bodies. It exhibited in a clear degree the paralysis to which a partisan Senate and Congress could subject the executive arm and destroy the principle of executive responsibility and separation of the powers, sought for by the framers of our Government, if the President had no power of removal save by consent of the Senate. It was an attempt to re-distribute the powers and minimize those of the President.

After President Johnson's term ended, the injury and invalidity of the Tenure of Office Act in its radical innovation were immediately recognized by the Executive and objected to. General Grant, succeeding Mr. Johnson

in the Presidency, earnestly recommended in his first message the total repeal of the act, saying:

"It may be well to mention here the embarrassment possible to arise from leaving on the statute books the so-called 'tenure-of-office acts,' and to earnestly recommend their total repeal. It could not have been the intention of the framers of the Constitution, when providing that appointments made by the President should receive the consent of the Senate, that the latter should have the power to retain in office persons placed there by Federal appointment, against the will of the President. The law is inconsistent with a faithful and efficient administration of the Government. What faith can an Executive put in officials forced upon him, and those, too, whom he has suspended for reason? How will such officials be likely to serve an Administration which they know does not trust them?" 9 Messages and papers of the Presidents, 3992.

While, in response to this, a bill for repeal of that act passed the House, it failed in the Senate, and, though the law was changed, it still limited the Presidential power of removal. The feeling growing out of the controversy with President Johnson retained the act on the statute book until 1887, when it was repealed. 24 Stat. 500, c. 353. During this interval, on June 8, 1872, Congress passed an act reorganizing and consolidating the Post Office Department, and provided that the Postmaster General and his three assistants should be appointed by the President by and with the advice and consent of the Senate and might be removed in the same manner. 17 Stat. 284, c. 335, § 2. In 1876 the act here under discussion was passed, making the consent of the Senate necessary both to the appointment and removal of first, second and third class postmasters. 19 Stat. 80, c. 179, § 6.

In the same interval, in March, 1886, President Cleveland, in discussing the requests which the Senate had

made for his reasons for removing officials, and the assumption that the Senate had the right to pass upon those removals and thus to limit the power of the President, said:

" I believe the power to remove or suspend such officials is vested in the President alone by the Constitution, which in express terms provides that ' the executive power shall be vested in a President of the United States of America,' and that ' he shall take care that the laws be faithfully executed.'

" The Senate belongs to the legislative branch of the Government. When the Constitution by express provision super-added to its legislative duties the right to advise and consent to appointments to office and to sit as a court of impeachment, it conferred upon that body all the control and regulation of Executive action supposed to be necessary for the safety of the people; and this express and special grant of such extraordinary powers, not in any way related to or growing out of general Senatorial duties, and in itself a departure from the general plan of our Government, should be held, under a familiar maxim of construction, to exclude every other right of interference with Executive functions." 11 Messages and Papers of the Presidents, 4964.

The attitude of the Presidents on this subject has been unchanged and uniform to the present day whenever an issue has clearly been raised. In a message withholding his approval of an act which he thought infringed upon the executive power of removal, President Wilson said:

" It has, I think, always been the accepted construction of the Constitution that the power to appoint officers of this kind carries with it, as an incident, the power to remove. I am convinced that the Congress is without constitutional power to limit the appointing power and its incident, the power of removal, derived from the Constitution." 59 Congressional Record (June 4, 1920), 8609.

And President Coolidge, in a message to Congress, in response to a resolution of the Senate that it was the sense of that body that the President should immediately request the resignation of the then Secretary of the Navy, replied:

" No official recognition can be given to the passage of the Senate resolution relative to their opinion concerning members of the Cabinet or other officers under executive control.

" . . . The dismissal of an officer of the Government, such as is involved in this case, other than by impeachment, is exclusively an executive function. I regard this as a vital principle of our Government." 65 Congressional Record (Feb. 13, 1924), 2335.

In spite of the foregoing Presidential declarations, it is contended that, since the passage of the Tenure of Office Act, there has been general acquiescence by the Executive in the power of Congress to forbid the President alone to remove executive officers—an acquiescence which has changed any formerly accepted constitutional construction to the contrary. Instances are cited of the signed approval by President Grant and other Presidents of legislation in derogation of such construction. We think these are all to be explained, not by acquiescence therein, but by reason of the otherwise valuable effect of the legislation approved. Such is doubtless the explanation of the executive approval of the Act of 1876, which we are considering, for it was an appropriation act on which the section here in question was imposed as a rider.

In the use of Congressional legislation to support or change a particular construction of the Constitution by acquiescence, its weight for the purpose must depend not only upon the nature of the question, but also upon the attitude of the executive and judicial branches of the Government, as well as upon the number of instances in the execution of the law in which opportunity for objec-

tion in the courts or elsewhere is afforded. When instances which actually involve the question are rare, or have not in fact occurred, the weight of the mere presence of acts on the statute book for a considerable time, as showing general acquiescence in the legislative assertion of a questioned power, is minimized. No instance is cited to us where any question has arisen respecting a removal of a Postmaster General or one of his assistants. The President's request for resignations of such officers is generally complied with. The same thing is true of the postmasters. There have been many executive removals of them and but few protests or objections. Even when there has been a refusal by a postmaster to resign, removal by the President has been followed by a nomination of a successor, and the Senate's confirmation has made unimportant the inquiry as to the necessity for the Senate's consent to the removal.

Other acts of Congress are referred to which contain provisions said to be inconsistent with the 1789 decision. Since the provision for an Interstate Commerce Commission, in 1887, many administrative boards have been created whose members are appointed by the President, by and with the advice and consent of the Senate, and in the statutes creating them have been provisions for the removal of the members for specified causes. Such provisions are claimed to be inconsistent with the independent power of removal by the President. This, however, is shown to be unfounded by the case of *Shurtleff* v. *United States*, 189 U. S. 311 (1903). That concerned an act creating a board of general appraisers, 26 Stat. 131, 136, c. 407, § 12, and providing for their removal for inefficiency, neglect of duty or malfeasance in office. The President removed an appraiser without notice or hearing. It was forcibly contended that the affirmative language of the statute implied the negative of the power to remove, except for cause and after a hearing. This would

have been the usual rule of construction, but the Court declined' to apply it. Assuming for the purpose of that case only, but without deciding, that Congress might limit the President's power to remove, the Court held that, in the absence of constitutional or statutory provision otherwise, the President could by virtue of his general power of appointment remove an officer, though appointed by and with the advice and consent of the Senate, and notwithstanding specific provisions for his removal for cause, on the ground that the power of removal inhered in the power to appoint. This is an indication that many of the statutes cited are to be reconciled to the unrestricted power of the President to remove, if ' ِ chooses to exercise his power.

There are other later acts pointed out in which, doubtless, the inconsistency with the independent power of the President to remove is clearer, but these can not be said really to have received the acquiescence of the executive branch of the Government. Whenever there has been a real issue in respect of the question of Presidential removals, the attitude of the Executive in Congressional message has been clear and positive against the validity of such legislation. The language of Mr. Cleveland in 1886, twenty years after the Tenure of Office Act, in his controversy with the Senate in respect of his independence of that body in the matter of removing inferior officers appointed by him and confirmed by the Senate, was quite as pronounced as that of General Jackson in a similar controversy in 1835. Mr. Wilson in 1920 and Mr. Coolidge in 1924 were quite as all-embracing in their views of the power of removal as General Grant in 1869, and as Mr. Madison and Mr. John Adams in 1789.

The fact seems to be that all departments of the Government have constantly had in mind, since the passage of the Tenure of Office Act, that the question of power of removal by the President of officers appointed by him

with the Senate's consent, has not been settled adversely to the legislative action of 1789 but, in spite of Congressional action, has remained open until the conflict should be subjected to judicial investigation and decision.

The action of this Court can not be said to constitute assent to a departure from the legislative decision of 1789, when the *Parsons* and *Shurtleff* cases, one decided in 1897, and the other in 1903, are considered; for they certainly leave the question open. *Wallace* v. *United States*, 257 U. S. 541. Those cases indicate no tendency to depart from the view of the First Congress. This Court has, since the Tenure of Office Act, manifested an earnest desire to avoid a final settlement of the question until it should be inevitably presented, as it is here.

An argument *ab inconvenienti* has been made against our conclusion in favor of the executive power of removal by the President, without the consent of the Senate—that it will open the door to a reintroduction of the spoils system. The evil of the spoils system aimed at in the civil service law and its amendments is in respect of inferior offices. It has never been attempted to extend that law beyond them. Indeed, Congress forbids its extension to appointments confirmed by the Senate, except with the consent of the Senate. Act of January 16, 1883, 22 Stat. 403, 406, c. 27, sec. 7. Reform in the federal civil service was begun by the Civil Service Act of 1883. It has been developed from that time, so that the classified service now includes a vast majority of all the civil officers. It may still be enlarged by further legislation. The independent power of removal by the President alone, under present conditions, works no practical interference with the merit system. Political appointments of inferior officers are still maintained in one important class, that of the first, second and third class postmasters, collectors of internal revenue, marshals, collectors of customs and other officers of that

kind, distributed through the country. They are appointed by the President with the consent of the Senate. It is the intervention of the Senate in their appointment, and not in their removal, which prevents their classification into the merit system. If such appointments were vested in the heads of departments to which they belong, they could be entirely removed from politics, and that is what a number of Presidents have recommended. President Hayes, whose devotion to the promotion of the merit system and the abolition of the spoils system was unquestioned, said, in his 4th Annual Message, of December 6, 1880, that the first step to improvement in the civil service must be a complete divorce between Congress and the Executive on the matter of appointments, and he recommended the repeal of the Tenure of Office Act of 1867 for this purpose. 10 & 11 Messages and Papers of the Presidents, 4555–4557. The extension of the merit system rests with Congress.

What, then, are the elements that enter into our decision of this case? We have first a construction of the Constitution made by a Congress which was to provide by legislation for the organization of the Government in accord with the Constitution which had just then been adopted, and in which there were, as representatives and senators, a considerable number of those who had been members of the Convention that framed the Constitution and presented it for ratification. It was the Congress that launched the Government. It was the Congress that rounded out the Constitution itself by the proposing of the first ten amendments which had in effect been promised to the people as a consideration for the ratification. It was the Congress in which Mr. Madison, one of the first in the framing of the Constitution, led also in the organization of the Government under it. It was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest

weight in the interpretation of that fundamental instrument. This construction was followed by the legislative department and the executive department continuously for seventy-three years, and this although the matter, in the heat of political differences between the Executive and the Senate in President Jackson's time, was the subject of bitter controversy, as we have seen. This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given its provisions. *Stuart* v. *Laird,* 1 Cranch 299, 309; *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 351; *Cohens* v. *Virginia,* 6 Wheat. 264, 420; *Prigg* v. *Pennsylvania,* 16 Pet. 544, 621; *Cooley* v. *Board of Wardens, etc.,* 12 How. 299, 315; *Burroughs-Giles Lithographing Company* v. *Sarony,* 111 U. S. 53, 57; *Ames* v. *Kansas,* 111 U. S. 449, 463–469; *The Laura,* 114 U. S. 411, 416; *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S. 265, 297; *McPherson* v. *Blacker,* 146 U. S. 1, 28, 33, 35; *Knowlton* v. *Moore,* 178 U. S. 41, 56; *Fairbank* v. *United States,* 181 U. S. 283, 308; *Ex parte Grossman,* 267 U. S. 87, 118.

We are now asked to set aside this construction, thus buttressed, and adopt an adverse view, because the Congress of the United States did so during a heated political difference of opinion between the then President and the majority leaders of Congress over the reconstruction measures adopted as a means of restoring to their proper status the States which attempted to withdraw from the Union at the time of the Civil War. The extremes to which the majority in both Houses carried legislative measures in that matter are now recognized by all who calmly review the history of that episode in our Government, leading to articles of impeachment against President Johnson, and his acquittal. Without animadvert-

ing on the character of the measures taken, we are certainly justified in saying that they should not be given the weight affecting proper constitutional construction to be accorded to that reached by the First Congress of the United States during a political calm and acquiesced in by the whole Government for three-quarters of a century, especially when the new construction contended for has never been acquiesced in by either the executive or the judicial departments. While this Court has studiously avoided deciding the issue until it was presented in such a way that it could not be avoided, in the references it has made to the history of the question, and in the presumptions it has indulged in favor of a statutory construction not inconsistent with the legislative decision of 1789, it has indicated a trend of view that we should not and can not ignore. When, on the merits, we find our conclusion strongly favoring the view which prevailed in the First Congress, we have no hesitation in holding that conclusion to be correct; and it therefore follows that the Tenure of Office Act of 1867, in so far as it attempted to prevent the President from removing executive officers who had been appointed by him by and with the advice and consent of the Senate, was invalid, and that subsequent legislation of the same effect was equally so.

For the reasons given, we must therefore hold that the provision of the law of 1876, by which the unrestricted power of removal of first class postmasters is denied to the President, is in violation of the Constitution, and invalid. This leads to an affirmance of the judgment of the Court of Claims.

Before closing this opinion, we wish to express the obligation of the Court to Mr. Pepper for his able brief and argument as a friend of the Court. Undertaken at our request, our obligation is none the less if we find ourselves obliged to take a view adverse to his. The strong presentation of arguments against the conclusion of the Court

is of the utmost value in enabling the Court to satisfy itself that it has fully considered all that can be said. ·

*Judgment affirmed.*

MR. JUSTICE HOLMES, dissenting.

My brothers McREYNOLDS and BRANDEIS have discussed the question before us with exhaustive research and I say a few words merely to emphasize my agreement with their conclusion.

The arguments drawn from the executive power of the President, and from his duty to appoint officers of the United States (when Congress does not vest the appointment elsewhere), to take care that the laws be faithfully executed, and to commission all officers of the United States, seem to me spider's webs inadequate to control the dominant facts.

We have to deal with an office that owes its existence to Congress and that Congress may abolish tomorrow. Its duration and the pay attached to it while it lasts depend on Congress alone. Congress alone confers on the President the power to appoint to it and at any time may transfer the power to other hands. With such power over its own creation, I have no more trouble in believing that Congress has power to prescribe a term of life for it free from any interference than I have in accepting the undoubted power of Congress to decree its end. I have equally little trouble in accepting its power to prolong the tenure of an incumbent until Congress or the Senate shall have assented to his removal. The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.

The separate opinion of Mr. Justice McReynolds.

The following provisions of the Act making appropriations for the Post Office Department, approved July 12, 1876, (c. 179, 19 Stat. 78, 80), have not been repealed or superseded.

" Sec. 5. That the postmasters shall be divided into four classes [based on annual compensation]. . . . Sec. 6. Postmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or suspended according to law; and postmasters of the fourth class shall be appointed and may be removed by' the Postmaster-General, by whom all appointments and removals shall be notified to the Auditor for the Post Office Department."

The President nominated and with consent of the Senate appointed Frank S. Myers first-class postmaster at Portland, Ore., for four years, commencing July 21, 1917, and undertook to remove him February 3, 1920. The Senate has never approved the removal. Myers protested, asserted illegality of the order, refused to submit, and was ejected. He sued to recover the prescribed salary for the period between February 3, 1920, and July 21, 1921. Judgment must go against the United States unless the President acted within powers conferred by the Constitution.

## II.

May the President oust at will all postmasters appointed with the Senate's consent for definite terms under an Act which inhibits removal without consent of that body? May he approve a statute which creates an inferior office and prescribes restrictions on removal, appoint an incumbent, and then remove without regard to the restrictions? Has he power to appoint to an inferior office for a definite term under an Act which prohibits removal except as therein specified, and then arbitrarily

dismiss the incumbent and deprive him of the emoluments? I think there is no such power. Certainly it is not given by any plain words of the Constitution; and the argument advanced to establish it seems to me forced and unsubstantial.

A certain repugnance must attend the suggestion that the President may ignore any provision of an Act of Congress under which he has proceeded. He should promote and not subvert orderly government. The serious evils which followed the practice of dismissing civil officers as caprice or interest dictated, long permitted under congressional enactments, are known to all. It brought the public service to a low estate and caused insistent demand for reform. " Indeed, it is utterly impossible not to feel, that, if this unlimited power of removal does exist, it may be made, in the hands of a bold and designing man, of high ambition and feeble principles, an instrument of the worst oppression and most vindictive vengeance." Story on the Constitution, §1539.

During the notable Senate debate of 1835 (Debates, 23d Cong., 2d sess.) experienced statesmen pointed out the very real dangers and advocated adequate restraint, through congressional action, upon the power which statutes then permitted the President to exercise.

Mr. Webster declared (p. 469): " I deem this degree of regulation, at least, necessary, unless we are willing to submit all these officers to an absolute and perfectly irresponsible removing power, a power which, as recently exercised, tends to turn the whole body of public officers into partisans, dependants, favorites, sycophants, and man-worshippers."

Mr. Clay asserted (*id.* 515): " The power of removal, as now exercised, is nowhere in the Constitution expressly recognized. The only mode of displacing a public officer for which it does provide is by impeachment. But it has been argued on this occasion, that it is a sovereign power, an inherent power, and an executive power; and, there-

fore,, that it belongs to the President. Neither the premises nor the conclusion can be sustained. If they could be, the people of the United States have all along totally misconceived the nature of their government, and the character of the office of their supreme magistrate. Sovereign power is supreme power; and in no instance whatever. is there any supreme power vested in the President. Whatever sovereign power is, if there be any, conveyed by the Constitution of the United States, is vested in Congress, or in the President and Senate. The power to declare war, to lay taxes, to coin money, is vested in Congress; and the treaty-making power in the president and Senate. The Postmaster General has the power to dismiss his deputies. Is that a sovereign power or has he any?

"Inherent power! That is a new principle to enlarge the powers of the general government. . . . The partisans of the executive have discovered a third and more fruitful source of power. Inherent power! Whence., is it derived? The Constitution created the office of President, and made it just what it is. It had no powers prior to its existence. It can have none but those which are conferred upon it by the instrument which created it, or laws passed in pursuance of that instrument. Do gentlemen mean by inherent power, such power as is exercised by the monarchs or chief magistrates of other countries? If that be their meaning they should avow it."

And Mr. Calhoun argued (id. 553): "Hear what that sacred instrument says: 'Congress shall have power . . . to make all laws which shall be necessary and proper for carrying into execution the foregoing powers' (those granted to Congress itself) 'and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof.' Mark the fulness of the expression. Congress shall have

power to make all laws, not only to carry into effect the powers expressly delegated to itself, but those delegated to the government or any department or officer thereof; and of course comprehends the power to pass laws necessary and proper to carry into effect the powers expressly granted to the executive department. It follows, of course, to whatever express grant of power to the executive the power of dismissal may be supposed to attach, whether to that of seeing the law faithfully executed, or to the still more comprehensive grant, as contended for by some, vesting executive powers in the President, the mere fact that it is a power appurtenant to another power, and necessary to carry it into effect, transfers it, by the provisions of the Constitution cited, from the executive to Congress, and places it under the control of Congress, to be regulated in the manner which it may judge best."

The long struggle for civil service reform and the legislation designed to insure some security of official tenure ought not to be forgotten. Again and again Congress has enacted statutes prescribing restrictions on removals and by approving them many Presidents have affirmed its power therein.

The following are some of the officers who have been or may be appointed with consent of the Senate under such restricting statutes.

Members of the Interstate Commerce Commission, Board of General Appraisers, Federal Reserve Board, Federal Trade Commission, Tariff Commission, Shipping Board, Federal Farm Loan Board, Railroad Labor Board; officers of the Army and Navy; Comptroller General; Postmaster General and his assistants; postmasters of the first, second and third classes; judge of the United States Court for China; judges of the Court of Claims, established in 1855, the judges to serve "during good behavior"; judges of Territorial (statutory) courts; judges of the

Supreme Court and Court of Appeals for the District of Columbia (statutory courts), appointed to serve "during good behavior." Also members of the Board of Tax Appeals provided for by the Act of February 26, 1926, to serve for 12 years, who "shall be appointed by the President by and with the advice and consent of the Senate solely on the grounds of fitness to perform the duties of the office. Members of the Board may be removed by the President after notice and opportunity for public hearing, for inefficiency, neglect of duty or malfeasance in office but for no other cause."

Every one of these officers, we are now told in effect, holds his place subject to the President's pleasure or caprice.* And it is further said, that Congress cannot create any office to be filled through appointment by the President with consent of the Senate—except judges of the Supreme, Circuit and District (constitutional) courts—and exempt the incumbent from arbitrary dismissal. These questions press for answer; and thus the cause becomes of uncommon magnitude.

## III.

Nothing short of language clear beyond serious disputation should be held to clothe the President with authority wholly beyond congressional control arbitrarily to dismiss every officer whom he appoints except a few judges. There are no such words in the Constitution, and the asserted inference conflicts with the heretofore accepted theory that this government is one of carefully enumerated powers under an intelligible charter. " This instrument contains an enumeration of powers expressly granted." *Gibbons* v. *Ogden,* 9 Wheat. 1, 187. " Nor should it ever be lost sight of, that the government of

---

*The suggestion that different considerations may possibly apply to nonconstitutional judicial officers, I regard as a mere smoke screen.

the United States is one of limited and enumerated powers, and that a departure from the true import and sense of its powers is *pro tanto* the establishment of a new Constitution. It is doing for the people what they have not chosen to do for themselves. It is usurping the functions of a legislator, and deserting those of an expounder of the law. Arguments drawn from impolicy or inconvenience ought here to be of no weight. The only sound principle is to declare, *ita lex scripta est,* to follow, and to obey. Nor, if a principle so just and conclusive could be overlooked, could there well be found a more unsafe guide in practice than mere policy and convenience." Story on the Constitution, § 426.

If the phrase " executive power " infolds the one now claimed, many others heretofore totally unsuspected may lie there awaiting future supposed necessity; and no human intelligence can define the field of the President's permissible activities. "A masked battery of constructive powers would complete the destruction of liberty."

## IV.

Constitutional provisions should be interpreted with the expectation that Congress will discharge its duties no less faithfully than the Executive will attend to his. The legislature is charged with the duty of making laws for orderly administration obligatory upon all. It possesses supreme power over national affairs and may wreck as well as speed them. It holds the purse; every branch of the government functions under statutes which embody its will; it may impeach and expel all civil officers. The duty is upon it " to make all laws which shall be necessary and proper for carrying into execution " all powers of the federal government. We have no such thing as three totally distinct and independent departments; the others must look to the legislative for direction and

support. " In republican government the legislative authority necessarily predominates." The Federalist, XLVI, XVII. Perhaps the chief duty of the President is to carry into effect the will of Congress through such instrumentalities as it has chosen to provide. Arguments, therefore, upon the assumption that Congress may wilfully impede executive action are not important.

The Constitution provides—

"Art I, Sec. 1. All legislative powers herein granted shall be vested in a Congress of the United States. . . . Sec. 2. . . . The House of Representatives . . . shall have the sole power of impeachment. Sec. 3. . . . The Senate shall have the sole power to try all impeachments. . . . Sec. 8. The Congress shall have power . . . To establish post offices and post roads; . . . To raise and support armies . . . To provide and maintain a navy; To make rules for the government and regulation of the land and naval forces; . . . To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof."

"Art. II, Sec. 1. The executive power shall be vested in a President of the United States. . . .

" Sec. 2. The President shall be commander in chief of the Army and Navy of the United States, and of the militia of the several States, when called into the actual service of the United States; he may require the opinion, in writing, of the principal officer in each of the executive departments, upon any subject relating to the duties of their respective offices, and he shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment.

" He shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the senators present concur; and he shall nomi-

nate, and by and with the advice and consent of the Senate, shall appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law; but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments.

" The President shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session.

" Sec. 3. He shall from time to time give to the Congress information of the state of the union, and recommend to their consideration such measures as he shall judge necessary and expedient; he may, on extraordinary occasions, convene both houses, or either of them, and in case of disagreement between them, with respect to the time of adjournment, he may adjourn them to such time as he shall think proper; he shall receive ambassadors and other public ministers; he shall take care that the laws be faithfully executed, and shall commission all the officers of the United States."

"Art. III, Sec. 1. The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish.  .  .  .

" Sec. 2. The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority.  .  ."

### V.

For the United States it is asserted—Except certain judges, the President may remove all officers whether ex-

ecutive or judicial appointed by him with the Senate's consent; and therein he cannot be limited or restricted by Congress. The argument runs thus—The Constitution gives the President all executive power of the national government except as this is checked or controlled by some other definite provision; power to remove is executive and unconfined; accordingly, the President may remove at will. Further, the President is required to take care that the laws be faithfully executed; he cannot do this unless he may remove at will all officers whom he appoints; therefore he has such authority.

The argument assumes far too much. Generally, the actual ouster of an officer is executive action; but to prescribe the conditions under which this may be done is legislative. The act of hanging a criminal is executive; but to say when and where and how he shall be hanged is clearly legislative. Moreover, officers may be removed by direct legislation—the Act of 1820 hereafter referred to did this. " The essence of the legislative authority is to enact laws, or, in other words, to prescribe rules for the regulation of the society; while the execution of the laws, and the employment of the common strength, either for this purpose, or for the common defense, seem to comprise all the functions of the executive magistrate." The Federalist, No. LXXIV.

The legislature may create post offices and prescribe qualifications, duties, compensation and term. And it may protect the incumbent in the enjoyment of his term unless in some way restrained therefrom. The real question, therefore, comes to this—Does any constitutional provision definitely limit the otherwise plenary power of Congress over postmasters, when they are appointed by the President with consent of the Senate? The question is not the much-mooted one whether the Senate is part of the appointing power under the Constitution and therefore must participate in removals. Here the restriction

is imposed by statute alone and thereby made a condition of the tenure. I suppose that beyond doubt Congress could authorize the Postmaster General to appoint all postmasters and restrain him in respect of removals.

Concerning the insistence that power to remove is a necessary incident of the President's duty to enforce the laws, it is enough now to say: The general duty to enforce all laws cannot justify infraction of some of them. Moreover, Congress, in the exercise of its unquestioned power, may deprive the President of the right either to appoint or to remove any inferior officer, by vesting the authority to appoint in another. Yet in that event his duty touching enforcement of the laws would remain. He must utilize the force which Congress gives. He cannot, without permission, appoint the humblest clerk or expend a dollar of the public funds.

It is well to emphasize that our present concern is with the removal of an "inferior officer," within Art. II, Sec. 2, of the Constitution, which the statute positively prohibits without consent of the Senate. This is no case of mere suspension. The demand is for salary and not for restoration to the service. We are not dealing with an ambassador, public minister, consul, judge or "superior officer." Nor is the situation the one which arises when the statute creates an office without a specified term, authorizes appointment and says nothing of removal. In the latter event, under long-continued practice and supposed early legislative construction, it is now accepted doctrine that the President may remove at pleasure. This is entirely consistent with implied legislative assent; power to remove is commonly incident to the right to appoint when not forbidden by law. But there has never been any such usage where the statute prescribed restrictions. From its first session down to the last one Congress has consistently asserted its power to prescribe conditions concerning the removal of inferior officers. The executive

, has habitually observed them, and this Court has affirmed the power of Congress therein.*

## VI.

Some reference to the history of postal affairs will indicate the complete control which Congress has asserted over them with general approval by the executive.

The Continental Congress (1775) established a post office and made Benjamin Franklin Postmaster General, "with power to appoint such and so many deputies, as to him may seem proper and necessary." Under the Articles of Confederation (1781) Congress again provided for a post office and Postmaster General, with "full power and authority to appoint a clerk, or assistant to himself, and such and so many deputy postmasters as he shall think proper." The first Congress under the Constitution (1789) directed: "That there shall be appointed a Postmaster General; his powers and salary, and the compensation to the assistant or clerk and deputies which he may appoint, and the regulations of the post office shall be the same as they last were under the resolutions and ordinances of the late Congress. The Postmaster General to be subject to the direction of the President of the United States in performing the duties of his office, and in forming contracts for the transportation of the mail."

The Act of 1792 (1 Stat. 232, 234) established certain post roads, prescribed regulations for the Department,

---

* Different phases of this general subject have been elaborately discussed in Congress. See discussions on the following measures: Bill to establish a Department of Foreign Affairs, 1789, Annals 1st Cong.; bill to amend the judicial system of the United States, 1802, Annals 7th Cong., 1st Sess.; bill to amend Act of May 15, 1820, fixing tenure of certain offices, 1835, Debates 23d Cong., 2d Sess.; bill to regulate the tenure of certain civil offices, 1866–1867, Globe, 39th Cong., 3d Sess.; Johnson impeachment trial, 1868, Globe Supplement, 40th Cong., 2d Sess.

and continued in the Postmaster General sole power of appointment; but it omitted the earlier provision that he should "be subject to the direction of the President of the United States in performing the duties of his office."

The Act of March 2, 1799, provided: "That there be established at the seat of Government of the United States, a General Post Office, under the direction of a Postmaster General. The Postmaster General shall appoint an assistant, and such clerks as may be necessary for performing the business of his office; he shall establish post-offices, and appoint postmasters, at all such places as shall appear to him expedient, on the post roads that are or may be established by law." This provision remained until 1836; and prior to that time all postmasters were appointed without designated terms and were subject to removal by the Postmaster General alone.

In 1814 Postmaster General Granger appointed Senator Leib postmaster at Philadelphia contrary to the known wishes of President Madison. Granger was removed; but Leib continued to hold his office.

John Quincy Adams records in his Memoirs (January 5, 1822), that the President "summoned an immediate meeting of the members of the administration, which was fully attended. It was upon the appointment of the postmaster at Albany." A warm discussion arose with much diversity of opinion concerning the propriety of the Postmaster General's request for the President's opinion concerning the proposed appointment. "The President said he thought it very questionable whether he ought to interfere in the case at all." Some members severely censured the Postmaster General for asking the President's opinion after having made up his own mind, holding it an attempt to shift responsibility. "I said I did not see his conduct exactly in the same light. The law gave the appointment of all the postmasters exclusively

to the Postmaster General; but he himself was removable from his own office at the pleasure of the President. Now, Mr. Granger had been removed with disgrace by President Madison for appointing Dr. Leib postmaster at Philadelphia. Mr. Meigs, therefore, in determining to appoint General Van Rensselaer, not only exercised a right but performed a duty of his office; but, with the example of Mr. Granger's dismission before him, it was quite justifiable in him to consult the President's wish, with the declared intention of conforming to it. I thought I should have done the same under similar circumstances."

Act of July 2, 1836 (5 Stat. 80, 87)—" That there shall be appointed by the President of the United States, by and with the advice and consent of the Senate, a Deputy Postmaster for each post office at which the commissions allowed to the postmaster amounted to one thousand dollars or upwards in the year ending the thirtieth day of June, one thousand eight hundred and thirty-five, or which may, in any subsequent year, terminating on the thirtieth day of June, amount to or exceed that sum, who shall hold his office for the term of four years, unless sooner removed by the President." This is the first Act which permitted appointment of any postmaster by the President; the first also which fixed terms for them. It was careful to allow removals by the President, which otherwise, under the doctrine of *Marbury* v. *Madison,* 1 Cranch. 137, would have been denied him. And by this legislation Congress itself terminated the services of postmasters who had been appointed to serve at will.

The Act of 1863 (12 Stat. 701) empowered the Postmaster General to appoint and commission all postmasters whose salary or compensation " have been ascertained to be less than one thousand dollars." In 1864 five distinct classes were created (13 Stat. 335); and the Act of 1872 (17 Stat. 292) provided—" That postmasters of the fourth and fifth class shall be appointed and may be removed

by the Postmaster General, and all others shall be ap-pointed and may be removed by the President, by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or sus-pended according to law."ᐟ

In 1874 (18 Stat. 231, 233) postmasters were divided into four classes according to compensation and the statute directed that those " of the first, second, and third classes shall be appointed and may be removed by the President, by and with the advice and consent of the Sen-ate, and shall hold their offices for four years unless sooner removed or suspended according to law; and postmasters of the fourth class shall be appointed and may be removed by the Postmaster General, by whom all appointments and removals shall be notified to the Auditor for the Post Office Department." This language reappears in § 6, Act July 12, 1876, *supra.*

On July 1, 1925, there were 50,957 postmasters; 35,758 were of the fourth class.

For 47 years (1789 to 1836) the President could neither appoint nor remove any postmaster. The Act which first prescribed definite terms for these officers authorized him to do both. Always it has been the duty of the President to take care that the postal laws " be faithfully executed "; but there did not spring from this any illimitable power to remove postmasters.

## VII.

The written argument for the United States by the former Solicitor General avers that it is based on this premise: " The President's supervision of the executive branch of the government, through the necessary power of removal, has always been recognized, and is now recog-nized, alike by considerations of necessity and the theory of government as an executive power, and is clearly in-dicated in the text of the Constitution, even though the

power of removal is not expressly granted." A discourse proceeding from that premise. helps only because it indicates the inability of diligent counsel to discover a solid basis for his contention. The words of the Constitution are enough to show that the framers never supposed orderly government required the President either to appoint or to remove postmasters. Congress may vest the power to appoint and remove all of them in the head of a department and thus exclude them from presidential authority. From 1789 to 1836 the Postmaster General exercised these powers, as to all postmasters (Story on the Constitution, § 1536), and the 35,000 in the fourth class are now under his control. For forty years the President functioned and met his duty to " take care that the laws be faithfully executed " without the semblance of power to remove any postmaster. So I think the supposed necessity and theory of government are only vapors.

## VIII.

Congress has authority to provide for postmasters and prescribe their compensation, terms and duties. It may leave with the President the right to appoint them with consent of the Senate. or direct another to appoint. In the latter event *United States* v *Perkins,* 116 U. S. 483, 485, makes it clear that the right to remove may be restricted. But, so the argument runs, if the President appoints with consent of the Senate his right to remove can not be abridged because Art. II of the Constitution vests in him the " executive power," and this includes an illimitable right to remove. The Constitution empowers the President to appoint Ambassadors, other public ministers, consuls, judges of the Supreme Court and superior officers, and no statute can interfere therein. But Congress may authorize both appointment and removal of all inferior officers without regard to the President's wishes—even in direct opposition to them. This important distinction

must not be overlooked. And consideration of the complete control which Congress may exercise over inferior officers is enough to show the hollowness of the suggestion that a right to remove them may be inferred from the President's duty to " take care that the laws be faithfully executed." He cannot appoint any inferior officer, however humble, without legislative authorization; but such officers are essential to execution of the laws. Congress may provide as many or as few of them as it likes. It may place all of them beyond the President's control; but this would not suspend his duty concerning faithful execution of the laws. Removals, however important, are not so necessary as appointments.

## IX.

I find no suggestion of the theory that " the executive power " of Art. II, Sec. 1, includes all possible federal authority executive in nature unless definitely excluded by some constitutional provision, prior to the well-known House debate of 1789, when Mr. Madison seems to have given it support. A resolution looking to the establishment of an executive department—Department of Foreign Affairs (afterwards State)—provided for a secretary, " who shall be appointed by the President by and with the advice and consent of the Senate and to be removable by the President." Discussion arose upon a motion to strike out, " to be removable by the President." The distinction between superior and inferior officers was clearly recognized; also that the proposed officer was superior and must be appointed by the President with the Senate's consent. The bill prescribed no definite term—the incumbent would serve until death, resignation or removal. In the circumstances most of the speakers recognized the rule that where there is no constitutional or legislative restriction power to remove is incidental to that of appointment. Accordingly, they thought the

President could remove the proposed officer; but many supposed he must do so with consent of the Senate. They maintained that the power to appoint is joint.

Twenty-four of the fifty-four members spoke and gave their views on the Constitution and sundry matters of expediency. The record fairly indicates that nine, including Mr. Madison, thought the President would have the right to remove an officer serving at will under direct constitutional grant; three thought the Constitution did not and although Congress might it ought not to bestow such power; seven thought the Constitution did not and Congress could not confer it; five were of opinion that the Constitution did not but that Congress ought to confer it. Thus, only nine members said anything which tends to support the present contention, and fifteen emphatically opposed it.

The challenged clause, although twice formally approved, was finally stricken out upon assurance that a new provision (afterwards adopted) would direct disposition of the official records " whenever the said principal officer shall be removed from office by the President of the United States or in any other case of vacancy." This was susceptible of different interpretations and probably did not mean the same thing to all. The majority said nothing. The result of the discussion and vote was to affirm that the President held the appointing power with a right of negation in the Senate; and that, under the commonly accepted rule, he might remove without concurrence of the Senate when there was no inhibition by Constitution or statute. That the majority did not suppose they had assented to the doctrine under which the President could remove inferior officers contrary to an inhibition prescribed by Congress, is shown plainly enough by the passage later in the same session of two Acts containing provisions wholly inconsistent with any such idea. Acts of August 7, 1789, and September 24, 1789, *infra*.

Following much discussion of Mr. Madison's motion of May 19, a special committee reported this bill to the House on June 2. Debates upon it commenced June 16 and continued until June 24, when it passed by twenty-nine to twenty-two. The Senate gave it great consideration, commencing June 25, and passed it July 18, with amendments accepted by the House July 20. The Diary of President John Adams (Works 1851 ed., v. 3, p. 412) states that the Senate voted nine to nine and that the deciding vote was given by the Vice President in favor of the President's power to remove. He also states that Senator Ellsworth strongly supported the bill and Senator Patterson voted for it. These senators were members of the committee which drafted the Judiciary Bill spoken of below.

It seems indubitable that when the debate began Mr. Madison did not entertain the extreme view concerning illimitable presidential power now urged upon us; and it is not entirely clear that he had any very definite convictions on the subject when the discussion ended. Apparently this notion originated with Mr. Vining, of Delaware, who first advanced it on May 19. Considering Mr. Madison's remarks (largely argumentative) as a whole, they give it small, if any, support. Some of them, indeed, are distinctly to the contrary. He was author of the provision that the Secretary shall "be removable by the President"; he thought it "safe and expedient to adopt the clause," and twice successfully resisted its elimination—May 19 and June 19. He said: "I think it absolutely necessary that the President should have the power of removing from office. . . . On the constitutionality of the declaration I have no manner of doubt." "He believed they [his opponents] would not assert that any part of the Constitution declared that the only way to remove should be by impeachment; the contrary might be inferred, because Congress may establish offices by law;

therefore, most certainly, it is in the discretion of the legislature to say upon what terms the office shall be held, either during good behavior or during pleasure." " I have, since the subject was last before the House, examined the Constitution with attention, and I acknowledge that it does not perfectly correspond with the ideas I entertained of it from the first glance. . . . I have my doubts whether we are not absolutely tied down to the construction declared in the bill. . . . If the Constitution is silent, and it is a power the legislature have a right to confer, it will appear to the world, if we strike out the clause, as if we doubted the propriety of vesting it in the President of the United States. I therefore think it best to retain it in the bill." *

---

*This debate began May 19 in the Committee of the Whole on Mr. Madison's motion—" That it is the opinion of this committee, that there shall be established an executive department, to be denominated the Department of Foreign Affairs, at the head of which there shall be an officer, to be called the Secretary to the Department of Foreign Affairs, who shall be appointed by the President, by and with the advice and consent of the Senate; and to be removable by the President."

The words, "who shall be appointed by the President, by and with the advice and consent of the Senate," were objected to as superfluous since " the Constitution had expressly given the power of appointment in words there used," and Mr. Madison agreed to their elimination.

Doubts were then expressed whether the officer could be removed by the President. The suggestion was that this could only be done by impeachment. Mr. Madison opposed the suggestion, and said: " I think the inference would not arise from a fair construction of the words of that instrument. . . . I think it absolutely necessary that the President should have the power of removing from office. . . . On the constitutionality of the declaration I have no manner of doubt."

Thereupon Mr. Vining, of Delaware, declared: " There were no negative words in the Constitution to preclude the President from the exercise of this power; but there was a strong presumption that he was invested with it: because it was declared, that all executive

Writing to Edmund Randolph, June 17, 1789, Mr. Madison pointed out the precise point of the debate. "A very interesting question is started—By whom officers appointed during pleasure by the President and Senate are to be displaced." And on June 21, 1789, he advised Edmund Pendleton of the discussion, stated the four opinions held by members, and said: " The last opinion

---

power should be vested in him, except in cases where it is otherwise qualified; as, for example, he could not fully exercise his executive power in making treaties, unless with the advice and consent of the Senate—the same in appointing to office."

Mr. Bland and Mr. Jackson further insisted that removal could be effected only through impeachment, and Mr. Madison replied: He " did not concei∕e it was a proper construction of the Constitution to say that there was no other mode of removing from office than that by impeachment; he believed this, as applied to the judges, might be the case; but he could never imagine it extended in the manner which gentlemen contended for. He believed they would not assert, that any part of the Constitution declared that the only way to remove should be by impeachment; the contrary might be inferred, because Congress may establish offices by law; therefore, most certainly, it is in the discretion of the legislature to say upon what terms the office shall be held, either during good behaviour or during pleasure."

Later in the day Mr. Madison discussed various objections offered and said: " I cannot but believe, if gentlemen weigh well these considerations, they will think it safe and expedient to adopt the clause." Others spoke briefly, and then, as the record recites, " The question was now taken, and carried by a considerable majority, in favor of declaring the power of removal to be in the President." The resolution was reported; the. House concurred; and a committee (including Mr. Madison) was appointed to prepare and bring in a bill.

On June 2 the committee reported a bill, providing for a Secretary, " to be removable from office by the President of the United States," which was read and referred to the Committee of the Whole. It was taken up for consideration June 16, and the discussion continued during five days. Members expressed radically different views. Among other things Mr. Madison said—

" I have, since the subject was last before the House, examined the Constitution with attention; and I acknowledge that it does not perfectly correspond with the ideas I entertained of it from the first

[the one he held] has prevailed, but is subject to various modifications, by the power of the legislature to limit the duration of laws creating offices, or the duration of the appointments for filling them, and by the power over the salaries and appropriations."

Defending the Virginia Resolutions (of 1798) after careful preparation aided by long experience with national affairs, Mr. Madison emphasized the doctrine that

glance. . . . By a strict examination of the Constitution, on what appears to be its true principles, and considering the great departments of the government in the relation they have to each other, I have my doubts whether we are not absolutely tied down to the construction declared in the bill. . . .

" If this is the true construction of this instrument, the clause in the bill is nothing more than explanatory of the meaning of the Constitution, and therefore not liable to any particular objection on that account. If the Constitution is silent, and it is a power the legislature have a right to confer, it will appear to the world, if we strike out the clause, as if we doubted the propriety of vesting it in the President of the United States. I therefore think it best to retain it in the bill."

June 19, " the call for the question being now very general, it was put, shall the words ' to be removable by the President,' be struck out? It was determined in the negative; being yeas 20, nays 34." There were further remarks, and " the committee then rose and reported the bill . . . to the House."

Discussion of the disputed provision was renewed on June 22. Mr. Benson moved to amend the bill " so as to imply the power of removal to be in the President," by providing for a Chief Clerk who should have custody of the records, etc., " whenever the said principal officer shall be removed from office by the President of the United States, or in any other case of vacancy." He " hoped his amendment would succeed in reconciling both sides of the House to the decision and quieting the minds of gentlemen." If successful he would move to strike out the words, " to be removable by the President." After a prolonged discussion the amendment prevailed; the much-challenged clause was stricken out and the ambiguous one suggested by Mr. Benson was inserted. June 24 the bill, thus amended, finally passed.

Five members once delegates to the Constitutional Convention took part in the debate. Mr. Madison, Mr. Baldwin and Mr. Clymer expressed similar views; Mr. Sherman and Mr. Gerry were emphatically of the contrary opinion.

the powers of the United States are " particular and limited," that the general phrases of the Constitution must not be so expounded as to destroy the particular enumerations explaining and limiting their meaning, and that latitudinous exposition would necessarily destroy the fundamental purpose of the founders. He continued to hold these general views. In his letters he clearly exposed the narrow point under consideration by the first Congress, also the modification to which his views were subject, and he supported, during the same session, the Judiciary Act and probably the Northwest Territory Act, which contained provisions contrary to the sentiment now attributed to him. It therefore seems impossible to regard what he once said in support of a contested measure as present authority for attributing to the executive those illimitable and undefinable powers which he thereafter reprobated. Moreover, it is the fixed rule that debates are not relied upon when seeking the meaning or effect of statutes.

But if it were possible to spell out of the debate and action of the first Congress on the bill to establish the Department of Foreign Affairs some support for the present claim of the United States, this would be of little real consequence, for the same Congress on at least two occasions took the opposite position; and time and time again subsequent congresses have done the same thing. It would be amazing for this Court to base the interpretation of a constitutional provision upon a single doubtful congressional interpretation when there have been dozens of them extending through a hundred and thirty-five years, which are directly to the contrary effect.

Following the debate of 1789 it became the commonly approved view that the Senate is not a part of the appointing power. Also it became accepted practice that the President might remove at pleasure all officers appointed by him when neither Constitution nor statute

prohibited by prescribing a fixed term or otherwise. Prior to 1820 very few officers held for definite terms; generally they were appointed to serve at pleasure, and Mr. Madison seems always to have regarded this as the proper course. He emphatically disapproved the Act of 1820, which prescribed such terms, and even doubted its constitutionality. Madison's Writings, 1865 ed., vol. 3, p. 196. It was said that, "He thought the tenure of all subordinate executive officers was necessarily the pleasure of the chief by whom they were commissioned. If they could be limited by Congress to four years, they might to one—to a month—to a day—and the executive power might thus be annihilated." Diary, John Quincy Adams, 1875 ed., vol. VII, p. 425.

During the early administrations removals were infrequent and for adequate reasons. President Washington removed ten officers; President John Adams, eight.

Complying with a Resolution of March 2, 1839, President Van Buren sent to the House of Representatives, March 13, 1840, "a list of all [civil] officers of the Government deriving their appointments from the nomination of the President and concurrence of the Senate whose commissions are recorded in the Department of State and who have been removed from office since the 3rd of March, 1789." Document No. 132, 26th Cong., 1st Sess. Two hundred and eight had been removed; and, after a somewhat careful survey of the statutes, I think it true to say, that not one of these removals had been inhibited by Congress. On the contrary, all were made with its consent, either implied from authorization of the appointment for service at pleasure or indicated by express words of the applicable statute. The Act of 1789 authorized appointment of marshals for four years, removable at pleasure. The Act of 1820 established definite terms for many officers, but directed that they "shall be removable from office at pleasure." The Act of 1836 prescribed

fixed terms for certain postmasters and expressly provided for removals by the President.

A summary of the reported officers with commissions in the State Department who were removed, with the number in each class, is in the margin.* The Secretary of the Treasury reported that twenty-four officers in that Department had been removed "since the burning of the Treasury Building in 1833." The Postmaster General reported that thirteen postmasters appointed by the President had been dismissed (prior to 1836 all postmasters were appointed by the Postmaster General; after that time the President had express permission to dismiss those whom he appointed). Nine Indian Agents were removed. One hundred and thirty-nine commissioned officers of the army and twenty-two of the navy were removed. I find no restriction by Congress on the President's right to remove any of these officers. See *Wallace* v. *United States,* 257 U. S. 541.

Prior to the year 1839, no President engaged in the practice of removing officials contrary to congressional di-

* Officers with commissions in the State Department who were removed: Collectors of customs, 17; collectors and inspectors, 25; surveyors of ports, 4; surveyors and inspectors, 9; supervisors, 4; naval officers, 4; marshals, 28; district attorneys, 23; principal assessors, 3; collectors of direct taxes, 4; consuls, 49; ministers abroad, 5; chargés des affaires, 2; secretaries of legation, 3; Secretary of State, 1; Secretary of War, 1; Secretary of the Treasury, 1; Secretary of the Navy, 1; Attorney General, 1; Commissioner of Loans, 1; receivers of public moneys, 2; registers of land offices, 2; Agent of the Creek Nation, 1; Register of the Treasury, 1; Comptroller of the Treasury, 1; auditors, 2; Treasurer of the United States, 1; Treasurer of the Mint, 1; Commissioner of Public Buildings, 1; Recorder of Land Titles, 1; Judge of territory, 1; secretaries of territories, 2; Commissioner for the adjustment of private land claims, 1; surveyors-general, 2; surveyors of the public lands, 3.

Officers in the Treasury Department who were removed: Surveyor and inspector, 1; naval officer, 1; appraisers, 2; collectors, 2; surveyors, 2; receivers of public moneys, 12; registers of the land office, 4.

rection.   There is no suggestion of any such practice which originated after that date.

Rightly understood the debate and Act of 1789 and subsequent practice afford no support to the claim now advanced.   In *Marbury* v. *Madison, supra,* this court expressly repudiated it, and that decision has never been overruled.   On the contrary, *Shurtleff* v. *United States,* 189 U. S. 311, clearly recognizes the right of Congress to impose restrictions.

Concerning the legislative and practical construction following this debate Mr. Justice Story wrote (1833): " It constitutes perhaps the most extraordinary case in the history of the government of a power, conferred by implication on the executive by the assent of a bare majority of Congress, which has not been questioned on many other occasions.   . . .   Whether the predictions of the original advocates of the executive power, or those of the opposers of it, are likely, in the future progress of the government, to be realized, must be left to the sober judgment of the community, and to the impartial award of time.   If there has been any aberration from the true constitutional exposition of the power of removal (which the reader must decide for himself), it will be difficult, and perhaps impracticable, after forty years' experience, to recall the practice to the correct theory.   But, at all events, it will be a consolation to those who love the Union, and honor a devotion to the patriotic discharge of duty, that in regard to ' inferior officers ' (which appellation probably includes ninety-nine out of a hundred of the lucrative offices in the government), the remedy for any permanent abuse is still within the power of Congress, by the simple expedient of requiring the consent of the Senate to removals in such cases."   Story on the Constitution, §§ 1543, 1544.

Writing in 1826 (*309, 310) Chancellor Kent affirmed: " The Act [the Judiciary Act of September 24, 1789, § 27]

says, that the marshal shall be removable *at pleasure,* without saying by whom; and on the first organization of the government, it was made a question whether the power of removal, in case of officers appointed to hold at pleasure, resided anywhere but in the body which appointed, and of course whether the consent of the Senate was not requisite to remove. This was the construction given to the Constitution while it was pending for ratification before the state conventions, by the author of The Federalist. . . . But the construction which was given to the Constitution by Congress, after great consideration and discussion, was different. In the Act for establishing the Treasury Department, the Secretary was contemplated as being removable from office by the President. The words of the Act are, ' That whenever the Secretary shall be removed from office by the President of the United States, or in any other case of vacancy in the office, the assistant shall act,' &c. This amounted to a legislative construction of the Constitution, and it has ever since been acquiesced in and acted upon, as of decisive authority in the case. It applies equally to every other officer of government appointed by the President and Senate, *whose term of duration is not specially declared.*"

These great expounders had no knowledge of any practical construction of the Constitution sufficient to support the theory here advanced. This court knew nothing of it in 1803 when it decided *Marbury* v. *Madison;* and we have the assurance of Mr. Justice McLean (*United States* v. *Guthrie,* 17 How. 284, 305) that it adhered to the view there expressed so long as Chief Justice Marshall lived. And neither Calhoun, nor Clay, nor Webster knew of any such thing during the debate of 1835 when they advocated limitation, by further legislation, of powers granted to the President by the Act of 1820.

If the remedy suggested by Mr. Justice Story and long supposed to be efficacious should prove to be valueless,

I suppose Congress may enforce its will by empowering the courts or heads of departments to appoint all officers except representatives abroad, certain judges and a few "superior" officers—members of the cabinet. And in this event the duty to "take care that the laws be faithfully executed" would remain notwithstanding the President's lack of control. In view of this possibility, under plain provisions of the Constitution, it seems useless, if not, indeed, presumptuous, for courts to discuss matters of supposed convenience or policy when considering the President's power to remove.

## X.

Congress has long and vigorously asserted its right to restrict removals and there has been no common executive practice based upon a contrary view. The President has often removed, and it is admitted that he may remove, with either the express or implied assent of Congress; but the present theory is that he may override the declared will of that body. This goes far beyond any practice heretofore approved or followed; it conflicts with the history of the Constitution, with the ordinary rules of interpretation, and with the construction approved by Congress since the beginning and emphatically sanctioned by this court. To adopt it would be revolutionary.

The Articles of Confederation contained no general grant of executive power.

The first constitutions of the States vested in a governor or president, sometimes with and sometimes without a council, "the executive power," "the supreme executive power"; but always in association with carefully defined special grants, as in the federal Constitution itself. They contained no intimation of executive powers except those definitely enumerated or necessarily inferred therefrom or from the duty of the executive to enforce the laws. Speaking in the Convention, July 17,

Mr. Madison said: "The executives of the States are in general little more than cyphers; the legislatures omnipotent."

In the proceedings of the Constitutional Convention no hint can be found of any executive power except those definitely enumerated or inferable therefrom or from the duty to enforce the laws. In the notes of Rufus King (June 1) upon the Convention, this appears—

"Wilson—an extive. ought to possess the powers of secresy, vigour & Dispatch—and to be so constituted as to be responsible—Extive. powers are designed for the execution of Laws, and appointing Officers not otherwise to be appointed—if appointments of Officers are made, by a sing. Ex he is responsible for the propriety of the same. Not so where the Executive is numerous.

"Mad: agrees wth. Wilson in his definition of executive powers—executive powers ex vi termini, do not include the Rights of war & peace &c. but the powers shd. be confined and defined—if large we shall have the Evils of elective Monarchies—probably the best plan will be a single Executive of long duration wth. a Council, with liberty to depart from their Opinion at his peril—." Farrand, Records Fed. Con., v. I, p. 70.

If the Constitution or its proponents had plainly avowed what is now contended for there can be little doubt that it would have been rejected.

The Virginia plan, when introduced, provided—

"That a national executive be instituted; to be chosen by the national legislature for the term of    years, to receive punctually at stated times, a fixed compensation for the services rendered, in which no increase or diminution shall be made so as to affect the magistracy, existing at the time of increase or diminution, and to be ineligible a second time; and that besides a general authority to execute the national laws, it ought to enjoy the executive rights vested in Congress by the Confederation.

" That the executive and a convenient number of the national judiciary, ought to compose a council of revision with authority to examine every act of the national legislature before it shall operate, and every act of a particular legislature before a negative thereon shall be final; and that the dissent of the said council shall amount to a rejection, unless the act of the national legislature be again passed, or that of a particular legislature be again negatived by of the members of each branch."

This provision was discussed and amended. When reported by the Committee of the Whole and referred to the Committee on Detail, June 13, it read thus—" Resolved, That a national executive be instituted to consist of a single person, to be chosen by the national legislature for the term of seven years, with power to carry into execution the national laws, to appoint to offices in cases not otherwise provided for—to be ineligible a second time, and to be removable on impeachment and conviction of malpractices or neglect of duty—to receive a fixed stipend by which he may be compensated for the devotion of his time to public service to be paid out of the national treasury. That the national executive shall have a right to negative any legislative act, which shall not be afterwards passed unless by two-thirds of each branch of the national legislature."

The Committee on Detail reported: " Sec. 1. The executive power of the United States shall be vested in a single person," etc. This was followed by Sec. 2 with the clear enumeration of the President's powers and duties. Among them were these: " He shall from time to time give information to the Legislature of the state of the Union . . . He shall take care that the laws of the United States be duly and faithfully executed . . . He shall receive ambassadors . . . He shall be commander-in-chief of the Army and Navy." Many of these

were taken from the New York Constitution. After further discussion the enumerated powers were somewhat modified and others were added, among them (September 7), the power " to call for the opinions of the heads of departments, in writing."

It is beyond the ordinary imagination to picture forty or fifty capable men, presided over by George Washington, vainly discussing, in the heat of a Philadelphia summer, whether express authority to require opinions in writing should be delegated to a President in whom they had already vested the illimitable executive power here claimed.

The New Jersey plan—

" That the United States in Congress be authorized to elect a federal executive to consist of          persons, to continue in office for the term of          years, to receive punctually at stated times a fixed compensation for their services, in which no increase or diminution shall be made so as to affect the persons composing the executive at the time of such increase or diminution, to be paid out of the federal treasury; to be incapable of holding any other office or appointment during their time of service and for          years thereafter; to be ineligible a second time, and removable by Congress on application by a majority of the executives of the several States; that the executives besides their general authority to execute the federal acts ought to appoint all federal officers not otherwise provided for, and to direct all military operations; provided that none of the persons composing the federal executive shall on any occasion take command of any troops, so as personally to conduct any enterprise as general or in other capacity."

The sketch offered by Mr. Hamilton—

" The supreme executive authority of the United States to be vested in a governor to be elected to serve during good behavior—the election to be made by electors chosen by the people in the election districts aforesaid—the au-

thorities and functions of the executive to be as follows: to have a negative on all laws about to be passed, and the execution of all laws passed; to have the direction of war when authorized or begun; to have with the advice and approbation of the Senate the power of making all treaties; to have the sole appointment of the heads or chief officers of the departments of Finance, War and Foreign Affairs; to have the nomination of all other officers (ambassadors to foreign nations included) subject to the approbation or rejection of the Senate; to have the power of pardoning all offences except treason; which he shall not pardon without the approbation of the Senate."

## XI.

The Federalist, Article LXXVI by Mr. Hamilton, says: " It has been mentioned as one of the advantages to be expected from the co-operation of the Senate, in the business of appointments, that it would contribute to the stability of the administration. The consent of that body would be necessary to displace as well as to appoint. A change of the Chief Magistrate, therefore, would not occasion so violent or so general a revolution in the officers of the government as might be expected, if he were the sole disposer of offices. Where a man in any station had given satisfactory evidence of his fitness for it, a new President would be restrained from attempting a change in favor of a person more agreeable to him, by the apprehension that a discountenance of the Senate might frustrate the attempt, and bring some degree of discredit upon himself. Those who can best estimate the value of a steady administration will be most disposed to prize a provision, which connects the official existence of public men with the approbation or disapprobation of that body, which, from the greater permanency of its own composition, will in all probability be less subject to inconstancy than any other member of the government."

## XII.

Since the debate of June, 1789, Congress has repeatedly asserted power over removals; this court has affirmed the power; and practices supposed to be impossible have become common.

Mr. Madison was much influenced by supposed expediency, the impossibility of keeping the Senate in constant session, etc.; also the extraordinary personality of the President. He evidently supposed it would become common practice to provide for officers without definite terms, to serve until resignation, death or removal. And this was generally done until 1820. The office under discussion was a superior one, to be filled only by Presidential appointment. He assumed as obviously true things now plainly untrue and was greatly influenced by them. He said—" The danger then consists merely in this: the President can displace from office a man whose merits require that he should be continued in it. What will be the motives which the President can feel for such abuse of his power, and the restraints that operate to prevent it? In the first place, he will be impeachable by this House, before the Senate for such an act of mal-administration; for I contend that the wanton removal of ·meritorious officers would subject him to impeachment and removal from his own high trust. But what can be his motives for displacing a worthy man? It must be that he may fill the place with an unworthy creature of his own. . . . Now if this be the case with an hereditary monarch, possessed of those high prerogatives and furnished with so many means of influence, can we suppose a President, elected for four years only, dependent upon the popular voice, impeachable by the legislature, little, if at all, distinguished for wealth, personal talents, or influence from the head of the department himself; I say, will he bid defiance to all these considerations, and wantonly dismiss a meritorious and virtuous officer?

Such abuse of power exceeds my conception. If anything takes place in the ordinary course of business of this kind, my imagination cannot extend to it on any rational principle."

We face as an actuality what he thought was beyond imagination and his argument must now be weighed accordingly. Evidently the sentiments which he then apparently held came to him during the debate and were not entertained when he left the Constitutional Convention, nor during his later years. It seems fairly certain that he never consciously advocated the extreme view now attributed to him by counsel. His clearly stated exceptions to what he called the prevailing view and his subsequent conduct repel any such idea.

By an Act approved August 7, 1789, (c. 8, 1 Stat. 50, 53) Congress provided for the future government of the Northwest Territory, originally organized by the Continental Congress. This statute directed: " The President shall nominate and by and with the advice and consent of the Senate shall appoint all officers which by the said ordinance were to have been appointed by the United States in Congress assembled, and all officers so appointed shall be commissioned by 'iim; and in all cases where the United States in Congress assembled, might, by the said ordinance, revoke any commission or remove from any office, the President is hereby declared to have the same powers of revocation and removal." The ordinance of 1787 authorized the appointment by Congress of a Governor, " whose commission shall continue in force for the term of three years, unless sooner revoked by Congress;" a secretary, " whose commission shall continue in force for four years, unless sooner revoked;" and three judges, whose " commissions shall continue in force during good behavior." These were not constitutional judges. *American Insurance Co.* v. *Canter,* 1 Pet. 511. Thus Congress, at its first session, inhibited removal of judges

and assented to removal of the first civil officers for whom it prescribed fixed terms. It was wholly unaware of the now-supposed construction of the Constitution which would render these provisions improper. There had been no such construction; the earlier measure and debate related to an officer appointed by legislative consent to serve at will and whatever was said must be limited to that precise point.

On August 18, 1789, the President nominated, and on the twentieth the Senate "did advise and consent" to the appointment of, the following officers for the Territory: Arthur St. Clair, Governor; Winthrop Sargent, Secretary; Samuel Holden Parsons, John Cleves Symmes and William Barton, judges of the court.

The bill for the Northwest Territory was a House measure, framed and presented July 16, 1789, by a special committee of which Mr. Sedgwick, of Massachusetts, was a member, and passed July 21 without roll call. The Senate adopted it August 4. The debate on the bill to create the Department of Foreign Affairs must have been fresh in the legislative mind; and it should be noted that Mr. Sedgwick had actively supported the power of removal when that measure was up.

The Act of September 24, 1789 (c. 20, § 27, 1 Stat. 73, 87), provided for another civil officer with fixed term. "A marshal shall be appointed in and for each district for the term of four years, but shall be removable from office at pleasure, whose duty it shall be", etc. This Act also provided for district attorneys and an Attorney General without fixed terms and said nothing of removal. The legislature must have understood that if an officer be given a fixed term and nothing is said concerning removal he acquires a vested right to the office for the full period; also that officers appointed without definite terms were subject to removal by the President at will, assent of Congress being implied.

This bill was a Senate measure, prepared by a committee of which Senators Ellsworth and Paterson were members and introduced June 12. It was much considered between June 22 and July 17, when it passed the Senate fourteen to six. During this same period the House bill to create the Department of Foreign Affairs was under consideration by the Senate, and Senators Ellsworth and Paterson both gave it support. The Judiciary bill went to the House July 20, and there passed September 17. Mr. Madison supported it. .

If the theory of illimitable executive power now urged is correct, then the Acts of August 7 and September 24 contained language no less objectionable than the original phrase in the bill to establish the Department of Foreign Affairs over which the long debate arose. As nobody objected to the provisions concerning removals and life tenure in the two later Acts it seems plain enough that the first Congress never entertained the constitutional views now advanced by the United States. As shown by Mr. Madison's letter to Edmund Randolph, *supra*, the point under discussion was the power to remove officers appointed to serve at will. Whatever effect is attributable to the action taken must be confined to such officers.

Congress first established courts in the District of Columbia by the Act of February 27, 1801, c. 15, 2 Stat. 103. This authorized three judges to be appointed by the President with consent of the Senate "to hold their respective offices during good behavior." The same tenure has been bestowed on all subsequent superior District of Columbia judges. The same Act also provided for a marshal, to serve during four years, subject to removal at pleasure; for a district attorney without definite term, and "such number of discreet persons to be justices of the peace, as the President of the United States shall from time to time think expedient, to con-

tinue in office five years." Here, again, Congress under-
took to protect inferior officers in the District from ex-
ecutive interference, and the same policy has continued
down to this time. (See Act of February 9, 1893, c. 74,
27 Stat. 434.)

The Acts providing " for the government of the Ter-
ritory of the United States south of the River Ohio "
(1790), and for the organization of the Territories of
Indiana (1800), Illinois (1809), and Michigan (1805), all
provided that the government should be similar to that
established by the ordinance of 1787, for the Northwest
Territory. Judges for the Northwest Territory were ap-
pointed for life.

The Act establishing the territorial government of Wis-
consin (1836) directed: " That the judicial power of the
said Territory shall be vested in a supreme court, district
courts, probate courts, and in justices of the peace. The
supreme court shall consist of a chief justice and two
associate judges, any two of whom shall be a quorum, and
who shall hold a term at the seat of government of the
said Territory annually, and they shall hold their offices
during good behaviour."

The organization Acts for the territories of Louisiana
(1804), Iowa (1838), Minnesota (1849), New Mexico
(1850), Utah (1850), North Dakota (1861), Nevada
(1861), Colorado (1861), and Arizona (1863), provided
for judges " to serve for four years." Those for the or-
ganization of Oregon (1848), Washington (1853), Kansas
(1854), Nebraska (1854), Idaho (1863), Montana (1864),
Alaska (1884), Indian Territory (1889), and Oklahoma
(1890), provided for judges " to serve for four years, and
until their successors shall be appointed and qualified."
Those for Missouri (1812), Arkansas (1819), Wyoming
(1868), Hawaii (1900), and Florida (1822), provided that
judges should be appointed to serve " four years unless
sooner removed;" " four years unless sooner removed by

the President;" "four years unless sooner removed by the President with the consent of the Senate of the United States;" "who shall be citizens of the Territory of Hawaii and shall be appointed by the President of the United States, by and with the advice and consent of the Senate of the United States, and may be removed by the President;" "for the term of four years and no longer."

May 15, 1820, President Monroe approved the first general tenure of office Act, c. 102, 3 Stat. 582. If directed—

"All district attorneys, collectors of the customs, naval officers and surveyors of the customs, navy agents, receivers of public moneys for lands, registers of the land offices, paymasters in the army, the apothecary general, the assistant apothecaries general, and the commissary general of purchases, to be appointed under laws of the United States, shall be appointed for the term of four years, but shall be removable from office at pleasure. [Prior to this time these officers were appointed without term to serve at will.]

"Sec. 2. . . . The commission of each and every of the officers named in the first section of this Act, now in office, unless vacated by removal from office, or otherwise, shall cease and expire in the manner following: All such commissions, bearing date on or before the thirtieth day of September, one thousand eight hundred and fourteen, shall cease and expire on the day and month of their respective dates, which shall next ensue after the thirtieth day of September next; all such commissions, bearing date after the said thirtieth day of September, in the year one thousand eight hundred and fourteen, and before the first day of October, one thousand eight hundred and sixteen, shall cease and expire on the day and month of their respective dates, which shall next ensue after the thirtieth day of September, one thousand eight hundred and twenty-one. And all other such commissions shall cease

and expire at the expiration of the term of four years from their respective dates." Thus Congress not only asserted its power of control by prescribing terms and then giving assent to removals, ·but it actually removed officers who were serving at will under presidential appointment with consent of the Senate. This seems directly to conflict with the notion that removals are wholly executive in their nature.

## XIII.

The claim advanced for the United States is supported by no opinion of this court, and conflicts with *Marbury* v. *Madison* (1803), *supra,* concurred in by all, including Mr. Justice Paterson, who was a conspicuous member of the Constitutional Convention and, as Senator from New Jersey, participated in the debate of 1789 concerning the power to remove and supported the bill to establish the Department of Foreign Affairs.

By an original proceeding here Marbury sought a mandamus requiring Mr. Madison, then Secretary of State, to deliver a commission signed by President Adams which showed his appointment (under the Act of February 27, 1801) as Justice of the Peace for the District of Columbia, "to continue in office five years." The Act contained no provision concerning removal.* As required by the circumstances the court first considered Marbury's right to demand the commission and affirmed it. Mr. Chief Justice Marshall said—

"It is, therefore, decidedly the opinion of the court, that when a commission has been signed by the President,

---

* Mr. Lee (theretofore Attorney General of the United States), counsel for Marbury, distinctly claimed that the latter was appointed to serve for a definite term independent of the President's will, and upon that predicate rested the legal right which he insisted should be enforced by mandamus. Unless that right existed there was no occasion—no propriety, indeed—for considering the court's power to declare an Act of Congress invalid.

the appointment is made; and that the commission is complete when the seal of the United States has been affixed to it by the Secretary of State.

" Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is not removable at the will of the executive, the appointment is not revocable, and cannot be annulled. It has conferred legal rights which cannot be resumed.

" The discretion of the executive is to be exercised until the appointment has been made. But having once made the appointment, his power over the office is terminated in all cases, where by law the officer is not removable by him. The right to the office is *then* in the person appointed, and he has the absolute, unconditional power of accepting or rejecting it.

" Mr. Marbury, then, since his commission was signed by the President, and sealed by the Secretary of State, was appointed; and as the law creating the office, gave the officer a right to hold for five years, independent of the executive, the appointment was not revocable, but vested in the officer legal rights, which are protected by the laws of his country. [This freedom from executive interference had been affirmed by Representative Bayard in February, 1802, during the debate on repeal of the Judiciary Act of 1801.]

" To withhold his commission, therefore, is an act deemed by the court not warranted by law, but violative of a vested legal right. . . .

" The office of justice of peace in the District of Columbia is such an office [of trust, honor, or profit] . . . . It has been created by special Act of Congress, and has been secured, so far as the laws can give security, to the person appointed to fill it, for five years. . . .

" It is, then, the opinion of the court—1st. That by signing the commission of Mr. Marbury, the President of the United States appointed him a justice of peace for the County of Washington, in the District of Columbia; and that the seal of the United States, affixed thereto by the Secretary of State, is conclusive testimony of the verity of the signature, and of the completion of the appointment; and that the appointment conferred on him a legal right to the office for the space of five years. . . .

" It has already been stated that the applicant has, to that commission, a vested legal right, of which the executive cannot deprive him. He has been appointed to an office, from which he is not removable at the will of the executive; and being so appointed, he has a right to the commission which the Secretary has received from the President for his use."

The point thus decided was directly presented and essential to proper disposition of the cause. If the doctrine now advanced had been approved there would have been no right to protect and the famous discussion and decision of the great constitutional question touching the power of the court to declare an Act of Congress without effect would have been wholly out of place. The established rule is that doubtful constitutional problems must not be considered unless necessary to determination of the cause. The sometime suggestion, that the Chief Justice indulged an *obiter dictum,* is without foundation. The court must have appreciated that unless it found Marbury had the legal right to occupy the office irrespective of the President's will there would be no necessity for passing upon the much-controverted and far-reaching power of the judiciary to declare an Act of Congress without effect. In the circumstances then existing it would have been peculiarly unwise to consider the second and more important question without first demonstrating the necessity therefor by ruling upon the first. Both points

were clearly presented by the record, and they were decided in logical sequence. *Cooley's Constitutional Limitations,* 7th ed., 231*.

But, assuming that it was unnecessary in *Marbury v. Madison* to determine the right to hold the office, nevertheless this Court deemed it essential and decided it. I can not think this opinion is less potent than Mr. Madison's argument during a heated debate concerning an office without prescribed tenure.

This opinion shows clearly enough why Congress, when it directed appointment of marshals for definite terms by the Act of 1789, also took pains to authorize their removal. The specification of a term without more would have prevented removals at pleasure.

We are asked by the United States to treat the definite holding in *Marbury v. Madison* that the plaintiff was not subject to removal by the President at will as mere *dictum*—to disregard it. But a solemn adjudication by this Court may not be so lightly treated. For a hundred and twenty years that case has been regarded as among the most important ever decided. It lies at the very foundation of our jurisprudence. Every point determined was deemed essential, and the suggestion of *dictum,* either idle or partisan exhortation, ought not to be tolerated. The point here involved was directly passed upon by the great Chief Justice, and we must accept the result unless prepared to express direct disapproval and exercise the transient power which we possess to overrule our great predecessors—the opinion cannot be shunted.

At the outset it became necessary to determine whether Marbury had any legal right which could, *prima facie* at least, create a justiciable or actual case arising under the laws of the United States. Otherwise, there would have

---

*At this time the power of the court to declare Acts of Congress unconstitutional was being vigorously denied. *The Supreme Court in United States History,* by Charles Warren, Vol. I.

been nothing more than a moot cause; the proceeding would have been upon an hypothesis; and he would have shown no legal right whatever to demand an adjudication on the question of jurisdiction and constitutionality of the statute. The court proceeded upon the view that it would not determine an important and far-reaching constitutional question unless presented in a properly-justiciable cause by one asserting a clear legal right susceptible of protection. It emphatically declared, not by way of argument or illustration, but as definite opinion, that the appointment of Marbury " conferred on him a legal right to the office for the space of five years," beyond the President's power to remove; and, plainly on this premise, it thereupon proceeded to consider the grave constitutional question. Indeed, if Marbury had failed to show a legal right to protect or enforce, it could be urged that the decision as to invalidity of the statute lacked force as a precedent, because rendered upon a mere abstract question raised by a moot case. The rule has always been cautiously to avoid passing upon important constitutional questions unless some controversy properly presented requires their decision.

The language of Mr. Justice Matthews in *Liverpool, etc., Steamship Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39, is pertinent—

" If, on the other hand, we should assume the plaintiff's case to be within the terms of the statute, we should have to deal with it purely as an hypothesis, and pass upon the constitutionality of an Act of Congress as an abstract question. That is not the mode in which this court is accustomed or willing to consider such questions. It has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two

rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. These rules are safe guides to sound judgment. It is the dictate of wisdom to follow them closely and carefully."

Also the words of Mr. Justice Brewer in *Union Pacific Co.* v. *Mason City Co.*, 199 U. S. 160, 166—" Of course, where there are two grounds, upon either of which the judgment of the trial court can be rested, and the appellate court sustains both, the ruling on neither is *obiter*, but each is the judgment of the court and of equal validity with the other. Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the court in respect thereto can, in no just sense, be called mere *dictum*. *Railroad Companies* v. *Schutte*, 103 U. S. 118, in which this court said (p. 143): 'It can not be said that a case is not authority on the point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. Here the precise question was properly presented, fully argued and elaborately considered in the opinion. The decision on this question was as much a part of the judgment of the court as was that on any other of the several matters on which the case as a whole depended.' "

And see—*Chicago, etc., Railway Co.* v. *Wellman*, 143 U. S. 339, 345; *United States* v. *Chamberlin*, 219 U. S. 250, 262; *United States.* v. *Title Insurance Co.*, 265 U. S. 472, 486; *Watson* v. *St. Louis, etc., Ry. Co.*, 169 Fed. 942, 944, 945.

Although he was intensely hostile to *Marbury* v. *Madison*, and refused to recognize it as authoritative, I do not find that Mr. Jefferson ever controverted the view

that an officer duly appointed for a definite time, without more, held his place free from arbitrary removal by the President. If there had been any generally-accepted opinion or practice under which he could have dismissed such an officer, as now claimed, that cause would have been a rather farcical proceeding with nothing substantial at issue, since the incumbent could have been instantly removed. And, asuming such doctrine, it is hardly possible that Mr. Jefferson would have been ignorant of the practical way to end the controversy—a note of dismissal or removal. Evidently he knew nothing of the congressional interpretation and consequent practice here insisted on. And this notwithstanding Mr. Madison sat at his side.

Mr. Jefferson's letters to Spencer Roane (1819) and George Hay (1807) give his views. "In the case of Marbury and Madison, the federal judges declared that commissions, signed and sealed by the President, were valid, although not delivered. I deemed delivery essential to complete a deed, which, as long as it remains in the hands of the party, is as yet no deed, it is in *posse* only, but not in *esse,* and I withheld delivery of the commissions." I think it material to stop citing *Marbury* v. *Madison* as authority and have it denied to be law. "1. Because the judges, in the outset, disclaimed all cognizance of the case, although they then went on to say what would have been their opinion, had they had cognizance of it. This, then, was confessedly an extrajudicial opinion. and, as such, of no authority. 2. Because, had it been judicially pronounced, it would have been against law; for to a commission, a deed, a bond, *delivery* is essential to give validity. Until, therefore, the commission is delivered out of the hands of the executive and his agents, it is not his deed."

The judges did not disclaim all cognizance of the cause—they were called upon to determine the question

irrespective of the result reached—and, whether rightly or wrongly, they distinctly held that actual delivery of the commission was not essential. That question does not now arise—here the commission was. delivered and the appointee took office.

· *Ex parte Hennen* (1839), 13 Peters 230, 258, involved the power of a United States District Judge to dismiss at will the clerk· whom he had appointed. Mr. Justice Thompson. said—

"¡The Constitution is silent with respect to the power of ṛemoval from office, where the· tenure is not fixed. It provides, that the judges, both.of the supreme and inferior courts, shall hold their offices during good behaviour. But no tenure is fixed for the office of clerks. Congress has by law limited the tenure of certain ʾofficers to the term ʾof four years, 3 Story, 1790; but expressly providing that the officers shall, within that term, be removable at pleasure; which, of course, is without requiring any cause for such· removal. The clerks of courts are not included within this law, and there is no express limitation in ʾthe ʾConstitution, or laws of Congress, upon the ʾenure of the · office.

"All offices, the tenure of which is not fixed by the Constitution. or limited by law, must be ʾheld either dur- ·ing ʾgood behavior, or (which, is the same· thing in contemplation of law) during the life of the incumbent; ·or must be held at the will and discretion of some department of the government, and subject to removal at pleasure.

"It cannot, for a moment, be admitted, that it was the ·intention of the Constitution, that those offices which are denominated inferior· offices should be held during life. And if removable at pleasure, by whom is such removal to be· made? In the absence of all constitutional provision, or statutory regulation, ·it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment. This power of

removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained in the early history of this government. This related, however, to the power of the President to remove officers appointed with the concurrence of the Senate; and the great question was, whether the removal was to be by the President alone, or with the concurrence of the Senate, both constituting the appointing power. No one denied the power of the President and Senate, jointly, to remove, where the tenure of the office was not fixed by the Constitution; which was a full recognition of the principle that the power of removal was incident to the power of appointment. But it was very early adopted, as the practical construction of the Constitution, that this power was vested in the President alone. And such would appear to have been the legislative construction of the Constitution. . . .

" It would be a most extraordinary construction of the law, that all these offices were to be held during life, which must inevitably follow, unless the incumbent was removable at the discretion of the head of the department: the President has certainly no power to remove. These clerks fall under that class of inferior officers, the appointment of which the Constitution authorizes Congress to vest in the head of the department. The same rule, as to the power of removal, must be applied to offices where the appointment is vested in the President alone. The nature of the power, and the control over the officer appointed, does not at all depend on the source from which it emanates. The execution of the power depends upon the authority of law, and not upon the agent who is to administer it. And the Constitution has authorized Congress, in certain cases, to vest this power in the President alone, in the Courts of law, or in the heads of departments; and all inferior officers appointed under each, by authority of law, must hold their office at the discretion

of the appointing power. Such is the settled usage and practical construction of the Constitution and laws, under which these offices are held."

*United States* v. *Guthrie* (1854), 17 How. 284. Goodrich had been removed from the office of Chief Justice of the Supreme Court, Territory of Minnesota, to which he had been appointed to serve "during the period of four years." He sought to recover salary for the time subsequent to removal through a mandamus to the Secretary of the Treasury. The court held this was not a proper remedy and did not consider whether the President had power to remove a territorial judge appointed for a fixed term. The reported argument of counsel is enlightening; the dissenting opinion of Mr. Justice McLean is important. He points out that only two territorial judges had been removed—the plaintiff Goodrich, in 1851, and William Trimble, May 20, 1830. The latter was judge of the Superior Court of the Territory of Arkansas, appointed to "continue in office for the term of four years, unless sooner removed by the President."

*United States* v. *Bigler*, Fed. Cases, 14481 (1867). This opinion contains a valuable discussion of the general doctrine here involved.

*United States* v. *Perkins* (1886), 116 U. S. 483, 485, held that "when Congress, by law, vests the appointment of inferior officers in the heads of Departments it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict and regulate the removal by such laws as Congress may enact in relation to the officers so appointed."

*McAllister* v. *United States* (1891), 141 U. S. 174. Plaintiff was appointed District Judge for Alaska "for the term of four years from the day of the date hereof, and until his successor shall be appointed and qualified, sub-

ject to the conditions prescribed by law." He was suspended and the Senate confirmed his successor. He sought to recover salary for the time between his removal and qualification of his successor. Section 1768, R. S., authorized the President to suspend civil officers " except judges of the courts of the United States." This court reviewed the authorities and pointed out that judges of territorial courts were not judges of courts of the United States within § 1768, and, accordingly, were subject to suspension by the President as therein provided. This argument would have been wholly unnecessary if the theory now advanced, that the President has illimitable power to remove, had been approved.

In an elaborate dissent Mr. Justice Field, Mr. Justice Gray and Mr. Justice Brown expressed the view that it was beyond the President's power to remove the judge of any court during the term for which appointed. They necessarily repudiated the doctrine of illimitable power.

*Parsons* v. *United States* (1897), 167 U. S. 324, 343. After a review of the history and cases supposed to be apposite, this court, through Mr. Justice Peckham, held that the President had power to remove Parsons from the office of District Attorney, to which he had been appointed " for the term of four years from the date hereof, subject to the conditions prescribed by law." " We are satisfied that its [Congress'] intention in the repeal of the Tenure of Office sections of the Revised Statutes was again to concede to the President the power of removal if taken from him by the original Tenure of Office Act, and by reason of the repeal to thereby enable him to remove an officer when in his discretion he regards it for the public good, although the term of office may have been limited by the words of the statute creating the office." He referred to the Act of 1820 and suggested that the situation following it had been renewed by repeal of the Tenure of Office Act.

The opinion does express the view that by practical construction prior to 1820 the President had power to remove an officer appointed for a fixed term; but this is a clear mistake. In fact, no removals of such duly commissioned officers were made prior to 1820; and *Marbury* v. *Madison* expressly affirms that this could not lawfully be done. The whole discussion in Parson's case was futile if the Constitution conferred upon the President illimitable power to remove. It was pertinent only upon the theory that by apt words Congress could prohibit removals, and this view was later affirmed by Mr. Justice Peckham in *Shurtleff* v. *United States*. Apparently he regarded the specification of a definite term as not equivalent to positive inhibition of removal by Congress.

*Reagan* v. *United States* (1901), 182 U. S. 419, 425. Reagan, a Commissioner of the United States Court in Indian Territory, was dismissed by the judge, and sued to recover salary. He claimed that the judge's action was invalid because the cause assigned therefor was not one of those prescribed by law. This court, by Mr. Chief Justice Fuller, said: "The inquiry is, therefore, whether there were any causes of removal prescribed by law, March 1, 1895, or at the time of removal. If there were, then the rule would apply that where causes of removal are specified by constitution or statute, as also where the the term of office is for a fixed period, notice and hearing are essential. If there were not, the appointing power could remove at pleasure or for such cause as it deemed sufficient. . . . The commissioners hold office neither for life, nor for any specified time, and are within the rule which treats the power of removal as incident to the power of appointment, unless otherwise provided. By chapters forty-five and forty-six, justices of the peace on conviction of the offences enumerated are removable from office, but these necessarily do not

include all causes which might render the removal of commissioners necessary or advisable. Congress did not provide for the removal of commissioners for the causes for which justices of the peace might be removed, and if this were to be ruled otherwise by construction, the effect would be to hold the commissioners in office for life unless some of those specially enumerated causes became applicable to them. We agree with the Court of Claims that this would be a most unreasonable construction and would restrict the power of removal in a manner which there is nothing in the case to indicate could have been contemplated by Congress."

*Shurtleff v. United States* (1903), 189 U. S. 311, 313. The plaintiff sought to recover his salary as General Appraiser. He was appointed to that office without fixed term, with consent of the Senate, and qualified July 24, 1890. The Act creating the office provided that the incumbents "shall not be engaged in any other business, avocation or employment, and may be removed from office at any time by the President for inefficiency, neglect of duty or malfeasance in office." Shurtleff was dismissed May 3, 1899, without notice or charges and without knowledge of the reasons for the President's action. Through Mr. Justice Peckham the court said: " There is, of course, no doubt of the power of Congress to create such an office as is provided for in the above section. Under the provision that the officer might be removed from office at any time for inefficiency, neglect of duty, or malfeasance in office, we are of opinion that if the removal is sought to be made for those causes, or either of them, the officer is entitled to notice and a hearing. *Reagan* v. *United States,* 182 U. S. 419, 425. . . . The appellant contends that because the statute specified certain causes for which the officer might be removed, it thereby impliedly excluded and denied the right to remove for any other cause, and that the President was

therefore by the statute prohibited from any removal excepting for the causes, or some of them therein defined. The maxim, *expressio unius est exclusio alterius,* is used as an illustration of the principle upon which the contention is founded. We are of opinion that as thus used the maxim does not justify the contention of the appellant. We regard it as inapplicable to the facts herein. The right of removal would exist if the statute had not contained a word upon the subject. It does not exist by virtue of the grant, but it inheres in the right to appoint, unless limited by Constitution or statute. It requires plain language to take it away." 'The distinct recognition of the right of Congress to require notice and hearing if removal were made for any specified cause is of course incompatible with the notion that the President has illimitable power to remove. And it is well to note the affirmation that the right of removal inheres in the right to appoint.

## XIV.

If the framers of the Constitution had intended "the executive power," in Art. II, Sec. 1, to include all power of an executive nature, they would not have added the carefully defined grants of Sec. 2. They were scholarly men, and it exceeds belief " that the known advocates in the Convention for a jealous grant and cautious definition of federal powers should have silently permitted the introduction of words and phrases in a sense rendering fruitless the restrictions and definitions elaborated by them." Why say, the President shall be commander-in-chief; may require opinions in writing of the principal officers in each of the executive departments; shall have power to grant reprieves and pardons; shall give information to Congress concerning the state of the union; shall receive ambassadors; shall take care that the laws be faithfully executed—if all of these things and more had already

been vested in him by the general words? The Constitution is exact in statement. *Holmes* v. *Jennison*, 14 Pet. 540. That the general words of a grant are limited when followed by those of special import is an established canon; and an accurate writer would hardly think of emphasizing a general grant by adding special and narrower ones without explanation. "An affirmative grant of special powers would be absurd, as well as useless, if a general authority were intended." Story on the Constitution, § 448. "The powers delegated by the proposed Constitution to the federal government are few and defined." Federalist, No. XLIV. "Affirmative words are often, in their operation, negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them, or they have no operation at all. It cannot be presumed that any clause in the Constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, p. 174.

In his address to the Senate (February 16, 1835) on "The Appointing and Removing Power," Mr. Webster considered and demolished the theory that the first section of Art. II conferred all executive powers upon the President except as therein limited—Webster's Works (Little, B. & Co., 1866), vol. 4, pp. 179, 186; Debates of Congress—and showed that the right to remove must be regarded as an incident to that of appointment. He pointed out the evils of uncontrolled removals and, I think, demonstrated that the claim of illimitable executive power here advanced has no substantial foundation. The argument is exhaustive and ought to be conclusive. A paragraph from it follows: "It is true, that the Constitution declares that the executive power shall be vested in the President; but the first question which then arises is, *What is executive power? What is the degree, and what are the limitations?* Executive power is not a

thing so well known, and so accurately defined, as that the written constitution of a limited government can be supposed to have conferred it in the lump. What *is* executive power? What are its boundaries? What model or example had the framers of the Constitution in their minds, when they spoke of 'executive power'? Did they mean executive power as known in England, or as known in France, or as known in Russia? Did they take it as defined by Montesquieu, by Burlamaqui, or by De Lolme? All these differ from one another as to the extent of the executive power of government. What, then, was intended by 'the executive power'? Now, Sir, I think it perfectly plain and manifest, that, although the framers of the Constitution meant to confer executive power on the President, yet they meant to define and limit that power, and to confer no more than they did thus define and limit. When they say it shall be vested in a President, they mean that one magistrate, to be called a President, shall hold the executive authority; but they mean, further, that he shall hold this authority according to the grants and limitations of the Constitution itself."

## XV.

Article I provides: "All legislative powers herein granted, shall be vested in a Congress," etc. I hardly suppose, if the words "herein granted" had not been inserted Congress would possess all legislative power of Parliament, or of some theoretical government, except when specifically limited by other provisions. Such an omission would not have overthrown the whole theory of a government of definite powers and destroyed the meaning and effect of the particular enumeration which necessarily explains and limits the general phrase. When this Article went to the Committee on Style it provided: "The legislative power shall be vested in a Congress,"

etc. The words "herein granted" were inserted by that committee September 12, and there is nothing whatever to indicate that anybody supposed this radically changed what already had been agreed upon. The same general form of words was used as to the legislative, executive and judicial powers in the draft referred to the Committee on Style. The difference between the reported and final drafts was treated as unimportant.

"That the government of the United States is one of delegated, limited and enumerated powers," and "that the federal government is composed of powers specifically granted, with the reservation of all others to the States or to the people," are propositions which lie at the beginning of any effort rationally to construe the Constitution. Upon the assumption that the President, by immediate grant of the Constitution, is vested with all executive power without further definition or limitation, it becomes impossible to delimit his authority, and the field of federal activity is indefinitely enlarged. Moreover, as the Constitution authorizes Congress "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof," it likewise becomes impossible to ascertain the extent of congressional power. Such a situation would be intolerable, chaotic indeed.

If it be admitted that the Constitution by direct grant vests the President with all executive power, it does not follow that he can proceed in defiance of congressional action. Congress, by clear language, is empowered to make all laws necessary and proper for carrying into execution powers vested in him. Here he was authorized only to appoint an officer of a certain kind, for a certain period, removable only in a certain way. He undertook to proceed under the law so far as agreeable, but repudiated the remainder. I submit that no warrant can be

found for such conduct. This thought was stressed by Mr. Calhoun in his address to the Senate, from which quotation has been made, *ante.*

## XVI.

Article III provides: " The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may, from time to time, ordain and establish." But this did not endow the federal courts with authority to proceed in all matters within the judicial power of the federal government. Except as to the original jurisdiction of the Supreme Court, it is settled that the federal courts have only such jurisdiction as Congress sees fit to confer. " Only the jurisdiction of the Supreme Court is derived directly from the Constitution. Every other court created by the general government derives its jurisdiction wholly from the authority of Congress. That body may give, withhold or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution. . . . The Constitution simply gives to the inferior courts the capacity to take jurisdiction in the enumerated cases, but it requires an Act of Congress to confer it." *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 234.

In *Sheldon et al.* v. *Sill*, 8 How. 441, 449, it was argued that Congress could not limit the judicial power vested in the courts by the Constitution—the same theory, let it be observed, as the one now advanced concerning executive power. Replying, through Mr. Justice Grier, this court declared: " In the case of *Turner* v. *Bank of North America* [1799], 4 Dall. 10, it was contended, as in this case, that, as it was a controversy between citizens of different States, the Constitution gave the plaintiff a right to sue in the Circuit Court, notwithstanding he was an assignee within the restriction of the eleventh section of the Judiciary Act. But the court said,—' The political

truth is, that the disposal of the judicial power (except in a few specified instances) belongs to Congress: and Congress is not bound to enlarge the jurisdiction of the federal courts to every subject, in every form which the Constitution might warrant.' This decision was made in 1799; since that time, the same doctrine has been frequently asserted by this court, as may be seen in *McIntire* v. *Wood,* 7 Cranch 506; *Kendall* v. *United States,* 12 Peters 616; *Cary* v. *Curtis,* 3 Howard 245." The argument of counsel, reported in 4 Dallas, is interesting. The bad reasoning, there advanced, although exposed a hundred years ago, is back again asking for a vote of confidence.

## XVII.

The Federal Constitution is an instrument of exact expression. Those who maintain that Art. II, Sec. 1, was intended as a grant of every power of executive nature not specifically qualified or denied must show that the term " executive power " had some definite and commonly accepted meaning in 1787. This court has declared that it did not include all powers exercised by the King of England; and, considering the history of the period, none can say that it had then (or afterwards) any commonly accepted and practical definition. If any one of the descriptions of " executive power " known in 1787 had been substituted for it, the whole plan would have failed. Such obscurity would have been intolerable to thinking men of that time.

*Fleming* v. *Page,* 9 How. 603, 618—" Neither is it necessary to examine the English decisions which have been referred to by counsel. It is true that most of the States have adopted the principles of English jurisprudence, so far as it concerns private and individual rights. And when such rights are in question, we habitually refer to the English decisions, not only with respect, but in many

cases as authoritative. But in the distribution of political power between the great departments of government, there is such a wide difference between the power conferred on the President of the United States, and the authority and sovereignty which belong to the English crown, that it would be altogether unsafe to reason from any supposed resemblance between them, either as regards conquest in war, or any other subject where the rights and powers of the executive arm of the government are brought into question. Our own Constitution and form of government must be our only guide."

Blackstone, *190, 250, 252, affirms that "The supreme executive power of these kingdoms is vested by our laws in a single person, the king or queen," and that there are certain "branches of the royal prerogative, which invest thus our sovereign lord, thus all-perfect and immortal in his kingly capacity, with a number of authorities and powers, in the execution whereof consists the executive part of government." And he defines "prerogative," as "consisting (as Mr. Locke has well defined it) in the discretionary power of acting for the public good, where the positive laws are silent."

Montesquieu's Spirit of Laws, in 1787 the most popular and influential work on government, says: "In every government there are three sorts of power: the legislative; the executive, in respect to things dependent on the law of nations; and the executive, in regard to matters that depend on the civil law. By virtue of the first, the prince or magistrate enacts temporary or perpetual laws, and amends or abrogates those that have been already enacted. By the second, he makes peace or war, sends or receives embassies, establishes the public security, and provides against invasions. By the third, he punishes criminals, or determines the disputes that arise between individuals. The latter we shall call the judiciary power, and the other simply the executive power of the state."

Perhaps the best statement concerning "executive power" known in 1787 was by Mr. Jefferson in his Draft of a Fundamental Constitution for the Commonwealth of Virginia, proposed in 1783 (Writings, Ford's ed. 1894, vol. 3, 155–156): "The executive powers, shall be exercised by a Governor, who shall be chosen by joint ballot of both Houses of Assembly. . . . By executive powers, we mean no reference to those powers exercised under our former government by the crown as of its prerogative, nor that these shall be the standard of what may or may not be deemed the rightful powers of the Governor. We give them those powers only, which are necessary to execute the laws (and administer the government), and which are not in their nature either legislative or judiciary. The application of this idea must be left to reason. We do, however, expressly deny him the prerogative powers of erecting courts, offices, boroughs, corporations, fairs, markets, ports, beacons, light-houses, and sea marks; of laying embargoes, of establishing precedence, of retaining within the State, or recalling to it any citizen thereof, and of making denizens, except so far as he may be authorized from time to time by the legislature to exercise any of those powers." This document was referred to by Mr. Madison in the Federalist, No. XLVIII.

Substitute any of these descriptions or statements for the term "executive power" in Art. II, Sec. 1, and the whole plan becomes hopelessly involved—perhaps impossible.

The term "executive power" is found in most, if not all, of the state constitutions adopted between 1776 and 1787. They contain no definition of it, but certainly it was not intended to signify what is now suggested. It meant in those instruments what Mr. Webster declared it signifies in the federal Constitution—"When they say it shall be vested in a President, they mean that one magistrate, to be called a President, shall hold the execu-

tive authority; but they mean, further, that he shall hold this authority according to the grants and limitations of the Constitution itself."

The Constitution of New York, much copied in the federal Constitution, declared: "The supreme executive power and authority of this State shall be vested in a Governor." It then defined his powers and duties— among them, "to take care that the laws are faithfully executed to the best of his ability." It further provided, "that the Treasurer of this State shall be appointed by Act of the Legislature;" and entrusted the appointment of civil and military officers to a council. The Governor had no power to remove them, but apparently nobody thought he would be unable to execute the laws through officers designated by another.

The Constitution of Virginia, 1776, provided: "The legislative, executive, and judiciary department, shall be separate and distinct, so that neither exercise the powers properly belonging to the other." It then imposed upon the two Houses of Assembly the duty of selecting by ballot judges, Attorney General and Treasurer.

New Jersey Constitution, 1776—"That the Governor . . . shall have the supreme executive power . . . and act as captain-general and commander in chief of all the militia. . . . That captains, and all other inferior officers of the militia, shall be chosen by the companies, in the respective counties; but field and general officers, by the Council and Assembly."

North Carolina Constitution, 1776—"That the legislative, executive, and supreme judicial powers of government, ought to be forever separate and distinct from each other. . . . That the General Assembly shall, by joint ballot of both houses, appoint Judges of the Supreme Courts of Law and Equity, Judges of Admiralty, and Attorney-General. . . . That the General Assembly shall, by joint ballot of both houses, triennially appoint a Secretary for this State."

During the debate of 1789 Congressman Stone well said: " If gentlemen will tell us that powers, impliedly executive, belong to the President, they ought to go further with the idea, and give us a correct idea of executive power, as applicable to their rule.  In an absolute monarchy there never has been any doubt with respect to implication; the monarch can do what he pleases.  In a limited monarchy, the prince has powers incident to kingly prerogative.  How far will a federal executive, limited by a Constitution, extend in implications of this kind?  Does it go so far as absolute monarchy?  Or is it confined to a restrained monarchy?  If gentlemen will lay down their rule, it will serve us as a criterion to determine all questions respecting the executive authority of this government.  My conception may be dull; but telling me that this is an executive power, raises no complete idea in my mind.  If you tell me the nature of executive power, and how far the principle extends, I may be able to judge whether this has relation thereto, and how much is due to implication."  See The Federalist, No. XLVI.

## XVIII.

In any rational search for answer to the questions arising upon this record, it is important not to forget—

That this is a government of limited powers definitely enumerated and granted by a written Constitution.

That the Constitution must be interpreted by attributing to its words the meaning which they bore at the time of its adoption and in view of commonly-accepted canons of construction, its history, early and long-continued practices under it, and relevant opinions of this court.

That the Constitution endows Congress with plenary powers " to establish post offices and post roads."

That, exercising this power during the years from 1789 to 1836, Congress provided for postmasters and vested the

power to appoint and remove all of them at pleasure in the Postmaster General.

That the Constitution contains no words which specifically grant to the President power to remove duly appointed officers. And it is definitely settled that he cannot remove those whom he has not appointed—certainly they can be removed only as Congress may permit.

That postmasters are inferior officers within the meaning of Art. II, Sec. 2, of the Constitution.

That from its first session to the last one Congress has often asserted its right to restrict the President's power to remove inferior officers, although appointed by him with consent of the Senate.

That many Presidents have approved statutes limiting the power of the executive to remove, and that from the beginning such limitations have been respected in practice.

That this court, as early as 1803, in an opinion never overruled and rendered in a case where it was necessary to decide the question, positively declared that the President had no power to remove at will an inferior officer appointed with consent of the Senate to serve for a definite term fixed by an Act of Congress.

That the power of Congress to restrict removals by the President was recognized by this court as late as 1903, in *Shurtleff* v. *United States*.

That the proceedings in the Constitutional Convention of 1787, the political history of the times, contemporaneous opinion, common canons of construction, the action of Congress from the beginning and opinions of this court, all oppose the theory that by vesting " the executive power " in the President the Constitution gave him an illimitable right to remove inferior officers.

That this court has emphatically disapproved the same theory concerning " the judicial power " vested in the courts by words substantially the same as those which

vest "the executive power" in the President. "The executive power shall be vested in a President of the United States of America." "The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."

That to declare the President vested with indefinite and illimitable executive powers would extend the field of his possible action far beyond the limits observed by his predecessors and would enlarge the powers of Congress to a degree incapable of fair appraisement.

Considering all these things, it is impossible for me to accept the view that the President may dismiss, as caprice may suggest, any inferior officer whom he has appointed with consent of the Senate, notwithstanding a positive inhibition by Congress. In the last analysis that view has no substantial support, unless it be the polemic opinions expressed by Mr. Madison (and eight others) during the debate of 1789, when he was discussing questions relating to a "superior officer" to be appointed for an indefinite term. Notwithstanding his justly exalted reputation as one of the creators and early expounders of the Constitution, sentiments expressed under such circumstances ought not now to outweigh the conclusion which Congress affirmed by deliberate action while he was leader in the House and has consistently maintained down to the present year, the opinion of this court solemnly announced through the great Chief Justice more than a century ago, and the canons of construction approved over and over again.

Judgment should go for the appellant.

Mr. Justice Brandeis, dissenting.

In 1833 Mr. Justice Story, after discussing in §§ 1537–1543 of his Commentaries on the Constitution the much debated question concerning the President's power of removal, said in § 1544:

" If there has been any aberration from the true constitutional exposition of the power of removal (which the reader must decide for himself), it will be difficult, and perhaps impracticable, after forty years' experience, to recall the practice to the correct theory. But, at all events, it will be a consolation to those who love the Union, and honor a devotion to the patriotic discharge of duty, that in regard to 'inferior officers' (which appellation probably includes ninety-nine out of a hundred of the lucrative offices in the government), the remedy for any permanent abuse is still within the power of Congress, by the simple expedient of requiring the consent of the Senate to removals in such cases."

Postmasters are inferior officers. Congress might have vested their appointment in the head of the department.[1] The Act of July 12, 1876, c. 176, § 6, 19 Stat. 78, 80, re-enacting earlier legislation,[2] provided that "postmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or suspended according to law." That statute has been in force un-

---

[1] Prior to the Act of July 2, 1836, c. 270, § 33, 5 Stat. 80, 87, all postmasters were appointed by the Postmaster General. Fourth class postmasters are still appointed by him. See Acts of May 8, 1794, c. 23, § 3, 1 Stat. 354, 357; April 30, 1810, c. 37, §§ 1, 5, 28, 40, 42, 2 Stat. 592; March 3, 1825, c. 64, § 1, 4 Stat. 102; March 3, 1863, c. 71, § 1, 12 Stat. 701; July 1, 1864, c. 197, § 1, 13 Stat. 335.

[2] The removal provision was introduced specifically into the postal legislation by Act of Jan 8, 1872, c. 335, § 63, 17 Stat. 283, 292; and re-enacted, in substance, in Act of June 23, 1874, c. 456, § 11, 18 Stat. 231, 234; in the Revised Statutes, § 3830; and the Act of 1876.

modified for half a century.　Throughout the period, it has governed a large majority of all civil offices to which appointments are made by and with the advice and consent of the Senate.[3]　May the President, having acted under the statute in so far as it creates the office and authorizes the appointment, ignore, while the Senate is in session, the provision which prescribes the condition under which a removal may take place?

It is this narrow .question, and this only, which we are required to decide.　We need not consider what power the President, being Commander in Chief, has over officers in the Army and the Navy.　We need not determine whether the President, acting alone, may remove high political officers.　We need not even determine whether, acting alone, he may remove inferior civil officers when the Senate is not in session.　It was in session when the President purported to remove Myers, and for a. long time thereafter.　All questions of statutory construction have been eliminated by the language of the Act.　It .is settled that, in the absence of a provision expressly providing for the consent of the Senate to a removal, the clause fixing the tenure will be construed as a limitation, not as a grant; and that, under such legislation, the President, acting alone, has the power of removal.　*Parsons* v. *United States,* 167 U. S. 324; *Burnap* v. *United States,* 252 U. S. 512, 515.　But, in defining the tenure, this statute used words of ʻgrant.　Congress clearly intended to preclude a removal without the consent of the Senate.

Other questions have been eliminated by the facts found, by earlier decisions of this Court, and by the

---

[3] During the year ending June 30, 1913, there. were in the civil service 10,543 presidential appointees.　Of these 8,423 were postmasters of the first, second and third classes.　Report of U. S. Civil Service Commission for 1913, p. 8.　During the year ending June 30, 1923, the number of presidential appointees was 16,148.　The number of postmasters of the first, second and third classes was 14,261. .Report for 1923, pp. xxxii, 100.

nature of the claim made.  It is settled that where the statute creating an office provides for the consent of the Senate to both appointment and removal, a removal by the President will be deemed to have been so made, if consent is given to the appointment of a successor.  *Wallace* v. *United States,* 257 U. S. 541.  But, in the case at bar, no successor was appointed until after the expiration of Myers' term.  It is settled that if Congress had, under clause 2 of section 2, Art II, vested the appointment in the Postmaster General, it could have limited his power of removal by requiring consent of the Senate. *United States* v. *Perkins,* 116 U. S. 483.  It is not questioned here that the President, acting alone, has the constitutional power to suspend an officer in the executive branch of the government.  But Myers was not suspended.  It is clear that Congress could have conferred upon postmasters the right to receive the salary for the full term unless sooner removed with the consent of the Senate.  Compare *Embry* v. *United States,* 100 U. S. 680, 685.  It is not claimed by the appellant that the Senate has the constitutional right to share in the responsibility for the removal, merely because it shared, under the Act of Congress, in the responsibility for the appointment.  Thus, the question involved in the action taken by Congress after the great debate of 1789 is not before us.  The sole question is whether, in respect to inferior offices, Congress may impose upon the Senate both responsibilities, as it may deny to it participation in the exercise of either function.

In *Marbury* v. *Madison,* 1 Cranch 137, 167, it was assumed, as the basis of decision, that the President, acting alone, is powerless to remove an inferior civil officer appointed for a fixed term with the consent of the Senate; and that case was long regarded as so deciding.[4]  In no

---

[4] In *McAllister* v. *United States,* 141 U. S. 174, 189, it was said by this Court of the decision in *Marbury* v. *Madison:* " On the contrary, the Chief Justice asserted the authority of Congress to fix the term

case, has this Court determined that the President's power of removal is beyond control, limitation, or regulation by Congress. Nor has any lower federal court ever so decided.[5] This is true of the power as it affects officers in the Army or the Navy and the high political officers like heads of departments, as well as of the power in respect to inferior statutory offices in the executive branch. Continuously for the last fifty-eight years, laws comprehensive in character, enacted from time to time with the approval of the President, have made removal from the

of a Justice of the Peace in the District of Columbia beyond the power of the President to lessen it by removal. . . ." The same significance is attached to the decision in 1 Kent, Commentaries, 12th ed., 311, note 1.

Reverdy Johnson, who had been Attorney General, said of *Marbury* v. *Madison,* while addressing the Senate on Jan. 15, 1867, in opposition to the Tenure of Office bill: " But, says my brother and 'friend from Oregon, that case decided that the President had no right to remove. Surely that is an entire misapprehension. The Constitution gives to the President the authority to appoint, by and with the advice and consent of the Senate, to certain high offices, but gives to Congress the power to vest the appointment and to give the removal of inferior officers to anybody they think proper; and these justices of the peace were inferior and not high officers within the meaning of those two terms in the Constitution. Congress, therefore, by providing that such an officer should hold his commission for four years, removed the officer from the power of removal of the President, as they could have taken from him the power to appoint. Nobody doubts that if they were inferior officers, as they were, Congress might have given the power to appoint those officers to the people of the district by election, or to any individual that they might think proper, or to any tribunal other than the executive department of the Government. They had a right, although they thought proper to give it to the President himself, to provide that it should endure for four years against any such power of removal. That is all the case decided upon that question." Cong. Globe, 39th Cong., 2d sess., 461. See Note 71, *infra.*

[5] In *United States* v. *Avery,* 1 Deady 204, the statute creating the office did not prescribe a fixed tenure and there was no provision for removal only by and with the consent of the Senate. In *United States* v. *Guthrie,* 17 How. 284, 305, Mr. Justice McLean, dissenting,

great majority of the inferior presidential offices depend-
ent upon the consent of the Senate. Throughout that
period these laws have been continuously applied. We
are requested to disregard the authority of *Marbury* v.
*Madison* and to overturn this long established constitu-
tional practice.

The contention that Congress is powerless to make
consent of the Senate a condition of removal by the Presi-
dent from an executive office rests mainly upon the clause
in § 1 of Article II which declares that " The executive
Power shall be vested in a President." The argument is
that appointment and removal of officials are executive
prerogatives; that the grant to the President of " the
executive Power " confers upon him, as inherent in the
office, the power to exercise these two functions without
restriction by Congress, except in so far as the power
to restrict his exercise of them is expressly conferred

denied that the President's power of removal was uncontrollable.
In *Ex parte Hennen,* 13 Pet. 230, 238, it was stated that where the
power of appointment is vested in the head of a department " the
President has certainly no power to remove."

State courts have uniformly held that, in the absence of express
provision in their constitution to the contrary, legislative restrictions
upon the power of removal by the governor, or other appointing
power, are valid as applied to persons holding statutory offices. *Com-
monwealth* v. *Sutherland,* 3 Serg. & R. 145, 155; *Commonwealth* v.
*Bussier;* 5 Serg. & R. 451; also *Bruce* v. *Matlock,* 86 Ark. 555;
*People* v. *Jewett,* 6 Cal. 291; *Gray* v. *McLendon,* 134 Ga. 224; *Dubuc*
v. *Voss,* 19 La. Ann. 210; *State* v. *Cowen,* 96 Ohio St. 277; *Att'y
Gen'l* v. *Brown,* 1 Wis. 513. Compare *Rankin* v. *Jauman,* 4 Ida. 53;
*State* v. *Curtis,* 180 Ind. 191; *Shira* v. *State,* 187 Ind. 441; *State* v.
*Henderson,* 145 Ia. 657; *Markey* v. *Schunk,* 152 Ia. 508; *State* v.
*Martin,* 87 Kan. 817; *State* v. *Sheppard,* 192 Mo. 497; *State* v. *San-
derson,* 280 Mo. 258; *State* v. *District Court,* 53 Mont. 350; *State* v.
*Archibald,* 5 N. D. 359; *State* v. *Ganson,* 58 Ohio St. 313; *Cameron*
v. *Parker,* 2 Okla. 277; *Christy* v. *City of Kingfisher,* 13 Okla. 585;
*State* v. *Hewitt,* 3 S. D. 187; *State* v. *Kipp,* 10 S. D. 495; *Skeen* v.
*Paine,* 32 Utah 295; *State* v. *Burke,* 8 Wash. 412; *State* v. *Grant,*
14 Wyo. 41.

upon Congress by the Constitution; that in respect to appointment certain restrictions of the executive power are so provided for; but that in respect to removal, there is no express grant to Congress of any power to limit the President's prerogative. The simple answer to the argument is this: The ability to remove a subordinate executive officer, being an essential of effective government, will, in the absence of express constitutional provision to the contrary, be deemed to have been vested in some person or body. Compare *Ex parte Hennen*, 13 Pet. 230, 259. But it is not a power inherent in a chief executive. The President's power of removal from statutory civil inferior offices, like the power of appointment to them, comes immediately from Congress. It is true that the exercise of the power of removal is said to be an executive act; and that when the Senate grants or withholds consent to a removal by the President, it participates in an executive act.[6] But the Constitution has confessedly granted to Congress the legislative power to create offices, and to prescribe the tenure thereof; and it has not in terms denied to Congress the power to control removals. To prescribe the tenure involves prescribing the conditions under which incumbency shall cease. For the possibility of removal is a condition or qualification of the tenure.[7] When Congress provides that the incumbent

[6] Power to remove has been held not to be inherently an executive power in States whose constitution provides in terms for separation of the powers. See note 12 *infra;* also *Dullam* v. *Willson*, 53 Mich. 392.

[7] "If a law were to pass, declaring that district attorneys, or collectors of customs, should hold their offices four years, unless removed on conviction for misbehavior, no one could doubt its constitutional validity; because the legislature is naturally competent to prescribe the tenure of office. And is a reasonable check on the power of removal any thing more than a qualification of the tenure of office?" Webster,-Feb. 16, 1835, 4 Works, 8th ed., 197.

"It is the legislative authority which creates the office, defines its duties, and may prescribe its duration. I speak, of course, of offices

shall hold the office for four years unless sooner removed with the consent of the Senate, it prescribes the term of the tenure.

It is also argued that the clauses in Article II, § 3, of the Constitution, which declare that the President "shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States" imply a grant to the President of the alleged uncontrollable power of removal. I do not find in either clause anything which supports this claim. The provision that the President "shall Commission all the Officers of the United States" clearly bears no such implication. Nor can it be spelled out of the direction that "he shall take Care that the Laws be faithfully executed." There is no express grant to the President of incidental powers resembling those conferred upon Congress by clause 18 of Article I, § 8. A power implied on the ground that it is inherent in the executive, must, according to established principles

not created by the constitution, but the law. The office, coming into existence by the will of Congress, the same will may provide how, and in what manner, the office and the officer shall both cease to exist. It may direct the conditions on which he shall hold the office, and when and how he shall be dismissed." Clay, Feb. 18, 1835, 11 Cong. Deb. 518.

"Congress shall have power to make all laws, not only to carry into effect the powers expressly delegated to itself, but those delegated to the Government, or any department or office thereof; and of course comprehends the power to pass laws necessary and proper to carry into effect the powers expressly granted to the executive department. It follows, of course, to whatever express grant of power to the Executive the power of dismissal may be supposed to attach, whether to that of seeing the law faithfully executed, or to the still more comprehensive grant, as contended for by some, vesting executive powers in the President, the mere fact that it is a power appurtenant to another power, and necessary to carry it into effect, transfers it, by the provisions of the constitution cited, from the Executive to Congress, and places it under the control of Congress, to be regulated in the manner which it may judge best." Calhoun, Feb. 20, 1835, 11 Cong. Deb. 553.

of constitutional construction, be limited to "the least possible power adequate to the end proposed." Compare *Marshall* v. *Gordon,* 243 U. S. 521, 541; *Michaelson* v. *United States,* 266 U. S. 42, 66. The end to which the President's efforts are to be directed is not the most efficient civil service conceivable, but the faithful execution of the laws consistent with the provisions therefor made by Congress. A power essential to protection against pressing dangers incident to disloyalty in the civil service may well be deemed inherent in the executive office. But that need, and also insubordination and neglect of duty, are adequately provided against by implying in the President the ·constitutional power of suspension.[8] Such provisional executive power is comparable to the provisional judicial power of granting a restraining order without notice to the defendant and opportunity to be heard. Power to remove, as well as to suspend, a high political officer, might conceivably be deemed indispensable to democratic government and, hence, inherent in the President. But power to remove an inferior administrative officer ap-·. pointed for a fixed term cannot conceivably be deemed an essential of government.

To imply a grant to the President of the uncontrollable power of removal from statutory inferior executive offices involves an unnecessary and indefensible limitation upon the constitutional power of Congress to fix the tenure of· inferior statutory offices. That such a limitation cannot be justified on the ground of necessity is demonstrated by the practice of our governments, state and national. In none of the original thirteen States did the chief executive

[8] See Debate of 1789 (June 17), Stone: "All the difficulties and embarrassments that have been mentioned, can be removed by giving to· the President the power of suspension during the recess of the Senate; and I think that an attention to the Constitution will lead us to decide that this is the only proper power to be vested in the President of the United States." 1 Ann. Cong. 495; also Gerry, 1 Ann. Cong. 504; Sherman, 1 Ann. Cong. 492; Jackson, 1 Ann. Cong. 489.

possess such power at the time of the adoption of the
Federal Constitution.   In none of the forty-eight States
has such power been conferred at any time since by a state
constitution,[9] with a single possible exception.[10]   In a few
States the legislature has granted to the governor, or other

---

[9] New York: Constitution of 1777, amended 1801.   The powers of
appointment and removal were vested in the Council of Appointment.
*People* v. *Foot*, 19 Johns. 58.   By later constitutions or amendments
varying restrictions were imposed on the governor's power of removal.
4 Lincoln, Constitutional History of New York, 554–594, 724–733.
Massachusetts: Constitution of 1780.   Appointments to be made by
governor with the advice and consent of the council.   No express
provision for removals.   By early practice the council was associated
with the governor in removals.   The Constitutional Amendment of
1855 altering the manner of appointment left the practice as to
removals unchanged.   *Opinion of the Justices*, 3 Gray 601, 605.   New
Hampshire: Constitution of 1784.   Provision and practice the same as
Massachusetts.   By Laws of 1850, c. 189, § 4, the legislature further
limited the governor's power of removal over certain inferior offices.
New Jersey: Constitution of 1776.   The "supreme executive power"
of the governor was limited to commissioning officers appointed by
the council and assembly.   Pennsylvania: Constitution of 1790.
Appointing power vested in the governor alone.   In the absence of
restrictive legislation he exercised the power of removal.   Biddle,
Autobiography, 283.   Control by the legislature of his power of
removal from inferior offices, had early judicial sanction.   *Common-
wealth* v. *Sutherland*, 3 Serg. & R. 145.   Maryland: The governor
seems to have had such power under the constitution of 1776, but it
was later taken away.   The Constitutional Convention of 1851 con-
sidered but refused to grant the governor the sole power of removal.
*Cull* v. *Wheltle*, 114 Md. 58, 80.   Illinois: Constitution of 1818 was
construed as denying the power of removal to the governor acting
alone.   *Field* v. *People*, 2 Scam. 79.   The Constitution of 1870, Art.
5, § 12, conferred the power, but only for certain specified causes.
In Maine and Florida, concurrent action of the senate is a constitu-
tional requirement.   *Opinion of the Justices*, 72 Me. 542; *Advisory
Opinion to the Governor*, 69 Fla. 508.

[10] The Pennsylvania Constitution of 1873 provided that " appointed
officers  .  .  .  may be removed, at the pleasure of the power by
which they shall have been appointed."   Art. VI, § 4.   The Supreme
Court held as to petty officers or subordinate ministerial agents

appointing power, the absolute power of removal.[11]   The legislative practice of most States reveals a decided tendency to limit, rather than to extend, the governor's power of removal.[12]   The practice of the Federal Government will be set forth in detail.

---

appointed by the governor, that his power of removal is controllable; and that a statute prohibiting removal except for specified causes is valid. *Commonwealth* v. *Black*, 201 Pa. St. 433. Officials deemed agents of the legislature are also held to be without the scope of the governor's power of removal. *Commonwealth* v. *Benn*, 284 Pa. St. 421.

[11] Oregon has by statute conferred a general power of removal upon the governor. 1920 Olson's Oregon Laws, § 4043. Vermont had also vested the power of removal with the governor. 1917 Vt. Gen. Laws, § 356. It later, however, placed restrictions upon the governor's power of removing members of the State Board of Education. 1917 Vt. Gen. Laws, § 1170. See Wyoming Act of Feb. 20, 1905, c. 59, *State* v. *Grant*, 14 Wyo. 41, 59–60. Compare *State* v. *Peterson*, 50 Minn. 239; *State* v. *Hawkins*, 44 Ohio St. 98.

[12] By statute, in some States, removals can be made only upon concurrence of the senate or legislature with the governor. 1914 Ga. Civ. Code, § 2618; 1924 Ia. Code, § 315; N. Y. Consol. Laws, c. 47, § 32; 1921 Throckmorton Ohio Gen. Code, § 13; 1913 Pa. Laws, 1374, 1401; 1923 R. I. Gen Laws, § 384; 1924 Va. Code, § 330. In some, the governor is required merely to record his reasons for dismissal. Conn. Rev. Stats. § 86; 1905 Wyo. Laws, c. 59. In many States, the power of removal is limited by statute to specific instances of misconduct or misbehavior in office. 1921 Colo. Comp. Laws, § 138; Carroll's Ky. Stats. § 3750;. 1915 Mich. Comp. Laws, §§ 243, 252 (during recess of legislature only); 1913 N. D. Comp. Laws, § 685; 1910 Okla. Rev. Stats. § 8052; 1919 S. D. Rev. Code, §§ 7009, 7010; 1917 Utah Comp. Laws, § 5684 (during recess of legislature only); 1893 Wash. Laws, c. 101. In addition, a statement of record of the reasons for dismissal is often required. 1913 Ariz. Civ. Code, § 247 (inspector of apiaries), § 4757, (board of dental examiners), § 4769 (board of embalmers); 1914 Ga. Code, § 1697(b) (board of medical examiners), § 1963 (state geologist); 1919 Ida. Comp. Stats. § 793 (board of education), § 2398 (utility commissioners); 1855 La. Acts, No. 297, § 13 (public weighers); 1910 Md. Laws, c. 180, § 2 (utility commissioners); 1923 Minn. Gen. Stats. § 2229 (tax officers), § 2356 (tax commission); 1912 Nev. Rev. Laws, § 4432 (dental examiners);

Over removal from inferior civil offices, Congress has, from the foundation of our Government, exercised continuously some measure of control by legislation. The instances of such laws are many. Some of the statutes were directory in character. Usually, they were mandatory. Some of them, comprehensive in scope, have endured for generations. During the first forty years of our Government, there was no occasion to curb removals.[13] Then, the power of Congress was exerted to ensure removals. Thus, the Act of September 2, 1789, c. 12, 1 Stat. 65, 67, establishing the Treasury Department, provided by § 8 that if any person appointed to any office by that Act should be convicted of offending against any of its provisions, he shall " upon conviction be removed from office." The Act of March 3, 1791, c. 18, § 1, 1 Stat. 215, extended the provision to every clerk employed in the Depart-

---

1910 N. Y. Laws, c. 480, § 4 (Public Service Commission); 1921 N. Y. Laws, c. 134 (transit commission); 1921 Throckmorton Ohio Gen. Laws, § 88 (board of clemency), § 488 (utility commissioners), § 486-3 (civil service commissioners), § 710-6 (superintendent of banks), § 744-16 (commissioner of securities), § 871-2 (industrial commission), § 1337 (board of embalming examiners), § 1465-2 (tax commission); 1917 Vt. Gen. Laws, § 1170 (board of education). In other States, or for other officers, the laws require the existence of " cause " or provide for notice and hearing. 1919 Mo. Rev. Stat. § 10414 (utility commissioners); 1921 Mont. Pol. Code, § 2820 (industrial accident commission); N. Y. Consol. Laws, c. 46, § 33 (officials appointed by governor alone); 1921 Throckmorton Ohio Gen. Laws, § 1236-4 (board of health), § 1380 (commissioners of state laws); 1920 Tex. Comp. Stats. Art. 4995b (board of water engineers), Art. 6027 (appointees of governor), Art. 6195 (board of prison commissioners), Art. 6286 (board of pharmacy); 1923 Wis. Stats. § 17.07 (appointees of governor). Some statutes make removal dependent upon the recommendation of a board. 1920 Tex. Comp. Stats. Art. 5927 (mining inspectors).

[13] Removals made from 1789 to 1829 of Presidential appointees, exclusive of military officers, were as follows: Washington—17, Adams—19, Jefferson—62, Madison—24, Monroe—27, J. Q. Adams— 7, being a total of 156. Fish, Removal of Officials, 1899 Am. Hist.

ment.  The Act of May 8, 1792, c. 37, § 12, 1 Stat. 279, 281, extended it further to the Commissioner of the Revenue and the Commissioners of Loans, presidential appointments.  The first Tenure of Office Act, May, 15, 1820, c. 102, 3 Stat. 582, introduced the four-year term, which was designed to ensure removal under certain conditions.[14]  The Act of January 31, 1823, c. 9, § 3, 3 Stat. 723, directed that officers receiving public money and failing to account quarterly shall be dismissed by the President unless they shall account for such default to his satisfaction.  The Act of July 2, 1836, c. 270, §§ 26, 37, 5 Stat. 80, 86, 88, which first vested the appointment of postmasters in the President by and with the advice and consent of the Senate, directed that postmasters and others offending against certain prohibitions " be forthwith dismissed from office;" and as to other offences pro-

---

Ass'n Rep. 67.  Compare Sen. Rep. No. 576, 47th Cong., 1st sess., Ser. No. 2006, p. iv.  " It was the intention of the founders of our Government that administrative officers should hold office during good behavior. . . . Madison, the expounder of the Constitution, said that the wanton removal of a meritorious officer was an impeachable offense.  It was the established usage without question or variation during the first forty years of our Government to permit executive officers, except members of the Cabinet, to hold office during good behavior, and this practice was only changed by the four-year tenure act of 1820, which was passed at the instance of an appointing officer for the purpose of using this power to secure his nomination as a Presidential candidate."  Report of U. S. Civil Service Commission for 1896, pp. 28–29.

[14] Fish, Civil Service and Patronage, 66–70.  Madison, in commenting upon the Four Year Limitation Act of 1820 to President Monroe, recognized the necessary identity of a power to prescribe qualifications of tenure and a power to remove from office.  " Is not the law vacating periodically the described offices an encroachment on the Constitutional attributes of the Executive? . . . If a law can displace an officer at every period of four years, it can do so at the end of every year, or at every session of the Senate; and the tenure will then be the pleasure of the Senate as much as of the President, and not of the President alone."  3 Letters and Writings, 200.

vided for such dismissal upon conviction by any court. The Act of July 17, 1854, c. 84, § 6, 10 Stat. 305, 306, which authorized the President to appoint registers and receivers, provided that " on satisfactory proof that either of said officers, or any other officer, has charged or received fees or other rewards not authorized by law, he shall be forthwith removed from office." [15]

In the later period, which began after the spoils system had prevailed for a generation,[16] the control of Congress over inferior offices was exerted to prevent removals. The removal clause here in question was first introduced by the Currency Act of February 25, 1863, c. 58, § 1, 12 Stat. 665, which was approved by President Lincoln. That statute provided for the appointment of the Comp-

---

[15] The provisions of the Acts of 1789, 1791, 1792, 1836 and 1854, were reenacted in the Revised Statutes and are still in force. Rev. Stats. §§ 243, 244, 2242, 3947. as amended. Mandatory directions of dismissal for specified offenses are also contained in the Act of Mar. 2, 1867, c. 172, § 3, 14 Stat. 489, 492, reenacted in Rev. Stats. § 1546; Act of Feb. 1, 1870, c. 11, 16 Stat. 63, reenacted in Rev. Stats. § 1784; and Act of Aug. 15, 1876, c. 287, § 6, 19 Stat. 143, 169. From the operation of the latter Act executive officers and employees appointed by the President by and with the advice and consent of the Senate are significantly excepted.

[16] Removals made from 1829 to 1869 of Presidential appointees, exclusive of military officers, were as follows: Jackson—180, Van Buren—43, Harrison and Tyler—389, Polk—228, Taylor—491, Fillmore—73, Pierce—771, Buchanan—253, Lincoln—1400, Johnson—726, being a total of 4,554. Fish, Removal of Officials, 1899 Am. Hist. Ass'n Rep. 67. The great increase in removals under President Jackson included offices besides those to which appointments were made by the President and Senate, the accepted estimate during the first year of his administration being 2,000. 2 Story, Constitution, § 1543; House Rep, No. 47, 40th Cong., 2d sess., Ser. No. 1352, p. 8. Of these 491 were postmasters. 1 Am. State Papers, Post Office, 242. The increase in the number of such removals is testified to by the incomplete reports of the following years. The Post Office Department consistently suffered most. See Lucy Salmond, History of the Appointing Power, 1 Am. Hist. Ass'n Papers, No. 5, pp. 67–86.

troller, and that he " shall hold his office for the term of five years unless sooner removed by the President, by and with the advice and consent of the Senate." In 1867 this provision was inserted in the Tenure of Office Act, March 2, 1867, c. 154, §§ 1, 3, 6, 14 Stat. 431, which applied, in substance, to all presidential offices. It was passed over President Johnson's veto.[17] In 1868, after the termination of the impeachment proceedings, the removal clause was inserted in the Wyoming Act of July 25, 1868, c. 235, §§ 2, 3, 9, 10, 15 Stat. 178–181, which was approved by President Johnson.

By Act of June 8, 1872, c. 335, 17 Stat. 283, a consolidation and revision of the postal laws was made. The removal clause was inserted in § 63 in the precise form in which it had first appeared in the Currency Act of 1863. From the Act of 1872, it was carried as § 3830 into Revised Statutes, which consolidated the statutes in force December 1, 1873. The Act of 1' 72 was amended by the Act of June 23, 1874, c. 456, § 11, 18 Stat. 231, 234, so as to reduce the classes of postmasters, outside New York City, from five to four. The removal clause was again inserted. When the specific classification of New York City in § 11 of the Act of 1874, was repealed by the Act of July 12, 1876, c. 179, § 4, 19 Stat. 80, the removal clause was retained. Thus, postmasters of the first three classes were made, independently of the Tenure of Office Act, subject to the removal clause. Each of these postal statutes was approved by President Grant. When President Cleveland secured, by Act of March 3, 1887, c. 353, 24 Stat. 500, the repeal of §§ 1767 to 1772 of Revised Statutes (which had re-enacted as to all presidential offices the removal provision of the Tenure of Office Act) he made no attempt to apply the repeal to postmasters, although postmasters constituted then, as they have ever since, a large majority of all presidential appointees. The removal clause, which

---

[17] It was amended by Act of April 5, 1869, c. 10, 16 Stat. 6.

had become operative as to them by specific legislation, was continued in force.  For more than half a century this postal law has stood unmodified.  No President has recommended to Congress that it be repealed.  A few proposals for repeal have been made by bills introduced in the House.  Not one of them has been considered by it.[18]

It is significant that President Johnson, who vetoed in 1867 the Tenure of Office Act which required the Senate's consent to the removal of high political officers, approved other acts containing the removal clause which related only to inferior officers.  Thus, he had approved the Act

---

[18] On Feb. 8, 1887, while the bill for the repeal of the Tenure of Office Act was pending, the Committee on Post Offices and Post Roads reported a bill, H. R. 11108, for reclassifying postmasters into three classes, and provided (§ 1) that: " Postmasters of the first and second classes shall be appointed by the President, by and with the advice and consent of the Senate, for a term of four years, subject to the provisions of law respecting their removal or suspension, and the filling of vacancies occurring when the Senate shall not be in session. . . . Postmasters of the third class shall be appointed and commissioned by the Postmaster General, and hold their offices during his pleasure."  18 Cong. Rec. 1498.  The bill was not considered by Congress.

On Jan. 5, 1892, Sherman Hoar introduced a bill (H. R. 196) to provide that all postmasters should hold office during good behavior 23 Cong. Rec. 130.  § 1 contained the following proviso: " Provided, however, That the President may at any time remove or suspend a postmaster for cause stated."  On Dec. 22, 1895, De Forest introduced H. R. 8328, 27 Cong. Rec. 576.  Section 2 provided: " That postmasters of all classes now in office or hereafter to be appointed shall be appointed to hold their offices for good behavior; Provided, That the President may at any time remove or suspend a postmaster of the first, second or third class for cause, communicated in writing to the Senate at the next subsequent session of Congress after such removal, and that the Postmaster General may at any time remove or suspend a postmaster of the fourth class for cause, communicated in the letter of removal."  Sec. 3 forbade appointment, removal or suspension for political reasons.  On Jan. 28, 1896, Gillett introduced the identical bill (H. R. 8328).  28 Cong. Rec. 1061.  None of these three bills was considered even by a committee.

of July 13, 1866, c. 176, § 5, 14 Stat. 90, 92, which provided that "no officer in the military or naval service shall in time of peace, be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof." [19] And in 1868 he approved the Wyoming Act, which required such consent to the removal of inferior officers who had been appointed for fixed terms. It is significant also that the distinction between high political officers and inferior ones had been urged in the Senate in 1867 by Reverdy Johnson, when opposing the passage of the Tenure of Office Act.[20] It had apparently been recognized in 1789 at the time of the great debate in the First Congress, and by Chief Justice Marshall in 1807.[21]

---

[19] This provision was reenacted by Rev. Stats. § 1229. Comp. Sen. Rep. Apr. 4, 1864, No. 42, 38th Cong. 1st sess., Ser. No. 1178. In *Blake* v. *United States*, 103 U. S. 227, 237, this provision was interpreted as not denying " the power of the President, by and with the advice and consent of the Senate, to displace them by the appointment of others in their places." The Act of June 4, 1920, c. 227, Art. 118, 41 Stat. 759, 811, provides:

"ART. 118. OFFICERS, SEPARATION FROM SERVICE.—No officer shall be discharged or dismissed from the service, except by order of the President or by sentence of a general court-martial; and in time of peace no officer shall be dismissed except in pursuance of the sentence of a general court-martial or in mitigation thereof; but the President may at any time drop from the rolls of the Army any officer who has been absent from duty three months without leave or who has been absent in confinement in a prison or penitentiary for three months after final conviction by a court of competent jurisdiction."

[20] See Note 4, p. 242, *supra.*

[21] See Lawrence, June 17, 1 Ann. Cong. 483–484; Smith, June 17, 1 Ann. Cong. 508–9; Madison, June 18, 1 Ann. Cong., 547–8. A few days subsequent to the debate on the removal provision in the Act establishing a Department of Foreign Affairs, Madison, although he believed that the power to prescribe the tenure of office and the power of removal were in essence the same, moved to amend the Act establishing a Treasury Department by providing that the Comptroller should hold office for a limited period of years. To the objection that such a provision was not within the power of Con-

It had been repeatedly pointed out in later years.[22]

gress he replied: "When I was up before . . . I endeavored to show that the nature of this office differed from the others upon which the House had decided; and, consequently, that a modification might take place, without interfering with the former distinction; so that it cannot be said we depart from the spirit of the Constitution." 1 Ann. Cong. 614. Stone, in support of Madison, added: "As the Comptroller was an inferior officer, his appointment might be vested in the President by the Legislature; but, according to the determination which had already taken place, it did not necessarily follow that he should have the power of dismissal; and before it was given, its propriety ought to be apparent." 1 Ann. Cong. 613. See Note 71, *infra*.

[22] In 1830, Senator Barton, in defense of his resolutions denying an uncontrollable Presidential power of removal, said: "It is no question whether a President may remove, at his own will and pleasure, his Secretary of State. That was the very question before Congress in the great debate of 1789, . . . Nobody would wish to force a disagreeable member of the cabinet on the President. . . . But the class of officers now before the Senate, and their predecessors, attempted to be removed by the President, were not under consideration in the debate of 1789. This is a class of · public officers—or officers of the law—whose term, tenure, and duties of office are fixed and prescribed by the laws of the land, and not by the Executive will, as in the other class. . . . The power is now boldly asserted on this floor by the majority, for the first time since the foundation of the republic, of removing this class of federal officers by the President at discretion, without the slightest restraint by the Senate." 6 Cong. Deb. 458–459. The same distinction was taken in 1835, by Senators Wright and White, in the debate on the Executive Patronage Bill. 11 Cong. Deb. 480, 487.

On June 15, 1844, the Senate Committee on Retrenchment dealing with the evils of executive patronage said: "It will be sufficient for the committee to show that Congress may regulate, by law, as well the power to appoint inferior officers as to remove them. . . . The committee will not protract the argument. It is not known to them that the power of Congress to regulate the appointment and removal of inferior officers has been questioned. It is very certain that the authority of the President to control the departments in the exercise of the power has not at any time been recognised by law." Sen. Doc. No. 399, 28th Cong. 1st sess., Ser. No. 437, p. 29–30.

The administrative action of President Johnson under the Tenure of Office Act indicates likewise a recognition of this distinction between inferior and high political offices. The procedure prescribed in § 2 required of the President a report to the Senate of the reasons for a suspension and also made its consent essential to a removal. In respect to inferior officers this course appears to have been scrupulously observed by the President in every case. This is true for the period before the institution of the impeachment proceedings [23] as well as for the later period.[24] On the other hand, in the case of a high political officer, Secretary of War Stanton, President Johnson declined on several grounds to follow the procedure prescribed by the Act. 16 Ex. Journ. 95. The requirement that the President should report reasons for suspension to the Senate was not retained by the amended Tenure of Office Act of April 5, 1869, c. 10, 16 Stat. 6; the other provisions, however, were substantially reenacted; and affirmative evidence of compliance by succeeding Presidents with its requirements as to inferior officers is recorded between 1869 and the repeal of the Act in 1887. Suspensions and not removals were made during recess.[25] In those rare instances where removals

[23] In six instances President Johnson in separate messages communicated his reasons for suspension. 16 Ex. Journ. 3, 109–110, 122, 133. In two further instances misconduct was given as the ground for suspension. 16 *ibid.* 1.

[24] Five cases of this nature are on record. 16 Ex. Journ. 411–412.

[25] From President Grant's administration to the close of the first two years of President Cleveland's first administration, nominations of officials to succeed those who had been suspended during the recess follow one of two forms: "I nominate A. B., who was designated during the recess of the Senate, to be —, vice C. D. suspended," or "I nominate A. B. to be postmaster at — in place of C. D., suspended under the provisions of the seventeen hundred and sixty-eighth section of the Revised Statutes of the United States." These forms are not used after Mar. 3, 1887. The case of A. C. Botkin, marshal of Montana Territory, is illustrative of the fact that suspension and not removal could be effected during the recess. On Jan.

were sought by means other than the appointment of a
"successor," Presidents Grant, Hayes, Garfield and Ar-
thur requested the Senate's consent to the removals.[26]
Where the Senate failed to confirm the nomination of a
successor, the former incumbent retained office until
either the expiry of his commission or the confirmation
of a successor.[27]

28, 1885, President Arthur nominated E. A. Kreidler in place of A. C.
Botkin to be removed. 24 Ex. Journ. 425. The Senate failed to act
upon the nomination and on Dec. 21, 1885, President Cleveland nomi-
nated R. S. Kelly vice A. C. Botkin suspended. For several months
action upon the nomination was delayed and on April 28, 1886, the
President sent the following message to the Senate: " I nominated
Robert S. Kelly, of Montana, to the Senate on the 21st day of
December, 1885. . . . in the place of A. C. Botkin, who was by
me suspended under the provisions of section 1708 of the Revised
Statutes. On the 12th day of April, 1886, the term of office for
which said A. C. Botkin was originally appointed expired: And I
renew the nomination of Robert S. Kelly, of Montana . . . in
the place of the said A. C. Botkin, whose term of office has so expired
as aforesaid." 25 Ex. Journ. 441. These years of President Cleve-
land disclose 78 other cases of a similar nature. 25 ibid. 396–410,
426, 436, 441, 488, 490–494, 497, 501, 516, 539, 563, 714–715.

[26] On Dec. 6, 1869, President Grant requested the consent of the
Senate to the removal of certain Indian agents, to whose posts army
officers had been assigned. 17 Ex. Journ. 289. On May 17, 1872,
the Senate gave its consent to the removal of T. H. Bazin, appraiser
of merchandise at Charleston, S. C., 18 ibid. 251. On Dec. 4, 1878,
President Hayes requested the Senate's consent to the removal of
A. M. Devereux, a third lieutenant in the revenue service. 21 ibid.
393. The Senate during that session took no action. To the three
succeeding sessions of the Senate the same request was made without
securing its consent. 22 ibid. 23, 108, 410. President Garfield like-
wise made the same request but failed to secure any action by the
Senate. 23 ibid. 9, 29. On April 15, 1884, President Arthur recom-
mended to the Senate the removal of F. N. Wicker as collector of
customs at Key West. 24 ibid. 246. The Senate concurred in his
removal without expressing an opinion upon the constitutional powers
of the President and Senate upon the subject of removal. 24 ibid. 249.

[27] The instances are numerous and a few illustrations will suffice.
On Mar. 2, 1883, Paul Strobach was nominated as a marshal vice

From the foundation of the Government to the enact-ment of the Tenure of Office Act, during the period while it remained in force, and from its repeal to this time, the administrative practice in respect to all offices has, so far as appears, been consistent with the exist-ence in Congress of power to make removals subject to the consent of the Senate.[28] The practice during the earlier period was described by Webster in addressing the Senate on February 16, 1835:

"If one man be Secretary of State, and another be ap-pointed, the first goes out by the mere force of the ap-

M. C. Osborn to be removed. 23 Ex. Journ. 711. The Senate took no action during that session and in the recess Osborn was suspended. Strobach was again nominated but was rejected at the next session of the Senate. Thereupon on May 8, 1884, J. H. Speed was nomi-nated "vice Paul Strobach, temporarily appointed during the recess of the Senate." 24 Ex. Journ. 265. Pending action upon the nomi-nation President Arthur on May 14, 1884, again nominated J. H. Speed "vice M. C. Osborn, whose term has expired. This nomina-tion is made to correct an error in the nomination of Joseph H. Speed to the above-named office, which was delivered to the Senate on the 8th instant, and which is hereby withdrawn." 24 Ex. Journ. 267. The correction expressly recognizes that Osborn had never ceased to hold office. Compare 15 Op. A. G. 375. Again, on Mar. 2, 1884, Windus was nominated as a postmaster vice Lambert "whose removal for cause is hereby proposed." 24 Ex. Journ. 220. The Senate rejected Windus, and on Dec. 17, 1885, President Cleveland nominated Gildea vice Lambert "whose commission expired May 13, 1885." 25 *ibid.* 228. On Jan. 6, 1885, Richardson was nominated as a postmaster vice Corson "whose removal for cause is hereby proposed." 24 *ibid.* 412. The Senate failed to act upon the nomina-tion, and on April 1, 1885, Cleveland nominated Bonner to the post vice Corson "whose removal for cause is hereby proposed." 25 *ibid.* 45.

[28] Since the enactment of the Tenure of Office Act various forms have been used to nominate officials to succeed those whose removal is thereby sought. Examination of their use over a period of thirty-two years indicates that no significance is to be attached to the use of any particular form. Thus the nomination is sometimes in the form A. B. vice C. D. "removed"; sometimes it is "to be removed";

pointment of the other, without any previous act of removal whatever. And this is the practice of the government, and has been, from the first. In all the removals which have been made, they have generally been effected simply by making other appointments. I cannot find a case to the contrary. There is no such thing as any distinct official act of removal. I have looked into the practice, and caused inquiries to be made in the departments, and I do not learn that any such proceeding is known as an entry or record of the removal of an officer from office; and the President could only act, in such cases, by causing some proper record or entry to be made, as proof of the

---

sometimes " removed for cause "; sometimes " whose removal for cause is hereby proposed."

| | " re-moved " | " to be removed " | " removed for cause " | " whose removal for cause is hereby proposed " |
|---|---|---|---|---|
| 1867–1869 (Johnson) | 37 | 72 | 3 | |
| 1869–1873 (Grant) | 468 | 464 | 17 | |
| 1873–1877 (Grant) | 120 | 144 | 19 | |
| 1877–1881 (Hayes) | 8 | 102 | 10 | 42 |
| 1881 (Garfield) | 1 | | | 19 |
| 1881–1885 (Arthur) | 4 | 78 | | 69 |
| 1885–1887 (Cleveland) | 15 | 19- | | 24 |
| 1887–1889 (Cleveland) | 178 | 1 | | |
| 1889–1893 (Harrison) | 1080 | 118 | 9 | |
| 1893–1897 (Cleveland) | 808 | 101 | | |
| 1897–1899 (McKinley) | 813 | 26 | | |

Postmasters will be found included within all these categories. 16–31 Ex. Journ., *passim*. The form " who has been removed " was twice used by President Grant and once by President Harrison. On one occasion President Grant used the form " whom I desire to remove," and on six occasions President Hayes used the form " to be thus removed." The simple form " removed," which has been exclusively used for postmasters since 1887, does not imply that removal has already been accomplished. That form was used in the Parsons and Shurtleff cases, where the notification of removal sent to the incumbent stated that the removal would take effect upon the qualification of a successor. 29 Ex. Journ. 11; 31 *ibid*. 1328.

fact of removal. I am aware that there have been some cases in which notice has been sent to persons in office that their services are, or will be, after a given day, dispensed with. These are usually cases in which the object is, not to inform the incumbent that he is *removed,* but to tell him that a successor either is, or by a day named will be, appointed." 4 Works, 8th ed., 189.

In 1877, President Hayes, in a communication to the Senate in response to a resolution requesting information as to whether removals had been made prior to the appointment of successors, said:

" In reply I would respectfully inform the Senate that in the instances referred to removals had not been made at the time the nominations were sent to the Senate. The form used for such nominations was one found to have been in existence and heretofore used in some of the Departments, and was intended to inform the Senate that if the nomination proposed were approved it would operate to remove an incumbent whose name was indicated. R. B. Hayes." 7 Messages and Papers of the President, 481.

Between 1877 and 1899, the latest date to which the records of the Senate are available for examination, the practice has, with few exceptions, been substantially the same.[29] It is, doubtless, because of this practice, and the long settled rule recently applied in *Wallace* v. *United States,* 257 U. S. 541, 545, that this Court has not had occasion heretofore to pass upon the constitutionality of the removal clause.

---

[29] Cases in this Court dealing with the removal of civil officers, appointed by the President with the advice and consent of the Senate, illustrate the practice of securing their removal by the appointment of a successor. In recent years the formal notification of removal commonly reads: " Sir: You are hereby removed from the office of —, to take effect upon the appointment and qualification of your successor." *Parsons* v. *United States,* 167 U. S. 324, 325; *Shurtleff* v. *United States,* 189 U. S. 311, 312.

The practice of Congress to control the exercise of the executive power of removal from inferior offices is evidenced by many statutes which restrict it in many ways besides the removal clause here in question. Each of these restrictive statutes became law with the approval of the President. Every President who has held office since 1861, except President Garfield, approved one or more of such statutes. Some of these statutes, prescribing a fixed term, provide that removal shall be made only for one of several specified causes.[30] Some provide a fixed term, subject generally to removal for cause.[31] Some pro-

---

[30] Provisions authorizing removal for

(a) Inefficiency, neglect of duty, malfeasance in office, but for no other cause: Act of May 27, 1908, c. 205, § 3, 35 Stat. 403, 406, amending Act of June 10, 1890, c. 407, § 12, 26 Stat. 131, 136, Board of General Appraisers; Act of July 15, 1913, c. 6, § 11, 38 Stat. 103, 108, Commissioner of Mediation and Conciliation (misconduct in office only); Act of June 2, 1924, c. 234, § 900b, 43 Stat. 253, 336, Board of Tax Appeals.

(b) Neglect of duty or malfeasance in office, but for no other cause: Act of Feb. 28, 1920, c. 91, § 306(b), 41 Stat. 456, 470, Railroad Labor Board; Act of Sept. 22, 1922, c. 412, § 1, 42 Stat. 1023, amended by Act of Mar. 4, 1923, c. 248, § 1, 42 Stat. 1446, United States Coal Commission.

(c) Inefficiency, neglect of duty, malfeasance in office, not restricting, however, under *Shurtleff* v. *United States,* 189 U. S. 311, the President's power to remove for other than the causes specified: Act of Feb. 4, 1887, c. 104, § 11, 24 Stat. 379, 383, Interstate Commerce Commission; Act of June 10, 1890, c. 407, § 12, 26 Stat. 131, 136, Board of General Appraisers; Act of Sept. 26, 1914, c. 311, § 1, 38 Stat. 717, 718, Federal Trade Commission; Act of Sept. 7, 1916, c. 451, § 3, 39 Stat. 728, 729, United States Shipping Board; Act of Sept. 8, 1916, c. 473, § 700, 39 Stat. 756, 795, United States Tariff Commission.

[31] Act of June 7, 1878, c. 162, § 1, 20 Stat. 100, justices of the peace of the District of Columbia; Act of June 6, 1900, c. 786, § 10, 31 Stat. 321, 325, governor, surveyor-general, attorneys, marshals of Alaska; Act of Aug. 24, 1912, c. 389, § 6, 37 Stat. 539, 555, removals from the classified civil service to be only for such cause as will promote the efficiency of the service and for reasons stated in writing; Act of

vide for removal only after hearing.[32] Some provide a fixed term, subject to removal for reasons to be communicated by the President to the Senate.[33] Some impose the restriction in still other ways. Thus, the Act of August 24, 1912, c. 389, § 6, 37 Stat. 539, 555, which deals only with persons in the classified civil service, prohibits removal " except for such cause as will promote the efficiency of the service and for reasons given in writing," and forbids removal for one cause which had theretofore been specifically prescribed by President Roosevelt and President Taft as a ground for dismissal.[34] The Budget

July 17, 1916, c. 245, § 3, 39 Stat. 360, Federal Farm Loan Board; Act of June 3, 1922, c. 205, 42 Stat. 620, Federal Reserve Board. The provision is also common with respect to judgeships. Act of Mar. 19, 1906, c. 960, § 1, 34 Stat. 73 (Juvenile Court of the District of Columbia); Act of June 30, 1906, c. 3934, § 7, 34 Stat. 814, 816 (United States Court for China); Act of Mar. 3, 1925, c. 443, § 3a, 43 Stat. 1119 (Police Court of the District of Columbia).

[32] Act of May 27, 1908, c. 205, § 3, 35 Stat. 403, 406, does so in express terms. *Shurtleff* v. *United States,* 189 U. S. 311, 314, 317, declares that, by construction, every Act which prescribes specific causes for removal requires that removal be not made for such cause without a hearing. In *Reagan* v. *United States,* 182 U. S. 419, 425, it was said: " The inquiry is therefore whether there were any causes of removal prescribed by law, March 1, 1895, or at the time of the removal. If there were, then the rule would apply that where causes of removal are specified by constitution or statute, as also where the term of office is for a fixed period, notice and hearing are essential. If there were not, the appointing power could remove at pleasure or for such cause as it deemed sufficient." State courts have held that statutes providing for removal " for cause " require that the appointee be given notice and an opportunity to defend himself. *State* v. *Frazier,* 47 N. D. 314; *Street Commissioners* v. *Williams,* 96 Md. 232; *Ham* v. *Board of Police,* 142 Mass. 90; *Haight* v. *Love,* 39 N. J. L. 14, aff'd. 39 N. J. L. 476; *Biggs* v. *McBride,* 17 Oreg. 640.

[33] Act of June 3, 1864, c. 106, § 1, 13 Stat. 99, Comptroller of the Currency; Act of Feb. 12, 1873, c. 131, § 1, 17 Stat. 424, Director of the Mint.

[34] The executive orders of Jan. 31, 1902, and Jan. 25, 1906 prescribed dismissal as a penalty for agitation by civil employees for an

Act of June 10, 1921, c. 18 § 303, 42 Stat. 20, 24, provides a fixed term for the Comptroller General and the Assistant Comptroller General, and makes these officers removable only by impeachment or, by joint resolution of Congress, after hearing, for one of the causes specified. It should be noted that while President Wilson had, on June 4, 1920, vetoed an earlier Budget Act, which like this denied to the President any participation in the removal, he had approved the Mediation and Conciliation Act of July 15, 1918, and the Railroad Labor Board Act of February 28, 1920, which prohibited removals except for the causes therein specified.

The assertion that the mere grant by the Constitution of executive power confers upon the President as a prerogative the unrestricted power of appointment and of removal from executive offices, except so far as otherwise expressly provided by the Constitution, is clearly inconsistent also with those statutes which restrict the exercise by the President of the power of nomination. There is not a word in the Constitution which in terms authorizes

increase in wages. The executive orders of Nov. 26, 1909, and April 8, 1912, forbade communications to members of Congress save through heads of departments. Report of U. S. Civil Service Commission, for 1912, pp. 23–24. Section 6 of the Act of 1912 was intended to override these orders. See 48 Cong. Rec. 5634–5636. On Feb. 19, 1886, the National Civil Service Reform League in a series of resolutions recommended that the reasons for removal be treated as "part of the public record." 5 Civ. Serv. Rec. 92. On Aug. 9, 1890, Commissioner Roosevelt advocated such a restriction upon removals. 10 Civ. Serv. Rec. 26. A bill reported from the Select Committee of the House on Civil Service Reform in 1891 contained such a provision. House Rep. No. 4038, 51 Cong., 2d sess., Ser. No. 2890. The Attorney General in 1913 ruled, against an earlier opinion of the Civil Service Commission, that Presidential appointees were excluded from the terms of the Act of 1912. 30 Op. A. G. 181. The Civil Service Act of Jan. 16, 1883, c. 27, § 2, 22 Stat. 403, 404, which was approved by President Arthur, had also provided that failure to subscribe to political funds should not be a ground of dismissal.

Congress to limit the President's freedom of choice in making nominations for executive offices. It is to appointment as distinguished from nomination that the Constitution imposes in terms the requirement of Senatorial consent. But a multitude of laws have been enacted which limit the President's power to make nominations, and which, through the restrictions imposed, may prevent the selection of the person deemed by him best fitted. Such restriction upon the power to nominate has been exercised by Congress continuously since the foundation of the Government. Every President has approved one or more of such acts. Every President has consistently observed them. This is true of those offices to which he makes appointments without the advice and consent of the Senate as well as of those for which its consent is required.

Thus, Congress has, from time to time, restricted the President's selection by the requirement of citizenship.[35]

---

[35] Citizens of

(a) The United States: Act of May 3, 1802, c. 53, § 5, 2 Stat. 195, 196, mayor of the District of Columbia; Act of Mar. 1, 1855, c. 133, § 9, 10 Stat. 619, 623, ministers and their subordinates; Act of Aug. 18, 1856, c. 127, § 7, 11 Stat. 52, 55, consular pupils; Act of June 20, 1864, c. 136, § 2, 13 Stat. 137, 139, consular clerks; Act of Mar. 22, 1902, c. 272, 32 Stat. 76, 78, Act of Feb. 9, 1903, c. 530, 32 Stat. 807, 809, Act of Mar. 12, 1904, c. 543, 33 Stat. 67, 69, Act of Mar. 3, 1905, c. 1407, 33 Stat. 915, 917, Act of June 16, 1906, c. 3337, 34 Stat. 286, 288, Act of Feb. 22, 1907, c. 1184, 34 Stat. 916, 918, Act of May 21, 1908, c. 183, 35 Stat. 171, 172, Act of Mar. 2, 1909, c. 235, 35 Stat. 672, 674, Act of May 6, 1910, c. 199, 36 Stat. 337, 339, Act of Mar. 3, 1911, c. 208, 36 Stat. 1027, 1029, Act of April 30, 1912, c. 97, 37 Stat. 94, 96, Act of Feb. 28, 1913, c. 86, 37 Stat. 688, 689, Act of June 30, 1914, c. 132, 38 Stat. 442, 444, Act of Mar. 4, 1915, c. 145, 38 Stat. 1116, 1117, Act of July 1, 1916, c. 208, 39 Stat. 252, 253, Act of Mar. 3, 1917, c. 161, 39 Stat. 1047, 1049, Act of April 15, 1918, c. 52, 40 Stat. 519, 520, Act of Mar. 4, 1919, c. 123, 40 Stat. 1325, 1327, Act of June 4, 1920, c. 223, 41 Stat. 739, 741, Act of Mar. 2, 1921, c. 113, 41 Stat. 1205, 1207, Act of June 1, 1922, c. 204, 42 Stat. 599, 601, Act of

It has limited the power of nomination by providing that the office may be held only by a resident of the United States [36]; of a State [37]; of a particular State [38]; of a par-

Jan. 3, 1923, c. 21, 42 Stat. 1068, 1070, student interpreters for China, Japan and Turkey; Act of April 5, 1906, c. 1366, § 5, 34 Stat. 99, 101, clerks in consular office receiving more than $1,000 per annum; Act of July 17, 1916, c. 245, § 3, 39 Stat. 360, Federal Farm Loan Board; Act of Feb. 23, 1917, c. 114, § 6, 39 Stat. 929, 932, Federal Board for Vocational Education; Act of May 24, 1924, c. 182, § 5, 43 Stat. 140, 141, Foreign Service officers; Act of June 7, 1924, c. 287, § 7, 43 Stat. 473, 474, board of advisors to the Federal Industrial Institution for Women.

(b) A State: Act of Mar. 3, 1891, c. 539, § 2, 26 Stat. 854, 855, attorney and interpreter for the Court of Private Land Claims.

(c) A Particular State: Act of July 27, 1854, c. 110, § 1, 10 Stat. 313, commissioner to adjust Indiana land claims; Act of Mar. 1, 1907, c. 2285, 34 Stat. 1015, 1036, Act of May 30, 1910, c. 260, § 4, 36 Stat. 448, 450, Act of June 1, 1910, c. 264, § 7, 36 Stat. 455, 457, Act of Aug. 3, 1914, c. 224, § 3, 38 Stat. 681, 682, various commissions to appraise unallotted Indian lands.

(d) A Particular Territory: Act of April 12, 1900, c. 191, § 40, 31 Stat. 77, 86, commission to revise the laws of Porto Rico; Act of April 30, 1900, c. 339, §§ 66, 69, 31 Stat. 141, 153, 154, governor and secretary of Hawaii; Act of July 9, 1921, c. 42, §§ 303, 313, 42 Stat. 108, 116, 119, governor, attorney and marshal of Hawaii.

(e) District of Columbia: Act of Mar. 3, 1855, c. 199, § 2, 10 Stat. 682, board of visitors for Government Hospital for the Insane; Act of Feb. 21, 1871, c. 62, § 37, 16 Stat. 419, 426, Board of Public Works; Act of June 11, 1878, c. 180, § 2, 20 Stat. 102, 103, commissioners of the District; Act of Sept. 27, 1890, c. 1001, § 2, 26 Stat. 492, Rock Creek Park Commission.

[36] Act of Mar. 1, 1855, c. 133, § 9, 10 Stat. 619, 623, ministers and their subordinates.

[37] Act of Mar. 3, 1891, c. 539, § 2, 26 Stat. 854, 855, attorney and interpreter for the Court of Private Land Claims.

[38] Act of Mar. 29, 1867, c. 14, § 1, 15 Stat. 9, commissioners to ascertain the amount raised in Indiana in enrolling the militia; Act of Mar. 1, 1907, c. 2285, 34 Stat. 1015, 1036, Act of May 30, 1910, c. 260, § 4, 36 Stat. 448, 450, Act of June 1, 1910, c. 264, § 7, 36 Stat. 455, 457, Act of Aug. 3, 1914, c. 224 § 3, 38 Stat. 681, 682, various commissions for the appraisal of unallotted Indian lands.

ticular district [39]; of a particular territory [40]; of the District of Columbia [41]; of a particular foreign country.[42] It has limited the power of nomination further by prescribing specific professional attainments,[43] or occupational

---

[39] Act of July 1, 1862, c. 119, § 2, 12 Stat. 432, 433, assessors and collectors of internal revenue; and semble, Act of July 2, 1836, c. 270, § 36, 5 Stat. 80, 88, postmasters.

[40] Act of Mar. 26, 1804, c. 38, § 4, 2 Stat. 283, 284, legislative council of Louisiana; Act of Mar. 3, 1891, c. 564, § 2, 26 Stat. 1104, territorial mine inspectors; Act of July 9, 1921, c. 42, §§ 303, 313, 42 Stat. 108, 116, 119, governor, attorney and marshal of Hawaii.

[41] Act of May 3, 1802, c. 53, § 5, 2 Stat. 195, 196, mayor of the District of Columbia; Act of April 16, 1862, c. 54, § 3, 12 Stat. 376, commissioners for claims arising from the abolition of slavery; Act of Feb. 21, 1874, c. 62, § 37, 16 Stat. 419, 426, Board of Public Works; Act of June 7, 1878, c. 162, § 5, 20 Stat. 100, 101, notaries public; Act of June 11, 1878, c. 180, § 2, 20 Stat. 102, 103, commissioners of the District.

[42] Act of Mar. 3, 1819, c. 101, § 2, 3 Stat. 532, 533, agents on the coast of Africa to receive negroes from vessels seized in the slave trade.

[43] Professional qualifications:

(a) Learning in the Law: Act of Sept. 24, 1789, c. 20, § 35, 1 Stat. 73, 92, Attorney-General and district attorneys; Act of Mar. 26, 1804, c. 38, § 8, 2 Stat. 283, 286, attorney for Louisiana Territory; Act of April 3, 1818, c. 29, § 4, 3 Stat. 413, attorney for Mississippi; Act of Mar. 3, 1819, c. 70, § 4, 3 Stat. 502, 503, attorney for Illinois; Act of April 21, 1820, c. 47 § 6, 3 Stat. 564, 565, attorney for Alabama; Act of Mar. 16, 1822, c. 12, § 4, 3 Stat. 653, attorney for Missouri; Act of Mar. 30, 1822, c. 13, § 7, 3 Stat. 654, 656, attorney for Florida Territory; Act of Mar. 3, 1823, c. 28, § 9, 3 Stat. 750, 752, attorney for Florida Territory; Act of May 26, 1824, c. 163, § 3, 4 Stat. 45, 46, attorney for Florida Territory; Act of May 29, 1830, c. 153, § 1, 4 Stat. 414, solicitor of the Treasury; Act of June 15, 1836, c. 100, § 6, 5 Stat. 50, 51, attorney for Arkansas; Act of July 1, 1836, c. 234, § 4, 5 Stat. 61, 62, attorney for Michigan; Act of Mar. 3, 1845, c. 75, § 7, 5 Stat. 788, attorney for Florida; Act of Mar. 3, 1845, c. 76, § 4, 5 Stat. 789, attorney for Iowa; Act of Dec. 29, 1845, c. 1, § 3, 9 Stat. 1, attorney for Texas; Act of Aug. 6, 1846, c. 89, § 5, 9 Stat. 56, 57, attorney for Wisconsin; Act of Feb. 23, 1847, c. 20, § 5, 9 Stat. 131, attorney for Florida; Act of Sept. 28, 1850, c. 86, § 8, 9 Stat. 521, 522, attorney for California; Act of Mar. 3, 1851, c. 41, § 4, 9 Stat. 631,

experience.[44]    It has, in other cases, prescribed the test of
examinations.[45]    It has imposed the requirement of

agent for California Land Commission; Act of Aug. 31, 1852, c. 108,
§ 12, 10 Stat. 76, 99, law agent for California; Act of July 27, 1854, c.
110, § 1, 10 Stat. 313, commissioner to adjust land claims; Act of
Mar. 4, 1855, c. 174, § 1, 10 Stat. 642, commissioners to revise Dis-
trict of Columbia laws; Act of Mar. 3, 1859, c. 80, 11 Stat. 410, 420,
Assistant Attorney-General; Act of Mar. 2, 1861, c. 88, § 2, 12 Stat.
246, examiners-in-chief in Patent Office; Act of May 20, 1862, c. 79,
§ 1, 12 Stat. 403, commissioners to revise District of Columbia laws;
Act of Mar. 3, 1863, c. 91, § 17, 12 Stat. 762, 765, commissioners to
revise District of Columbia laws; Act of Mar. 3, 1863, c. 101, § 2, 12
Stat. 795, solicitor to Peruvian Commissioners; Act of June 27, 1866,
c. 140, § 1, 14 Stat. 74, commissioners to revise United States laws,
Joint Res. of May 27, 1870, No. 66, § 1, 16 Stat. 378, examiner of
claims for the Department of State; Act of June 22, 1870, c. 150,
§§ 2, 3, 16 Stat. 162, Solicitor-General and Assistant Attorney-Gen-
erals; Act of July 8, 1870, c. 230, § 10, 16 Stat. 198, 200, examiners-
in-chief in Patent Office; Act of Mar. 2, 1877, c. 82, § 1, 19 Stat. 268,
commissioner for a new edition of the Revised Statutes; Act of Mar.
6, 1890, c. 27, § 1, 26 Stat. 17, delegates to the International Con-
ference at Madrid in patent and trade-mark laws; Act of Mar. 3,
1891, c. 539, § 2, 26 Stat. 854, 855, attorney of the Court of Private
Land Claims; Act of Mar. 2, 1901, c. 800, § 1, 31 Stat. 877, Spanish
claims commissioners; Act of June 13, 1902, c. 1079, § 4, 32 Stat.
331, 373, commission on Canadian boundary waters to include one
lawyer experienced in international and riparian law.

    (b)  Versed in Spanish and English Languages: Act of Mar. 3, 1849,
c. 107, § 2, 9 Stat. 393, secretary to Mexican Treaty Commissioners;
Act of Mar. 3, 1851, c. 41, § 4, 9 Stat. 631, agent for California Land
Commission; Act of Aug. 31, 1852, c. 108, § 12, 10 Stat. 76, 99, law
agent in California; Act of May 16, 1860, c. 48, § 2, 12 Stat. 15,
secretary of Paraguay Commission; Act of Feb. 20, 1861, c. 45, § 2,
12 Stat. 145, secretary of New Granada Commission; Act of Mar. 3,
1863, c. 101, §§ 2, 3, 12 Stat. 795, solicitor and secretary of Peruvian
Commissioners; Joint Res. of Jan. 12, 1871, No. 7, § 1, 16 Stat. 591,
secretary of San Domingo Commissioners; Act of Mar. 3, 1891, c. 539,
§ 2, 26 Stat. 854, 855, interpreter to the Court of Private Land Claims.

    (c)  Engineering: Act of Feb. 21, 1871, c. 62, § 37, 16 Stat. 419,
426, District of Columbia Board of Public Works: Act of April 4,
1871, c. 9, § 1, 17 Stat. 3, commission to examine Sutro Tunnel; Act

age [46]; of sex [47]; of race [48]; of property [49]; and of habitual temperance in the use of intoxicating liquors.[50]   Congress

of June 22, 1874, c. 411, § 1, 18 Stat. 199, commission to examine alluvial basin of Mississippi River; Act of June 28, 1879, c. 43, § 2, 21 Stat. 37, Mississippi River Commission; Act of June 4, 1897, c. 2, 30 Stat. 11, 59, Nicaragua Canal Commission; Act of June 13, 1902, c. 1079, § 4, 32 Stat. 331, 373, commission on Canadian boundary waters; Act of June 28, 1902, c. 1302, § 7, 32 Stat. 481, 483, Isthmian Canal Commission; Act of Aug. 24, 1912, c. 387, § 18, 37 Stat. 512, 517, Alaskan Railroad Commission; Act of Aug. 8, 1917, c. 49, § 18, 40. Stat. 250, 269, Inland Waterways Commission; Act of May 13, 1924, c. 153, 43 Stat. 118, Rio Grande Commission.

(d) Miscellaneous:—Joint Res. of July 5, 1866, No. 66, § 1, 14 Stat. 362, commissioners to Paris Universal Exhibition to be professional and scientific men; Act of June 10, 1896, c. 398, 29 Stat. 321, 342, commissioners to locate Indian boundaries to be surveyors; Act of Aug. 24, 1912, c. 387, § 18, 37 Stat. 512, 517, Alaskan Railroad Commission to include one geologist in charge of Alaskan survey.

[44] Act of Aug. 26, 1852, c. 91, § 2, 10 Stat. 30, superintendent of public printing to be a practical printer; Act of Aug. 31, 1852, c. 112, § 8, 10 Stat. 112, 119, Light House Board to include civilian of high scientific attainments; Act of July 27, 1866, c. 284, § 1, 14 Stat. 302, appraiser for New York to have had experience as an appraiser or to be practically acquainted with the quality and value of some one or more of the chief articles of importation subject to appraisement; Joint Res. of Feb. 9, 1871, No. 22, § 1, 16 Stat. 593, 594, commissioner for fish and fisheries to be a person of proved scientific and practical acquaintance with the fishes of the coast; Act of Feb. 28, 1871, c. 100, §§ 23, 63, 16 Stat. 440, 448, 458, supervising inspectors of steam vessels to be selected for their knowledge, skill, and practical experience in the uses of steam for navigation and to be competent judges of the character and qualities of steam vessels and of all parts of the machinery employed in steaming, inspector-general to be selected with reference to his fitness and ability to systematize and carry into effect all the provisions of law relating to the steamboat inspection service, Act of June 23, 1874, c. 480, § 2, 18 Stat. 277, 278, inspector of gas in the District of Columbia to be a chemist, assistant inspector to be a gas-fitter by trade; Joint Res. of Dec. 15, 1877, No. 1, § 2, 20 Stat. 245, commissioners to the International Industrial Exposition in Paris to include three practical artisan experts, four practical agriculturists, and nine scientific experts; Act of June 18, 1878, c. 265, § 6, 20 Stat.

has imposed like restrictions on the power of nomination by requiring political representation [51]; or that the selec-

163, 164, superintendent of Life Saving Service to be familiar with the various means employed in the Life Saving Service for the saving of life and property from shipwrecked vessels; Act of June 29, 1888, c. 503, § 8, 25 Stat. 217, 238, superintendent of Indian schools to be a person of knowledge and experience in the management, training and practical education of children; Act of July 9, 1888, c. 593, § 1, 25 Stat. 243, delegates to the International Marine Conference to include two masters of merchant marine (one sailing and one steam), and two civilians familiar with shipping and admiralty practice; Act of Mar. 3, 1891, c. 564, § 2, 26 Stat. 1104, mine inspectors in the territories to be practical miners; Act of July 13, 1892, c. 164, 27 Stat. 120, 139, Indian commissioners to be familiar with Indian affairs; Act of Jan. 12, 1895, c. 23, § 17, 28 Stat. 601, 603, public printer to be a practical printer; Act of Mar. 3, 1899, c. 419, § 2, 30 Stat. 1014, assistant director of the Census to be an experienced practical statistician; Act of May 16, 1910, c. 240, § 1, 36 Stat. 369, Director of Bureau of Mines to be equipped by technical education and experience; Act of Dec. 23, 1913, c. 6, § 10, 38 Stat. 251, 260, Federal Reserve Board to include two members experienced in banking or finance; Act of Mar. 3, 1919, c. 97, § 3, 40 Stat. 1291, 1292, assistant director of the Census to be an experienced practical statistician; Act of June 2, 1924, c. 234, § 900b, 43 Stat. 253, 336, Board of Tax Appeals to be selected solely on grounds of fitness to perform duties of the office.

[45]Act of Mar. 3, 1853, c. 97, § 3, 10 Stat. 189, 211, examination required of clerks in the Departments of Treasury, War, Navy, Interior, and Post Office; Act of June 20, 1864, c. 136, § 2, 13 Stat. 137, 139, examination required of consular clerks; Act of Jan. 16, 1883, c. 27, § 2, 22 Stat. 403, examinations for civil service employees; Act of Jan. 4, 1889, c. 19, § 1, 25 Stat. 639, medical officers of Marine Hospital Service; Act of May 22, 1917, c. 20, § 16, 40 Stat. 84, 88, officers of the Coast and Geodetic Survey; Act of Oct. 27, 1918, c. 196, § 16, 40 Stat. 1017, examinations for Public Health Service Reserve; Act of May 24, 1924, c. 182, § 5, 43 Stat. 140, 141, examination for appointments as Foreign Service officers in Diplomatic Corps.

[46]Act of June 20, 1864, c. 136, § 2, 13 Stat. 137, 139, consular clerks; Act of April 30, 1900, c. 339, § 66, 31 Stat. 141, 153, governor of Hawaii; Act of July 9, 1921, c. 42, § 303, 42 Stat. 108, 116, governor of Hawaii.

tion be made on a nonpartisan basis.[52]   It has required in some cases, that the representation be industrial [53]; in

---

[47] Joint Res. of Feb. 23, 1900, No. 9, 31 Stat. 711, one commissioner to represent the United States at the unveiling of the statue of Lafayette to be a woman; Act of June 5, 1920, c. 248, § 2, 41 Stat. 987, Director of Women's Bureau to be a woman.

[48] Act of July 1, 1902, c. 1362, § 59, 32 Stat. 641, 654, commission to sell coal and asphalt deposits in Indian lands to include two Indians.

[49] Act of Mar. 26, 1804, c. 38, § 4, 2 Stat. 283, 284, legislative council of Louisiana to be selected from those holding real estate.

[50] Act of Jan. 16, 1883, c. 27, § 8, 22 Stat. 403, 406, civil service appointees.

[51] Act of Mar. 22, 1882, c. 47, § 9, 22 Stat. 30, 32, board of elections in Utah Territory; Act of Jan. 16, 1883, c. 27, § 1, 22 Stat. 403, Civil Service Commission; Act of Feb. 4, 1887, c. 104, § 11, 24 Stat. 379, 383, amended by Act of June 29, 1906, c. 3591, § 8, 34 Stat. 584, 595, Act of Aug. 9, 1917, c. 50, § 1, 40 Stat. 270, and Act of Feb. 28, 1920, c. 91, § 440, 41 Stat. 456, 497, Interstate Commerce Commission; Act of June 10, 1890, c. 407, § 12, 26 Stat. 131, 136, Board of General Appraisers; Act of Mar. 2, 1889, c. 412, § 14, 25 Stat. 980, 1005, Act of Aug. 19, 1890, c. 807, 26 Stat. 336, 354, Act of July 13, 1892, c. 164, 27 Stat. 120, 138, 139, Act of June 10, 1896, c. 398, 29 Stat. 321, 342, various commissions to negotiate Indian treaties; Act of Sept. 26, 1914, c. 311, § 1, 38 Stat. 717, Federal Trade Commission; Act of July 17, 1916, c. 245, § 3, 39 Stat. 360, Federal Farm Loan Board; Act of Sept. 7, 1916, c. 451, § 3, 39 Stat. 728, 729, amended by Act of June 5, 1920, c. 250, § 3a, 41 Stat. 988, 989, United States Shipping Board; Act of Sept. 7, 1916, c. 458, § 28, 39 Stat. 742, 748, United States Employees' Compensation Commission; Act of Sept. 8, 1916, c. 463, § 700, 39 Stat. 756, 795, United States Tariff Commission; Act of Sept. 21, 1922, c. 356, § 518, 42 Stat. 858, 972, Board of General Appraisers; Act of Feb. 28, 1923, c. 146, § 2, 42 Stat. 1325, 1326, World War Foreign Debt Commission.

[52] Act of Mar. 3, 1901, c. 864, § 2, 31 Stat. 1440, Louisiana Purchase Exposition commission; Act of Mar. 22, 1902, c. 272, 32 Stat. 76, 78, Act of Feb. 9, 1903, c. 530, 32 Stat. 807, 809, Act of Mar. 12, 1904, c. 543, 33 Stat. 67, 69, Act of Mar. 3, 1905, c. 1407, 33 Stat. 915, 917, Act of June 16, 1906, c. 3337, 34 Stat. 286, 288, Act of Feb. 22, 1907, c. 1184, 34 Stat. 916, 918, Act of May 21, 1908, c. 183, 35 Stat. 171, 172, Act of Mar. 2, 1909, c. 235, 35 Stat. 672, 674, Act of May 6, 1910, c. 199, 36 Stat. 337, 339, Act of Mar. 3, 1911, c. 208, 36 Stat. 1027

others, that it be geographic.[54]   It has at times required
that the President's nominees be taken from, or include

1029, Act of April 30, 1912, c. 97, 37 Stat. 94, 96, Act of Feb. 28, 1913,
c. 86, 37 Stat. 688, 689, Act of June 30, 1914, c. 132, 38 Stat. 442, 444,
Act of Mar. 4, 1915, c. 145, 38 Stat. 1116, 1117, Act of July 1, 1916,
c. 208, 39 Stat. 252, 253, Act of Mar. 3, 1917, c. 161, 39 Stat. 1047
1049, Act of April 15, 1918, c. 52, 40 Stat. 519, 520, Act of Mar. 4,
1919, c. 123, 40 Stat. 1325, 1327, Act of June 4, 1920, c. 223, 41 Stat.
739, 741, Act of Mar. 2, 1921, c. 113, 41 Stat. 1205, 1207, Act of June
1, 1922, c. 204, 42 Stat. 599, 601, Act of Jan. 3, 1923, c. 21, 42 Stat.
1068, 1070, student interpreters for China, Japan, and Turkey.

[53] Joint Res. of Dec. 15, 1877, No. 1, § 2, 20 Stat. 245, commis-
sioners to the International Industrial Exposition in Paris; Act of
June 18, 1898, c. 466, § 1, 30 Stat. 476, Industrial Commission; Act
of Aug. 23, 1912, c. 351, § 1, 37 Stat. 415, Commission on Industrial
Relations; Act of Dec. 23, 1913, c. 6, § 10, 38 Stat. 251, 260, amended
by Act of June 3, 1922, c. 205, 42 Stat. 620, Federal Reserve Board;
Act of Feb. 23, 1917, c. 114, § 6, 39 Stat. 929, 932, Federal Board for
Vocational Education; Act of Feb. 28, 1920, c. 91, § 304, 41 Stat.
456, 470.

[54] Act of Aug. 6, 1861, c. 62, § 3, 12 Stat. 320, Board of Police
Commissioners for the District of Columbia; Act of Feb. 16, 1863,
c. 37, § 3, 12 Stat. 652, 653, commissioners to settle Sioux Indians'
claims; Act of Mar. 3, 1863, c. 106, § 1, 12 Stat. 799, levy court of
the District of Columbia; Act of Mar. 3, 1871, c. 105, § 2, 16 Stat.
470, 471, commissioners to the Philadelphia Exposition; Joint Res.
of Dec. 15, 1877, No. 1, § 2, 20 Stat. 245, commissioners to the Inter-
national Industrial Exposition in Paris; Act of Mar. 3, 1879, c. 202,
§ 1, 20 Stat. 484, National Board of Health; Act of Aug. 5, 1882,
c. 389, § 4, 22 Stat. 219, 255, civil employees of certain departments;
Act of Jan. 16, 1883, c. 27, § 2, 22 Stat. 403, civil service appointees;
Act of Feb. 10, 1883, § 3, 22 Stat. 413, commissioners of World's
Industrial and Cotton Centennial Exposition; Act of April 25, 1890,
c. 156, § 3, 26 Stat. 62, World's Columbian Exposition Commission;
Act of Aug. 19, 1890, c. 807, 26 Stat. 336, 354–355, commissions to
negotiate Indian treaties and investigate reservations; Act of Mar.
3, 1893, c. 209, § 1, 27 Stat. 612, 633, commission to select allotted
Indian lands; Act of June 10, 1896, c. 398, 29 Stat. 321, 342, com-
mission to adjust Indian boundaries; Act of Sept. 7, 1916, c. 451, § 3,
39 Stat. 728, 729, amended by Act of June 5, 1920, c. 250, § 3a, 41
Stat. 988, 989, United States Shipping Board; Act of Mar. 4, 1921,

representatives from, particular branches or departments of the Government.[55] By still other statutes, Congress

---

c. 171, § 3, 41 Stat. 1441, 1442, commission to appraise buildings of Washington Market Company; Act of June 3, 1922, c. 205, 42 Stat. 620, Federal Reserve Board; Joint Res. of Mar. 3, 1925, c. 482, § 1, 43 Stat. 1253, National Advisory Commission to the Sesquicentennial Exhibition Association.

[55] (a) Selection to be from civil employees: Joint Res. of Feb. 9, 1871, No. 22, § 1, 16 Stat. 593, 594, commissioner of fish and fisheries; Act of May 27, 1908, c. 200, § 11, 35 Stat. 317, 388, board of managers of Alaska-Yukon-Pacific Exposition; Act of June 23, 1913, c. 3, 38 Stat. 4, 76, Panama-Pacific Exposition Government Exhibit Board.

(b) Selection to be from particular civil employees: Act of April 5, 1906, c. 1366, § 4, 34 Stat. 99, 100, consulate inspectors from consulate force.

(c) Selection to be from army officers: Act of July 20, 1867, c. 32, § 1, 15 Stat. 17, commission to treat with hostile Indians; Act of Mar. 3, 1873, c. 316, § 1, 17 Stat. 622, commission to report on irrigation in the San Joaquin valley; Act of Mar. 1, 1893, c. 183, § 1, 27 Stat. 507, California Debris Commission; Act of June 4, 1897, c. 2, 30 Stat. 11, 51, board to examine Aransas Pass; Joint Res. of Aug. 9, 1912, No. 40, § 2, 37 Stat. 641, commission to investigate Mexican insurrection claims; Act of Mar. 4, 1923, c. 283, § 1, 42 Stat. 1509, secretary of American Battle Monuments Commission.

(d) Selection to be from army and navy: Act of April 14, 1818, c. 58, § 1, 3 Stat. 425, coast surveyors.

(e) Boards to include civilian representative of the Government: Act of Mar. 1, 1907, c. 2285, 34 Stat. 1015, 1036, Act of May 30, 1910, c. 260, § 4, 36 Stat. 448, 450, Act of June 1, 1910, c. 264, § 7, 36 Stat. 455, 457, Act of Aug. 3, 1914, c. 224, § 3, 38 Stat. 681, 682, various commissions to appraise unallotted Indian lands to include one representative of the Indian Bureau; Joint Res. of Mar. 4, 1911, No. 16, 36 Stat. 1458, commission to investigate cost of handling mail to include one Supreme Court Justice.

(f) Commissions to include army officers: Act of April 4, 1871, c. 9, § 1, 17 Stat. 3, commission to examine Sutro Tunnel; Act of June 13, 1902, c. 1079, § 4, 32 Stat. 331, 373, commission on Canadian boundary waters; Act of Aug. 8, 1917, c. 49, § 18, 40 Stat. 250, 269, Inland Waterways Commission.

(g) Commissions to include army and navy officers: Act of Aug. 31, 1852, c. 112, § 8, 10 Stat. 112, 119, Light House Board; Act of

·has confined the President's selection to a small number of persons to be named by others.[56]

The significance of this mass of legislation restricting the power of nomination is heightened by the action which· President Jackson and the Senate took when the right to impose such restrictions was, so far as appears, first mooted. On February 3, 1831, the Senate resolved that·it was inexpedient to appoint a citizen of one State to an office created or made vacant in another State of which such citizen was not a resident, unless an apparent necessity for such appointment existed. 4 Ex. Journ. 150.

---

June 4, 1897, c. 2, 30 Stat. 11, 59, Nicaragua Canal Commission; Act of June 28, 1902, c. 1302, § 7, 32 Stat. 481, 483, Isthmian Canal Commission; Joint Res. of June 28, 1906, No. 37, 34 Stat. 835, commission to appraise Chesapeake and Delaware Canal; Act of Aug. 24, 1912, c. 387, § 18, 37 Stat. 512, 517, Alaskan Railroad Commission.

(h) Commissions to include army and coast survey officers; Act of June 23, 1874, c. 457, § 3, 18 Stat. 237, 244, board of harbor engineers; Act of June 28, 1879, c. 43, § 2, 21 Stat. 37, Mississippi River · Commission.

· ·(i) Board to include navy officers and official·of Life Saving Service: Act of July 9, 1888, c. 593, § 1, 25 Stat. 243, delegates to International Marine Conference.

[56]Act of Feb. 25, 1863, c. 58, § 1, 12 Stat. 665, Comptroller of the Currency, on nomination of the Secretary of the Treasury, amended by Act of June 3, 1864, c. 106, § 1, 13 Stat. 99; Act of April 23, 1880, c. 60, § 4, 21 Stat. 77, 78, United States International Commission, on nominations of state governors; Act of Feb. 10, 1883, c. 42,.§§ 2, 3, 22 Stat. 413, managers of World's Industrial and Cotton Centennial Exposition, on recommmendation of executive committee of National Cotton Planters' Association and majority of subscribers to enterprise in the city where it shall be located, commissioners to the Exposition to be appointed on nomination of state governors; Act of July 1, 1902, c. 1362, § 59, 32 Stat. 641, 654, commission to sell coal and asphalt deposits in Indian lands, one appointment to be made on recommendation of principal chief of Choctaw Nation, one on recommendation of. Governor of Chickasaw Nation; Act of Feb. 23, 1920, c. 91, § 304, 41 Stat. 456, 470, Railroad Labor Board, three to be appointed from six nominees made by employees, three to be appointed from six nominees made by carriers.

Several nominations having been rejected by the .Senate· in ·accordance with the terms of this resolution, President Jackson communicated his protest to the Senate, on March 2, 1833, saying that he regarded " that resolution, in effect, as an unconstitutional restraint upon the authority of the President in relation to appointments to office." Thereupon, the Senate rescinded the resolution of 1831. 4 Ex. Journ. 331. But that Congress had the power was not questioned. The practice of prescribing by statute that nominations to an inferior presidential office shall be limited to residents of a particular State or district has prevailed, without interruption, for three-quarters of a century.[57]

The 'practical disadvantage. to the public service of denying to the President the uncontrollable power of removal from inferior civil offices would seem to have been exaggerated. Upon the service, the immediate effect would ordinarily be substantially the same, whether the President,. acting alone, has or has not the power of removal.• For he can, at any time, exercise his constitutional right to suspend an officer and designate some other person to act temporarily in his stead; and he cannot, while the Senate is in session, appoint a successor without its consent. Compare *Embry* v. *United States,* 100 U. S. 680. On the other hand, to the individual in the public service, and to the maintenance of its morale, the exist-. ence of a power in Congress to impose upon the Senate the duty to share in the responsibility for a removal is of paramount importance. The Senate's consideration of

[57] On July 25, 1868, the Senate having confirmed the nomination of · J. Marr as collector of internal revenue in Montana Territory, voted to reconsider the nomination, and ordered the nomination to be returned ,to the President " with the notification that the nominee is ineligible on account of non-residence in the district for whch he is nominated." 16 Ex. Journ. 372. President Johnson thereafter did not press Marr's nomination but appointed A. J. Simmons to the office. 16 *ibid.* 429.

a proposed removal may be necessary to protect reputation and emoluments of office from arbitrary executive action. Equivalent protection is afforded to other inferior officers whom Congress has placed in the classified civil service and which it authorizes the heads of departments to appoint and to remove without the consent of the Senate. Act of August 24, 1912, c. 389, § 6, 37 Stat. 539, 555. The existence of some such provision is a common incident of free governments. In the United States, where executive responsibility is not safeguarded by the practice of parliamentary interpellation, such means of protection to persons appointed to office by the President with the consent of the Senate is of special value.

Until the Civil Service Law, January 16, 1883, c. 27, 22 Stat. 403, was enacted, the requirement of consent of the Senate to removal and appointment was the only means of curbing the abuses of the spoils system. The contest over making Cabinet officers subject to the provisions of the Tenure of Office Act of 1867 has obscured the significance of that measure as an instrument designed to prevent abuses in the civil service.[58] But the importance of the measure as a means of civil service reform was urged at the time of its passage;[59] again

[58] The Tenure of Office Act as originally introduced excepted from its operation the Secretaries of State, Treasury, War, Navy, Interior and the Postmaster General. Howe's attempts to strike out this exception, opposed by Senators Edmunds and Sherman, who were the principal sponsors of the Act, failed twice in the Senate. A similar attempt in the House succeeded after first being rejected. The Senate again refused to concur in the House amendment. The amendment was, however, insisted upon by the House conferees. Finally, the Senate by a margin of three votes agreed to accept the conference report. Cong. Globe, 39th Cong., 2d sess., 1518.

[59] The occasion of the passage of the Tenure of Office Act was the threatened attempt of President Johnson to interfere with the reconstruction policies of Congress through his control over patronage. An attempt by Schenck to secure its recommitment to the Joint Select Committee on Retrenchment was placed upon the ground that

when its repeal was resisted in 1869 [60] and in 1872;[61] and finally in 1887, when its repeal was effecled.[62]   That Act

---

" this whole subject was expressly referred to that committee " which had before it " the bill introduced by the select committee on the civil service, at the head of which is the gentleman from Rhode Island [Mr. Jenckes]."   Cong. Globe, 39th Cong., 2d sess., 23.   Senator Edmunds, in resisting an attempt to expand the Tenure of Office Act to require the concurrence of the Senate in the appointment of all civil officers receiving more than $1,000 per annum, referred to the Jenckes bill as " another branch of the subject which is under consideration elsewhere."   *Ibid*, 489.   The committee in introducing the Tenure of Office Act, speaking through Senator Edmunds, " recommended the adoption of this rule respecting the tenure of officers as a permanent and systematic and as they believe an appropriate regulation of the Government for all Administrations and for all time."   *Ibid*, 382.

[60] The attempt on the part of the House to repeal the Act in 1869 brought forth the opposition of those members of the Senate who were most active in the general movement for civil service reform. Jenckes had voted against the repeal in the House.   Carl Schurz, who on Dec. 20, 1869, introduced a bill for the competitive principle in the civil service, opposed the repeal, and urged that it be recast at the next session more effectually to effect the desired civil service reform.   Cong. Globe, 41st Cong., 1st sess., 155–156.   Trumbull, speaking for the Committee on Judiciary, said that " they were unwilling after Congress had with such unanimity adopted this law within the last two years, and adopted it upon the principle that some law of this kind was proper to regulate the civil service, to recommend its absolute repeal  .  .  .  they thought it better to recommend the suspension of the act until the next session of Congress, and then Congress can either repeal it or adopt some civil-service bill which in its judgment shall be thought to be for the best and permanent interests of the country."   *Ibid*. 88.   The National Quarterly Review recognizing the essential unanimity of purpose between the Tenure of Office Act and other measures for civil service reform, said in 1867: " The recent legislation on this subject by Congress was the first step in the right direction; Mr. Jencke's bill is the second; but the one without the other is incomplete and unsafe." House Rep. No. 47, 40th Cong., 2d sess., Ser. No. 1352, p. 93.

[61] The attempt to repeal the Act was resisted in the House by Holman on the ground that since " the general impression exists in

was one of two far reaching measures introduced in 1866 aimed at the abuses of executive patronage. The Jenckes bill was to establish the classified service. The Tenure of Office bill was to control removals from presidential offices. Like the Jenckes bill, it applied, when introduced, only to inferior offices. The Jenckes bill, reported by the House Committee on June 13, 1866, was finally tabled in the House on February 6, 1867.[63] The Tenure of Office bill was reported out in the House on December 5, 1866;

the country that executive patronage should be in some form reduced rather than increased . . . this fragment of the original law should remain in force." Cong. Globe, 42nd Cong., 2d sess., 3411.

[62] Edmunds, one of the few Senators still acquainted with the circumstances of its passage, thus protested against the passage of the repealing Act: " It is, as it looks to me, as if we were to turn our backs now and here upon the principle of civil-service reform . . . the passage of this bill would be the greatest practical step backward on the theory of the reformation of the civil service of the United States." 18 Cong. Rec. 137.

[63] The Jenckes bill was introduced in the House on Dec. 20, 1865, Sumner had already on April 30, 1864, presented in the Senate a bill for a classified civil service. On June 13, 1866, the House Committee on Civil Service Reform reported out the Jenckes bill. It contained among other provisions a section requiring the proposed commission to prescribe, subject to the approval of the President, the misconduct or inefficiency which would be sufficient ground for removal and also the manner by which such charges were to be proved. This provision was retained in the succeeding bills sponsored by Jenckes in the House. The provision was expressly omitted from the Pendleton bill, which later became the Civil Service Act of 1883, in order not to endanger the passage of a measure for a classified civil service by impinging upon the controversial ground of removal. Senators Sherman and Brown attempted to secure legislation restricting removal by amendments to the Pendleton bill. 14 Cong. Rec. 210, 277, 364. In the First Session of the Thirty-ninth Congress no action was taken upon the Jenckes bill; but the bill was reintroduced in the following session on Jan. 29, 1867. An attempt on the part of Jenckes, after the initial passage of the Tenure of Office Act, to secure the passage of his bill resulted in the tabling of his scheme on Feb. 6, 1867, by a vote of 72 to 66.

was amended by the Conference Committee so as to apply to Cabinet officers; and having passed both Houses, was sent to the President on February 20, 1867, and passed over his veto on March 2, 1867.

The fact that the removal clause had been inserted in the Currency bill of 1863, shows that it did not originate in the contest of Congress with President Johnson, as has been sometimes stated. Thirty years before that, it had been recommended by Mr. Justice Story as a remedial measure, after the wholesale removals of the first Jackson administration. The Post Office Department was then the chief field for plunder. Vacancies had been created in order that the spoils of office might be distributed among political supporters. Fear of removal had been instilled in continuing office holders to prevent opposition or lukewarmness in support. Gross inefficiency and hardship had resulted. Several remedies were proposed. One of the remedies urged was to require the President to report to the Senate the reasons for each removal.[64] The second was to take the power of appointing postmasters from the Postmaster General and to confer it upon the President, subject to the consent of the Senate.[65] A third

---

[64] This measure appears to have been first suggested on May 4, 1826, in a bill which accompanied the report presented by Benton from the Select Committee of the Senate appointed to investigate executive patronage, when abuse of the power by President John Quincy Adams was apprehended. Sen. Doc. No. 88, 19th Cong., 1st sess., Ser. No. 128. On Mar. 23, 1830, Barton's resolution asserting the right to such information was reported. Sen. Doc. 103, 21st Cong., 1st sess., Ser. No. 193. On April 28, 1830, the proposal was renewed in a resolution introduced by Holmes. 6 Cong. Deb. 385. In 1835 it was embodied in the Executive Patronage Bill, which passed the Senate on two successive occasions, but failed of action in the House.

[65] This measure appears to have been first suggested by President Monroe in his message of Dec. 2, 1823. 41 Ann. Cong. 20. Its proposal for enactment into law was first suggested on May 4, 1826, by the report of the Select Committee appointed by the Senate on pos-

proposal was to require consent of the Senate also to removals.[66] Experience since has taught that none of these remedies is effective. Then, however, Congress adopted the second measure. The evil continued; and the struggle against the spoils system was renewed. The

sible abuses of Executive Patronage. In 1832 the proposal was again brought forward by Vance of Ohio in the nature of an amendment to the postal legislation, 8 Cong. Deb. 1913. On Mar. 7, 1834, Clay's resolutions, that advocated the concurrence of the Senate in removals, also included a proposal for the appointment of postmasters by the President with the concurrence of the Senate. On Jan. 28, 1835, a report by the Senate Committee on Post Offices called attention to the extended removals of postmasters. Sen. Doc. No. 86, 23rd Cong., 2d sess., Ser. No. 268, p. 88. This report led to the introduction in 1835, and passage by the Senate of a bill reorganizing the Post Office which contained the proposal under consideration. The House having failed to act upon the 1835 bill, it was reintroduced at the next session and passed by both Houses. Act of July 2, 1836, c. 270, 5 Stat. 80. See also Sen. Doc. No. 362, 24th Cong., 1st sess., Ser. No. 283.

[66] This measure appears to have been first proposed in Congress by Clay on Mar. 7, 1834. 10 Cong. Deb. 834. In 1835, it was, in substance, embodied in an amendment proposed by him to the Executive Patronage Bill, which read: " That in all instances of appointment to office by the President, by and with the advice and consent of the Senate, the power of removal shall be exercised only in concurrence with the Senate; and, when the Senate is not in session, the President may suspend any such officer, communicating his reasons for the suspension during the first month of its succeeding session; and if the Senate concur with him, the officer shall be removed; but if it do not concur with him, the officer shall be restored to office." 11 Cong. Deb. 523. In 1836 when a Senate Committee of Commerce investigated the removal of a gauger for political reasons, Levi Woodbury, then Secretary of the Treasury, suggested the assumption of Congressional control over removals, saying: "The Department deems it proper to add that . . . a great relief would be experienced if . ... the power of original appointment and removal in all these cases should be vested in Congress, if the exercise of it there is deemed more convenient and safe, and, at the same time, constitutional." Sen. Doc. No. 430, 24th Cong., 1st sess., Ser. No. 284, p. 30.

other crude remedies which had been rejected—accountability of the President to the Senate [67] and the requirement of its consent to removals [68]—were again considered.

[67] On July 1, 1841, Benton again reintroduced a proposal of this nature. Cong. Globe, 27th Cong., 1st sess., 63. On May 23, 1842, a Select Committee on Retrenchment reported to the House on the necessity of diminishing and regulating executive patronage, saying " they entertain no doubt of the power of Congress to prescribe, and of the propriety of prescribing, that, in all cases of removal by the President, he shall assign his reasons to the Senate at its next session." House Rep. No. 741, 27th Cong., 2d sess., Ser. No. 410, p. 5. See also Report of July 27, 1842, House Rep. No. 945, 27th Cong., 2d sess., Ser. No. 410; 5 Ex. Journ. 401. On Jan. 3, 1844, after an attempt to impeach President Tyler for misusing the appointing power had failed, Thomasson in the House again sought to secure the adoption of such a measure. On December 24, 1849, after the Post Office Department under Taylor's administration had recorded 3,406 removals, Bradbury proposed a resolution requiring the President to give the number and reasons for removals made from the beginning of his term of office. Senator Mangum in order to cut short debate on the resolution contended that it was an unconstitutional invasion of executive powers and called for a test vote upon the resolution. The Senate divided 29 to 23 in upholding its right to demand reasons for removals. Cong. Globe, 31st Cong., 1st sess., 160. On Jan. 4, 1850, the Senate adopted a resolution calling for a report upon the number and reasons for removals of deputy postmasters. *Ibid.* 100.

[68] The character that this movement to restrict the power of removal had assumed in consequence of the continuance of the spoils system is illustrated by the remarks of Bell in the Senate in 1850: " To restrain this power by law I would urge as one of the greatest reforms of the age, so far as this Government is concerned. . . . Sir, I repeat, that to restrain by law this unlimited, arbitrary, despotic power of the Executive over the twenty or thirty thousand valuable public officers of the country—the tendency of which is to make them slaves of his will—is the greatest reform demanded by the true interest of the country, no matter who may at any time be the tenant of the White House." Cong. Globe, 31st Cong., 1st sess., App. 1043. Restrictions were twice advocated in the official utterances of President Tyler. 4 Messages and Papers of the Presidents, 50, 89: See also Report of June 15, 1844, by Sen. Com. on Retrench-

And both continued to be urged upon Congress, even after the fourth and the more promising remedy—enquiry into fitness for office and competitive examinations—had been proposed. For a generation, the reformers failed to secure the adoption of any further measure.

The first substantial victory of the civil service reform movement, though a brief one, was the insertion of the removal clause in the Currency bill of 1863.[69] The next forward step was taken by the Consular and Diplomatic Appropriation Act, June 20, 1864, c. 136, § 2, 13 Stat. 137, 139–140, also approved by President Lincoln, which contained a provision that consular clerks should be appointed by the President after examination, and that " no clerk so appointed shall be removed from office except for cause stated in writing, which shall be submitted to congress at the session first following such removal." [70] It was in the next Congress that the removal clause was applied generally by the Tenure of Office Act. The long delay in adopting legislation to curb removals was not because Congress accepted the doctrine that the Consti-

---

ment; Sen. Doc. 399, 28th Cong., 1st sess., Ser. No. 437, p. 55; Resolution of Dec. 17, 1844, by Grider in the House, Cong. Globe, 28th Cong., 2d sess., 40.

[69] Act of Feb. 25, 1863, c. 58, § 1, 12 Stat. 665.

[70] By the Act of Mar. 3, 1853, c. 97, § 3, 10 Stat. 189, 211, clerks in the departments of the Treasury, War, Navy, Interior and Post Office, were to be classified and appointments to the various classes were to be made only after examination by a select board. This scheme was later abandoned after it became evident that the examinations prescribed were conducted arbitrarily and with no attempt to determine the fitness of candidates for positions. Fish, Civil Service and Patronage, 183. By the Act of Aug. 18, 1856, c. 127, § 7, 11 Stat. 52, 55, the appointment of twenty-five consular pupils was authorized and examinations were to be conducted to determine the fitness of applicants for appointment. This provision was, however, stricken from the diplomatic and consular appropriation bill in the next session of Congress. The principle was not returned to again until the Act of June 20, 1864, c. 136, § 2, 13 Stat. 137, 139.

tution had vested in the President uncontrollable power over removal. It was because the spoils system held sway.

The historical data submitted present a legislative practice, established by concurrent affirmative action of Congress and the President, to make consent of the Senate a condition of removal from statutory inferior, civil, executive offices to which the appointment is made for a fixed term by the President with such consent. They show that the practice has existed, without interruption, continuously for the last fifty-eight years; that, throughout this period, it has governed a great majority of all such offices; that the legislation applying the removal clause specifically to the office of postmaster was enacted more than half a century ago; and that recently the practice has, with the President's approval, been extended to several newly created offices. The data show further, that the insertion of the removal clause in acts creating inferior civil offices with fixed tenures is part of the broader legislative practice, which has prevailed since the formation of our Government, to restrict or regulate in many ways both removal from and nomination to such offices. A persistent legislative practice which involves a delimitation of the respective powers of Congress and the President, and which has been so established and maintained, should be deemed tantamount to judicial construction, in the absence of any decision by any court to the contrary. *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 469.

The persuasive effect of this legislative practice is strengthened by the fact that no instance has been found, even in the earlier period of our history, of concurrent affirmative action of Congress and the President which is inconsistent with the legislative practice of the last fifty-eight years to impose the removal clause. Nor has any instance been found of action by Congress which in-

volves recognition in any other way of the alleged uncontrollable executive power to remove an inferior civil officer. The action taken by Congress in 1789 after the great debate does not present such an instance. The vote then taken did not involve a decision that the President had uncontrollable power. It did not involve a decision of the question whether Congress could confer upon the Senate the right, and impose upon it the duty, to participate in removals. It involved merely the decision that the Senate does not, in the absence of legislative grant thereof, have the right to share in the removal of an officer appointed with its consent; and that the President has, in the absence of restrictive legislation, the constitutional power of removal without such consent. Moreover, as Chief Justice Marshall recognized, the debate and the decision related to a high political office, not to inferior ones.[71]

Nor does the debate show that the majority of those then in Congress thought that the President had the uncontrollable power of removal. The Senators divided equally in their votes. As to their individual views we lack knowledge; for the debate was secret.[72] In the House only 24 of the 54 members voting took part in the debate. Of the 24, only 6 appear to have held the opinion that the President possessed the uncontrollable power of removal. The clause which involved a denial of the claim that the Senate had the constitutional right to participate in removals was adopted, so far as appears, by aid of the votes of others who believed it expedient for

[71] Chief Justice Marshall said of the proceedings of 1789: " In organizing the departments of the executive, the question in what manner the high officers who filled them should be removable, came on to be discussed." 5 Marshall, Life of Washington, 196.

[72] Of the ten Senators who had been members of the Constitutional Convention of 1787, four voted against the bill. A fifth, Bassett, changed sides during the debate. Maclay, Sketches of Debate, 110.

Congress to confer the power of removal upon the President alone.[73] This is indicated both by Madison's appeal for support[74] and by the action taken on Benson's motions.[75]

---

[73] The six who held that the Constitution vested a sole power of removal in the President were Baldwin, 1 Ann. Cong. 557–560; Benson, 1 *ibid.* 505–507; Boudinot, 1 *ibid.* 526–532; Clymer, 1 *ibid.* 489; Madison, 1 *ibid.* 546; Vining, 1 *ibid.* 585. Madison, at first, considered it subject to Congressional control. 1 Ann. Cong. 374–375. Seven held that the power of removal was a subject for Congressional determination and that it was either expedient or inexpedient to grant it to the President alone. Hartley, 1 Ann. Cong. 585; Lawrence, 1 *ibid.* 583; Lee, 1 *ibid.* 523–526; Sedgwick, 1 *ibid.* 582–583; Sherman, 1 *ibid.* 491–492; Sylvester, 1 *ibid.* 560–563; Tucker, 1 *ibid.* 584–585. Five held that the power of removal was constitutionally vested in the President and Senate. Gerry, 1 Ann. Cong. 502; Livermore, 1 *ibid.* 477–479; Page, 1 *ibid.* 519–520; Stone, 1 *ibid.* 567; White, 1 *ibid,* 517. Two held that impeachment was the exclusive method of removal. Jackson, 1 Ann. Cong. 374, 529–532; Smith, of South Carolina, 1 Ann. Cong. 457, 507–510. Three made desultory remarks, Goodhue, 1 Ann. Cong. 378, 533–534; Huntington, 1 Ann. Cong. 459; and Scott, 1 Ann. Cong. 532–533, which do not admit of definitive classification. Ames was only certain that the Senate should not participate in removals, and did not differentiate between a power vested in the President by the Constitution and a power granted him by the legislature. 1 Ann. Cong. 473–477, 538–543. He inclined, however, towards Madison's construction. 1 Works of Fisher Ames, 56. During the earlier debate upon the resolutions for the creation of Executive Departments, Bland had contended that the Senate shared in the power of removal. 1 Ann. Cong. 373–374. The conclusion that a majority of the members of the House did not hold the view that the Constitution vested the sole power of removal in the President was expressed by Senator Edmunds. 3 Impeachment of Andrew Johnson, 84. It had been expressed twenty years earlier by Lockwood, J., of the Supreme Court of Illinois, in a case involving a similar question and decided adversely to Madison's contention. *Field* v. *People*, 2 Scamm. 79, 162–173.

[74] Madison's plea for support was addressed not only to those who conceived the power of removal to be vested in the President, but also to those who believed that Congress had power to grant the authority to the President and that under the circumstances it was

It is true that several Presidents have asserted that the Constitution conferred a power of removal uncontrollable

expedient to confer such authority. After expressing his own views on the subject, he continued: "If this is the true construction of this instrument, the clause in the bill is nothing more than explanatory of the meaning of the Constitution, and therefore not liable to any particular objection on that account. If the Constitution is silent, and it is a power the Legislature have a right to confer, it will appear to the world, if we strike out the clause, as if we doubted the propriety of vesting it in the President of the United States. I therefore think it best to retain it in the bill." 1 Ann. Cong. 464.

[75] The initial vote of 34 to 20, defeating a motion to strike out the words "to be removable by the President," was indecisive save as a determination that the Senate had no constitutional right to share in removals. Madison, June 22, 1789, 1 Ann. Cong. 578–579. "Indeed, the express grant of the power to the president rather implied a right in the legislature to give or withhold it at their discretion." 5 Marshall, Life of Washington, 200. Benson, therefore, proposed to remove this ambiguity by striking out the words "to be removable by the President," and inserting "whenever the said principal officer shall be removed from office by the President of the United States," thus implying the existence of the power in the President irrespective of legislative grant. The motions were successful and their adoption has been generally interpreted as a legislative declaration of Benson's purpose. Such interpretation, although oft repeated, is not warranted by the facts of record. The individual votes on these two motions are given. An examination of the votes of those whose opinions are also on record shows that Benson's first motion succeeded only as a result of coalition between those who accepted Madison's views and those who considered removal subject to Congressional control but deemed it advisable to vest the power in the President. The vote on Benson's second motion to strike out the words "to be removable by the President" brought forth a different alignment. The minority now comprised those who, though they believed the grant of power to be expedient, did not desire to imply the existence of a power in the President beyond legislative control. Whereas the majority exhibits a combination of diverse views—those who held to Madison's construction, those who initially had sought to strike out the clause on the ground that the Senate should share in removals, and those who deemed it unwise to make any legislative declaration of the Constitution. Thus none

by Congress.[76]   But of the many statutes enacted since
the foundation of our Government which in express terms
controlled the power of removal, either by the clause here
in question or otherwise, only two were met with a veto:
The Tenure of Office Act of 1867, which related to high
political officers among others, and the Budget Act of
1920, which denied to the President any participation in
the removal of the Comptroller and Assistant Comp-
troller.   One was passed over the President's veto; the
other was approved by the succeeding President.   It is
true also that several Presidents have at times insisted
that for the exercise of their power they were not ac-
countable to the Senate.[77]   But even these Presidents

of the three votes in the House revealed its sense upon the question
whether the Constitution vested an uncontrollable power of removal
in the President.   On the contrary the votes on Benson's amend-
ments reveal that the success of this endeavor was due to the
strategy of dividing the opposition and not to unanimity of consti-
tutional conceptions.

[76] President's Jackson, 3 Messages and Papers of the Presidents,
133; Johnson, 6 *ibid.* 492; Cleveland, 8 *ibid.* 379; Wilson, 59 Cong.
Rec. 8609.

[77] On Feb. 2, 1835, the Senate adopted a resolution requesting the
President to communicate to the Senate copies of the charges against
Gideon Fitz, surveyor-general, in that such information was neces-
sary for its constitutional action upon the nomination of his suc-
cessor.   4 Ex. Journ. 465.   On Feb. 10, 1835, President Jackson re-
fused to comply with these alleged " unconstitutional demands."   4
Ex. Journ. 468.   On Jan. 25, 1886, the Senate adopted a resolution
directing the Attorney General to transmit copies of documents on
file in the Department of Justice relating to the management of the
office of district attorney for the southern district of Alabama.   J. D.
Burnett had been nominated to the office in place of G. M. Duskin
suspended.   25 Ex. Journ. 294.   On Feb. 1, 1886, a letter from the
Attorney General was laid before the Senate refusing to accede with
the request by direction of the President.   On Mar. 1, 1886, Presi-
dent Cleveland in a message to the Senate denied the constitutional
right of the Senate to demand such information.   8 Messages and
Papers of the Presidents, 375.

have at other times complied with requests that the
ground of removal of inferior officers be stated.[78]  Many
of the Presidents have furnished the desired information

---

[78] During March 1830, prior to the Fitz episode, three resolutions
to request the President to communicate grounds for the removal of
inferior officials failed of adoption in the Senate.  4 Ex. Journ. 75, 76,
79.  However, during April 1830, in the case of nominations sent to
the Senate for confirmation, resolutions requesting the President to
communicate information relative to the character and qualifications
of the appointees, were adopted and complied with by President
Jackson.  4 *ibid.* 86, 88, 92.

The instances of President Johnson's compliance with the second
section of the Tenure of Office Act, requiring the communication of
reasons for the suspension of inferior officials during the recess of the
Senate, have been enumerated.  See Notes 23 and 24, *supra.*  Presi-
dent Johnson also complied with a resolution adopted by the Senate
on Dec. 16, 1867, requesting him to furnish the petitions of Idaho
citizens, filed with him, remonstrating against the removal of Gov-
ernor Ballard.  16 Ex. Journ. 109, 121.  Also, on April 5, 1867,
his Attorney General complied with a Senate resolution calling for
papers and other information relating to the charges against a judge
of Idaho Territory, whose removal the President was seeking through
the appointment of a successor.  15 *ibid.* 630, 644.  On Feb. 18, 1867,
his Postmaster General in compliance with a House resolution of Dec.
6, 1866, transmitted the number and reasons for the removals of
postmasters, appointed by the President, between July 28, 1866,
and Dec. 6, 1866.  House Ex. Doc. No. 96, 39th Cong., 2d sess.,
Ser. No. 1293.  His Secretary of the Interior also complied with a
House resolution requesting information as to removals and reasons
therefor in the department.  House Ex. Doc. No. 113 39th Cong.,
2d sess., Ser. No. 1293.

Prior to the date on which President Cleveland upheld his right
to refuse the Senate information as to the conduct of a suspended
official, his Secretary of the Treasury twice complied with requests
of the Senate for such information.  25 Ex. Journ. 312, 317.  These
requests were couched in substantially the same form as that which
was refused in the Duskin case.  Subsequent to that date, compli-
ances with similar resolutions are recorded in four further cases,
two by the Secretary of the Treasury, one by the Postmaster Gen-
eral and one by the Attorney General.  25 Ex. Journ. 362, 368,
480, 559.

without questioning the right to request it.[79]  And neither the Senate nor the House has at any time receded

[79] On Mar. 2, 1847, President Polk complied with a Senate resolution requesting reasons and papers relating to the failure to send in Captain H. Holmes' name for promotion.  7 Ex. Journ. 227.  On Sept. 2, 1850, President Fillmore complied with a Senate resolution requesting the President to communicate correspondence relating to "the alleged resignation" of Lieut. E. C. Anderson.  8 *ibid.* 226. Fillmore, in compliance with a Senate resolution of Aug. 14, 1850, laid before the Senate a report of the Postmaster General communicating the charges on file against the deputy postmaster at Milwaukee.  8 *ibid.* 220.  Nominations having been made for the collectorships of New York and Chicago and the former incumbents suspended, Edmunds on Nov. 26, 1877, proposed a resolution directing the Secretary of the Treasury to transmit all papers bearing upon the expediency of removing the collectors.  On Jan. 15, 1879, the Secretary of the Treasury communicated to the Senate an official report, and on Jan. 31, 1879, President Hayes forwarded his reasons for the suspensions.  21 *ibid.* 140, 455, 497.

Compliances with Senate resolutions directed to the Heads of Departments relative to the removal of Presidential appointees are also on record.  In response to a House resolution of Feb. 13, 1843, requesting the charges against Roberts and Blythe, collectors, and the names of the persons who petitioned for their removal, the Secretary of the Treasury transmitted the material that he had in his control.  House Doc. No. 158, 27th Cong., 3rd sess., Ser. No. 422. On Jan. 14, 1879, the Secretary of the Treasury complied with a Senate resolution requesting the charges on file against the Supervising Inspector-General of Steamboats.  21 Ex. Journ. 454.  On Jan. 20, 1879, the Secretary of the Treasury complied with a Senate resolution calling for the papers showing why Lieutenant Devereux was discharged from the Revenue Marine Service.  21 *ibid.* 470. The Secretary of the Navy complied with a Senate resolution of Feb. 25, 1880, asking why Edward Bellows was dropped from the roll of paymasters.  Sen. Doc. No. 113, 46th Cong., 2d sess., Ser. No. 1885.

Presidents Van Buren and Tyler also complied with resolutions requesting the number of removals.  Sen. Doc. No. 399, 28th Cong., 1st sess., Ser No. 437, p. 351; House Doc. No. 48, 27th Cong., 1st sess., Ser. No. 392.

Senate resolutions, occasioned by the nomination of the successor in place of a former incumbent, requesting information as to the

from the claim that Congress has power both to control by legislation removal from inferior offices and to require the President to report to it the reasons for removals made therefrom.[80] Moreover, no instance has been found in which a President refused to comply with an Act of Congress requiring that the reasons for removal of an inferior officer be given. On the contrary, President Cleveland, who refused to accede to the request of the Senate that he state the reasons for the removal of Duskin, had, in the case of Burchard, complied, without protest or reserva-

conduct or ability of the successor, have been complied with by Presidents Monroe on Feb. 1, 1822 (3 Ex. Journ. 273); Jackson on April 12, and 15, 1830 (4 ibid. 88, 92), and on April 24, 1834 (4 ibid. 390); by Tyler on June 29, 1842 (6 ibid. 97; by Polk on June 23, 1848 (7 ibid. 435); by Fillmore on Sept. 16, 1850 (8 ibid. 232); by Buchanan on Mar. 2, 1858 (10 ibid. 237); by Grant on Dec. 21, 1869 (17 ibid. 326); and by Heads of Departments under Polk on June 23, 1848 (7 ibid. 435); under Fillmore on Sept. 25, 1850, and Feb. 17, 1853 (8 ibid. 250, 9 ibid. 33); under Lincoln on Jan. 22, 1862, and on Feb. 23, 1865 (12 ibid. 95, 14 ibid. 135). The practice appears to have been suggested by President Washington. The Senate having rejected a nomination, President Washington on Aug. 7, 1789, in nominating a successor, said: " Permit me to submit to your consideration, whether, on occasions when the propriety of nominations appears questionable to you, it would not be expedient to communicate that circumstance to me, and thereby avail yourselves of the information which led me to make them, and which I would with pleasure lay before you." 1 Ex. Journ. 16.

[80] The Executive Patronage Bill, containing such a requirement, passed the Senate on Feb. 21, 1835, and on Feb. 3, 1836. A test vote on the Senate's right in 1850 is also on record. See Note 67, supra. Following the protest of President Cleveland, resolutions condemnatory of the Attorney General's refusal " under whatever influence " to communicate the information requested were favorably reported to the Senate, debated at length and passed. Among the members of the committee, advocating the adoption of the resolutions, were Hoar and Evarts, the two most energetic opponents of the Tenure of Office Act. Sen. Rep. No. 135, 49th Cong., 1st sess., Ser. No. 2358. The Acts of 1864 and 1873, approved by Presidents Lincoln and Grant, embody such a requirement. See Note 33, supra.

tion, with the requirement of the Act of February 12, 1873, c. 131, § 1, 17 Stat. 424 (now Rev. Stat. § 343) that the reasons for the removal of the Director of the Mint be communicated by him to the Senate. 25 Ex. Journ. 242. A construction given to the Constitution by the concurrent affirmative action of Congress and the President continued throughout a long period without interruption should be followed despite the isolated utterances, made in the heat of political controversies not involving the question here in issue by individual Presidents supported only by the advice of the Attorney General.[81]

The separation of the powers of government did not make each branch completely autonomous. It left each, in some measure, dependent upon the others, as it left to each power to exercise, in some respects, functions in their nature executive, legislative and judicial. Obviously the President cannot secure full execution of the

[81] Attorneys General Legare, Clifford, and Crittenden seem to have been of the opinion that the President possessed an absolute power of removal. 4 Op. A. G. 1, 603; 5 *ibid.* 288. Legare, however, having occasion to consider Story's contention that the power of removal might be restricted by legislation with respect to inferior officers, said that he was "not prepared to dissent from any part of this sweeping proposition." 4 *ibid.* 165, 166. In 1818 Attorney General Wirt in holding that where an Act of Congress gave the President power to appoint an officer, whose tenure of office was not defined, that officer was subject to removal by the President, said: "Whenever Congress intend a more permanent tenure, (during good behaviour, for example,) they take care to express that intention clearly and explicitly. . . ." 1 *ibid.* 212, 213. Following the passage of the Tenure of Office Act the subject was considered by Attorney General Evarts, who disposed of the problem "within the premises of the existing legislation." 12 *ibid.* 443, 449. In 1873 Attorney General Akerman refused to concede the President a power of removal in that under that Act he was limited to a power of suspension. 13 *ibid.* 300. In 1877 Attorney General Devens concurred in the provisions of the Tenure of Office Act restoring a suspended officer to his office upon the failure of the Senate to act upon the confirmation of his successor. 15 *ibid.* 375.

laws, if Congress denies to him adequate means of doing so. Full execution may be defeated because Congress declines to create offices indispensable for that purpose. Or, because Congress, having created the office, declines to make the indispensable appropriation. Or, because Congress, having both created the office and made the appropriation, prevents, by restrictions which it imposes, the appointment of officials who in quality and character are indispensable to the efficient execution of the law. If, in any such way, adequate means are denied to the President, the fault will lie with Congress. The President performs his full constitutional duty, if, with the means and instruments provided by Congress and within the limitations prescribed by it, he uses his best endeavors to secure the faithful execution of the laws enacted. Compare *Kendall* v. *United States,* 12 Pet. 524, 613, 626.

Checks and balances were established in order that this should be " a government of laws and not of men." As White said in the House, in 1789, an uncontrollable power of removal in the Chief Executive " is a doctrine not to be learned in American governments." Such power had been denied in Colonial Charters,[82] and even under Pro-

---

[82] The Connecticut Charter of 1662, vested the appointment of practically all officers in the assembly and provided that such officers were to be removable by the Governor, Assistants and Company for any misdemeanor or default. The Rhode Island Charter of 1663 contained the same provisions. The Massachusetts Charter of 1691 provided for the appointment of officers by and with the advice and consent of the Council. Under Governors Phipps and Stroughton the council asserted its rights over appointments and dismissals, and in 1741 Shirley was prevented from going back to the earlier arbitrary practice of Governor Belcher. Spencer, Constitutional Conflict in Massachusetts, 28. The Georgia Charter of 1732 provided that the common council should have power to nominate and appoint and " at their will and pleasure to displace, remove and put out such treasurer or treasurers, secretary or secretaries, and all such other officers, ministers and servants."

prietary Grants[83] and Royal Commissions.[84] It had
been denied in the thirteen States before the framing of
the Federal Constitution.[85] The doctrine of the separa-
tion of powers was adopted by the Convention of 1787,
not to promote efficiency but to preclude the exercise of
arbitrary power. The purpose was, not to avoid friction,
but, by means of the inevitable friction incident to the
distribution of the governmental powers among three
departments, to save the people from autocracy. In order
to prevent arbitrary executive action, the Constitution
provided in terms that presidential appointments be made
with the consent of the Senate, unless Congress should
otherwise provide; and this clause was construed by
Alexander Hamilton in The Federalist, No. 77, as requir-
ing like consent to removals.[86] Limiting further execu-

---

[83] As early as 1724 Mrs. Hannah Penn in her instructions to Sir
William Keith, governor of Pennsylvania, protested against his dis-
missal of the Secretary without seeking the advice of his council.
The practice of seeking such advice continued in later years. Shep-
herd, Proprietary Government in Pennsylvania, 321, 370.

[84] In the Royal Colonies there was a recognized tendency to guard
against arbitrariness in removals by making the governor respon-
sible to the home government instead of the local representative
assembly. In New Hampshire the first and second Andros Commis-
sions entrusted the power to the governor alone, but the Bellomont
Commission of 1697, the Dudley Commission of 1702, the Shute
Commission of 1716, the Burnet Commission of 1728, the Belcher
Commission of 1729, the Wentworth Commission of 1741, and the
John Wentworth Commission of 1766 were accompanied with instruc-
tions requiring either that removals be made only upon good and
sufficient cause or upon cause signified to the home government in
the "fullest & most distinct manner." In Virginia similar instruc-
tions accompanied the issuance of commissions to Governor Howard
in 1683 and to Governor Dunmore in 1771.

[85] Smith of South Carolina, June 17, 1789, 1 Ann. Cong. 471;
Gerry, June 17, 1789, 1 Ann. Cong. 504. See Note 9, *supra.*

[86] Hamilton's opinion is significant in view of the fact that it was he
who on June 5, 1787, suggested the association of the Senate with the
President in appointments, as a compromise measure for dealing

tive prerogatives customary in monarchies, the Constitution empowered Congress to vest the appointment of inferior officers, " as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Nothing in support of the claim of uncontrollable power can be inferred from the silence of the Convention of 1787 on the subject of removal. For the outstanding fact remains that every specific proposal to confer such uncontrollable power upon the President was rejected.[87] In America, as in England, the conviction prevailed then that the people must look to representative

with the appointment of judges. 1 Farrand, Records of the Federal Convention, 128. The proposition that such appointments should be made by and with the advice and consent of the Senate was first brought forward by Nathaniel Gorham of Massachusetts, " in the mode prescribed by the constitution of Masts." 2 *ibid.* 41. Later this association of the President and the Senate was carried over generally to other appointments. The suggestion for the concurrence of the Senate in appointments of executive officials was advanced on May 29 by Pinckney in his " draught of a foederal government " and by Hamilton in resolutions submitted by him on June 18, 1787, 1 *ibid.* 292; 3 *ibid.* 599.

[87] Rogers, Executive Power of Removal, 11, 39. On August 6, 1787, the Committee of Five reported the draft of the Constitution that in Art. X, Sect. 2, provided for a single executive who " shall appoint officers in all cases not otherwise provided for by this Constitution." 2 Farrand, Records of the Federal Convention, 185. On August 20 propositions were submitted to the Committee of Five for the creation of a Council of State consisting of the Chief Justice, the Secretaries of domestic affairs, commerce and finance, foreign affairs, war, marine and state. All the Secretaries were to be appointed by the President and hold office during his pleasure. 2 *ibid.* 335–337. That proposition was rejected because " it was judged that the Presidt. by persuading his Council—to concur in his wrong measures, would acquire their protection. . . ." 2 *ibid.* 542. The criticism of Wilson, who had proposed the Council of State, and Mason of the Senate's participation in appointments was based upon this rejection. The lack of such a Council was the " fatal defect " from which " has arisen the improper power of the Senate in the appointment of public officers." 2 *ibid.* 537, 639.

assemblies for the protection of their liberties.   And pro-
tection of the individual, even if he be an official, from
the arbitrary or capricious exercise of power was then
believed to be an essential of free government.